Nos. 2014-1225

IN THE

United States Court of Appeals for the Federal Circuit

DOWNHOLE PIPE & EQUIPMENT, L.P., and
DP-MASTER MANUFACTURING CO., LTD,

Plaintiff-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

VAM DRILLING USA, TEXAS STEEL CONVERSIONS, INC.,
ROTARY DRILLING TOOLS, TMK IPSCO, AND U.S. STEEL CORP,

Defendant-Appellees.

Appeal from the United States Court of International Trade in
Case no. 11-CV-00081,
Judge Nicholas Tsoucalas

**NON-CONFIDENTIAL BRIEF FOR PLAINTIFF-APPELLANTS
DOWNHOLE PIPE & EQUIPMENT, L.P., and
DP-MASTER MANUFACTURING CO., LTD,**

/s/ Mark B. Lehnardt
Mark B. Lehnardt

LEHNARDT & LEHNARDT LLC
20 Westwood Drive
Liberty, MO 64068
Tel: (816) 407-1400

Fax: 816-407-9049
e-mail: Mark@Lehnardt.com
*Counsel for Downhole Pipe &*
*Equipment, L.P., and DP-Master*
*Manufacturing Co., Ltd,*

Date: March 11, 2014

# CERTIFICATE OF INTEREST

Counsel for plaintiff-appellants Downhole Pipe & Equipment, L.P., and DP-Master Manufacturing Co., Ltd., certifies the following:

1.     The full name of every party or amicus represented by me is:

**Downhole Pipe & Equipment, L.P., and DP-Master Manufacturing Co., Ltd.**

2.     The name of the real party in interest represented by me is:

**Downhole Pipe & Equipment, L.P., and DP-Master Manufacturing Co., Ltd.**

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party of amicus curiae represented by me are: **None.**

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:  **LEHNARDT & LEHNARDT, LLC (Mark B. Lehnardt).**

Dated:  March 11, 2014                    /s/ Mark B. Lehnardt_____
                                          Mark B. Lehnardt

                                          *Counsel for Plaintiff-Appellants*
                                          *Downhole Pipe & Equipment, L.P.,*
                                          *and DP-Master Manufacturing Co.,*
                                          *Ltd.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................................................iv

STATEMENT OF RELATED CASES ............................................................1

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES.....................................................................1

STATEMENT OF THE CASE.........................................................................2

STATEMENT OF THE FACTS ......................................................................3

     I.     THE PRODUCT INVESTIGATED ....................................................3

          A.     Production of Drill Pipe ...............................................................4

          B.     Production of Green Tube.............................................................4

          C.     Upsetting and Heat Treatment .....................................................5

          D.     Green Tube Chemistry .................................................................8

          E.     Tool Joints and Friction Welding ...............................................9

     II.     PROCEDURAL BACKGROUND......................................................10

          A.     Pre-Initiation of the Investigation .............................................10

          B.     Initiation of the Investigation.....................................................11

          C.     The Preliminary Determination .................................................12

          D.     The Final Determination and Order...........................................15

          E.     Appeal to the Trade Court..........................................................17

SUMMARY OF THE ARGUMENT .............................................................22

ARGUMENT .................................................................................................26

I. STANDARD OF REVIEW ................................................................26

II. GREEN TUBE IS NOT PROPERLY INCLUDED IN THE SCOPE, THUS COMMERCE MUST RECALCULATE INDUSTRY SUPPORT ........................................................................................29

    A. Legal Background..................................................................30

    B. The Record lacks substantial evidence to support Commerce's determination that drill-pipe green tube can be distinguished from OCTG green tube based upon three criteria ....................30

    C. Without Green Tube Production Volume, the Petition Lacks Industry Support.........................................................................32

    D. The CIT Improperly Rejected Downhole's Arguments ...........33

III. COMMERCE HAS FAILED TO PROVIDE SUBSTANTIAL EVIDENCE TO SUPPORT ITS ABERRANTLY-HIGH-VALUED GREEN TUBE SV SELECTION ......................................................35

    A. Commerce did not adequately address Downhole Pipe's argument that the $4,978.11 AUV of IHTS 7304.59.20 is aberrantly high ........................................................................37

    B. Commerce's Legal Analysis of IHTS Alternatives in India HTS 7304 Analysis Is Inadequate .....................................................43

    C. Commerce Does Not Cite To Adequate Justification For Ignoring The Alternatives Provided By Downhole ..................55

CONCLUSION ........................................................................................61

CONFIDENTIAL MATERIAL OMITTED

All omitted material is subject to administrative protective order: the material omitted on pages 5 and 40-41 contains, or could reveal, Petitioners confidential information related to production costs and sales pricing; the material omitted on pages 6-7 describes proprietary American Petroleum Institute specifications; the material omitted on page 9 describes DP-Master's production costs.

# TABLE OF AUTHORITIES

Page

## Cases

*Acciai Speciali Terni S.P.A. v. United States*, 118 F. Supp. 2d 1298 (Ct. Int'l Trade 2000) ........................................................................................... 28, 41

*Ad Hoc Shrimp Trade Action Committee v. United States*, 618 F.3d 1316 (Fed. Cir. 2010) ...................................................................................................55

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, (1998) ............... 28, 41

*Anshan Iron & Steel Co. v. United States*, 27 CIT 1234 (2003) ............................57

*Baxter Healthcare Corp. of Puerto Rico v. United States*, 182 F.3d 1333 (Fed.Cir.1999) ..................................................................................................52

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) ........................................................................................... 27, 48

*Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 20,335 (Dep't of Commerce April 16, 2010) (final)....................................31

*Changhong Elec. Co. v. United States*, 460 F. Supp. 2d 1338 (Ct. Intl. Trade 2006) .............................................................................................................57

*Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ..................................................................................38

*Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 59 S. Ct. 206 (1938)............... 27, 38

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006)...........39

*Downhole Pipe & Equip., L.P. v. United States*, 887 F. Supp. 2d 1311 (Ct. Int'l Trade 2012) .................................................................... 3, 17, 33, 47

*Downhole Pipe & Equipment, L.P. v. United States*, 949 F. Supp. 2d 1288 (Ct. Int'l Trade 2013) .................................................................... 1, 41, 52

*Downhole Pipe & Equipment, L.P., et al. v. United States*, 949 F.Supp.2d 1288 (Ct. Int'l Trade 2013) ............................................................................3

*Gallant Ocean (Thailand) Co., Ltd. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ...................................................................................................38

*Goldlink Indus. Co. v. United States*, 431 F.Supp.2d 1323 (Ct. Int'l Trade 2006)..28

*Husteel Co. v. United States*, 491 F. Supp. 2d 1283 (Ct. Int'l Trade 2007)............29

*Labor Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292 (1939) ... 28, 55

iv

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) .....................27

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008)......27

*NTN Bearing Corp. v. United States*, 705 F. Supp. 594 (Ct. Int'l Trade 1989)......32

*PT Pindo Deli Pulp and Paper Mills v. United States*, 825 F. Supp. 2d 1310 (Ct. Int'l Trade 2012) ..........................................................................................34

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed.Cir.1990).....................38

*Save Domestic Oil, Inc. v. United States*, 116 F. Supp. 2d 1324 (Ct. Int'l Trade 2000) ........................................................................................................34

*Save Domestic Oil, Inc. v. United States*, 240 F. Supp. 2d 1342 (Ct. Int'l Trade 2002) ........................................................................................................34

Save Domestic Oil, Inc. v. United States, 357 F.3d 1278 (Fed. Cir. 2004) ...........34

*Shakeproof Assembly Components v. United States*, 268 F.3d 1376 (Fed.Cir.2001) .............................................................................................................28

*Suramerica De Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994)......................................................................................27

*USX Corp. v. United States*, 655 F. Supp. 487 (Ct. Int'l Trade 1987) ...................28

*Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, Slip Op. 13-30 (Ct. Int'l Trade Mar. 11, 2013) ................................................................39

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ..............................................................................................37

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).......................................................................................29

**Statutes**

19 U.S.C. § 1516a .........................................................................................................1

19 U.S.C. § 1677(35) ...................................................................................................36

19 U.S.C. § 1677b(c)(1)...............................................................................................36

19 U.S.C. §1677f-1(e)(1)..............................................................................................36

28 U.S.C. § 1295(A)(5).................................................................................................1

28 U.S.C. § 1581(c) .......................................................................................................1

## Other Authorities

*Uruguay Round Agreements Act, Statement of Administrative Action*, H.R .Rep. NO. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ..............................34

## Administrative Determinations

*Certain Oil Country Tubular Goods From the People's Republic of China*, 74 Fed. Reg. 64,045, 64,046 (Dep't of Commerce Dec. 7, 2009) (CVD final) ...............11

*Drill Pipe From the People's Republic of China*, 75 Fed. Reg. 4,531 (Dept' of Commerce Jan. 28, 2010) (initiation) ...................................................... 2, 11, 12

*Drill Pipe from the People's Republic of China*, 75 Fed. Reg. 51,004, 51,013 (Dep't of Commerce Aug. 18, 2010) (prelim)....................................... 12, 13, 29

*Drill Pipe from the People's Republic of China*, 76 Fed. Reg. 11,757 (Dep't Commerce) (March 3, 2011) (antidumping duty order).............................. 16, 45

*Drill Pipe From the People's Republic of China*, 76 Fed. Reg. 1966 (Dep't Commerce Jan. 11, 2011) (final) ................................................................. passim

*Final Results of Redetermination Pursuant to Court Remand, Drill Pipe from the People's Republic of China, Downhole Pipe & Equip., L.P. v. United States*, Court No. 11-00081 (CIT 2012) (May 13, 2013)....................................... passim

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding in the lower court was previously before this Court or any other appellate court. Counsel knows of no case pending before this or any other court that stands to be affected by the Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1295(A)(5) as an appeal from the U.S. Court of International Trade ("CIT"). The CIT had subject matter jurisdiction under 28 U.S.C. § 1581(c), which gives the CIT jurisdiction over any action commenced with respect to final determinations of the U.S. Department of Commerce ("Commerce") under 19 U.S.C. § 1516a. This appeal is timely. Downhole Pipe & Equipment, L.P. ("Downhole"), and DP-Master Manufacturing Co., Ltd. ("DP-Master"), filed their notices of appeal on January 3, 2014, within 60 days of the CIT's final judgment issued on November 4, 2013, in *Downhole Pipe & Equipment, L.P., et al v. United States*, 949 F. Supp. 2d 1288 (Ct. Int'l Trade 2013).

## STATEMENT OF THE ISSUES

1.    The trial court erred by concluding (1) that Appellants had not properly challenged the scope of the investigation; (2) that green tube was properly included

within the scope of the investigation; and, consequently, (3) that the domestic industry support requirement was satisfied.

2. The trial court erred by holding that the green-tube surrogate value selection by the U.S. Department of Commerce was supported by substantial evidence and in accordance with law.

## STATEMENT OF THE CASE

This appeal concerns the inclusion of green tube in the scope of the investigation and in the calculation of industry support by Commerce. *Drill Pipe From the People's Republic of China*, 75 Fed. Reg. 4,531 (Dep't of Commerce Jan. 28, 2010) (initiation) ("*Initiation*") (PJA527-PJA531); Antidumping Duty Investigation Initiation Checklist ("*Checklist*") (PJA495-PJA526); *Drill Pipe From the People's Republic of China*, 76 Fed. Reg. 1966 (Dep't Commerce Jan. 11, 2011) (final) ("*Final Determination*") (PJA2025-PJA2030), *Dec. Mem*. (PJA1890-PJA1938). This appeal also concerns the surrogate value for green tube selected by Commerce for DP-Master in the antidumping duty ("AD") investigation of drill pipe from the People's Republic of China ("PRC"). *Final Determination* (PJA2025-PJA2030), *Dec. Mem.* (PJA1890-PJA1938).

Appellant Downhole Pipe & Equipment, L.P., is a U.S. importer of drill pipe produced by appellant DP-Master Manufacturing Co., Ltd., a foreign producer of drill pipe that was individually investigated. Appellants challenge the lawfulness

of including green tube within the scope of the investigation, and consequently of

including green-tube production volume in the industry support calculation. The

green-tube scope and industry support determinations were affirmed by the CIT in

*Downhole Pipe & Equip., L.P. v. United States*, 887 F. Supp. 2d 1311 (Ct. Int'l

Trade 2012) ("*Downhole I*") (PJA21-PJA40)  Appellants also challenge the

lawfulness of Commerce's green-tube surrogate-value selection, as redetermined

following remand by the CIT.  *Final Results of Redetermination Pursuant to Court*

*Remand, Drill Pipe from the People's Republic of China*, *Downhole Pipe &*

*Equip., L.P. v. United States*, Court No. 11-00081 (CIT 2012) (May 13, 2013)

("*Remand*") (PJA2388-PJA2406).  The green-tube surrogate-value selection was

affirmed by the CIT in *Downhole Pipe & Equipment, L.P., et al. v. United States*,

949 F.Supp.2d 1288 (Ct. Int'l Trade 2013) ("*Downhole Pipe II*") (PJA1-PJA20).

Appeal from these final decisions is made to this Court.

## STATEMENT OF THE FACTS

## I.    THE PRODUCT INVESTIGATED

This case focuses upon green tube, which is the primary input in the

production of drill pipe.  Essential background regarding drill pipe and the role of

green tube is set forth below.

## A. Production of Drill Pipe

Drill pipe is used to drill for oil and gas. Drill pipe is typically about 30 feet long and has connectors (called "tool joints") on each end that allow each drill pipe section to connect with other drill pipe. *Petition for the Imposition of Antidumping and Countervailing Duties: Drill Pipe From the People's Republic of China* ("*Petition*"), at 21 (PJA76). Drill pipe connected together (with a drill bit at the end) form a drill string, which is the drilling tool. *Id.*

The production of drill pipe can be segmented into three phases. *Petition* at 9-11 (PJA77-PJA79). First, the primary input into drill pipe is a seamless tube – called "green tube" – which is produced from raw steel. *Id.* Second, green tubes are upset (have the ends thickened) and are heat treated. *Id.* Third, tool joints are friction welded to each end of the upset-and-heat-treated green tubes. *Id.* These processes are described below.

## B. Production of Green Tube

First, the production of green tube begins with a round or square billet (which is rounded) that is pierced, or pierced and extruded, to form a hole down the middle. *Id.* at 9-11, Ex. I-9 (PJA77-PJA79, PJA150). The resulting tube is rolled with a fixed plug or mandrill to reduce the wall thickness and make it uniform. *Id.* Finally, the tube is further rolled to the desired size. *Id.*; *DP-Master's* June 22, 2010 Submission at Ex. SV-33 ("*Smith Decl.*") (PJA659-PJA660). An

CONFIDENTIAL INFORMATION DELETED FROM THIS PAGE

uncontroverted industry expert explained that the [

]. [

].

The wall thickness, outside diameter, length, and other properties of the green tube are produced to industry standards published by the American Petroleum Institute ("API") or to proprietary grades. *DP-Master's Sept. 14, 2010 Submission*, Ex.3 ("*API Standards II*") (CJA1971-CJA1988). Some OCTG green tube have minimum requirements for alloying elements, Molybdenum and Chromium, in the steel, while one industry expert explained that drill pipe typically has amounts of Molybdenum and Chromium in a certain range. *Id.* (PJA1981); *DP-Master's Sept. 23, 2010 Submission* Ex.2 ("*Miller Decl.*") (PJA1752); *DP-Master's Sept. 23, 2010 Submission* Ex.2 ("*Williamson Declaration*") (PJA1756).

An uncontroverted industry expert set the value green tube at 30% of the value of finished drill pipe. *See Smith Decl.* (PJA659-PJA660).

## C.   Upsetting and Heat Treatment

According to the website of petitioner TMK IPSCO, green tube may be processed into OCTG or drill pipe, depending upon the finished processes. *Dowhnhole's Jan. 15, 2010 Submission*, Ex.B (PJA435). "{G}reen tube cannot become drill pipe without significant further processing . . . because it must be

CONFIDENTIAL INFORMATION DELETED FROM THIS PAGE

upset (thickened) to allow the satisfactorily strong attachment of a tool joint pin or

box." *Id.* Petitioners explained:

> green tubes are first processed by heating the ends of the
> {green tube} to forging temperature and then quickly
> inserting the pipe ends into a special forging press or
> upsetter. The press will form a pipe upset that is thicker
> than the pipe wall by pressing the hot metal around a set
> of special forging dies. Dimensional tolerances are
> required for the various pipe sizes and upset
> configurations, all of which are controlled by API
> dimensional tolerances.

*Petition* at 10 (PJA78); *DP-Master's June 22, 2010 Submission*, Ex.SV-32 ("*API*

*Standards I*") (PJA656-PJA657); *Smith Decl.* (PJA659). "Upset quality, especially

the shape of the transition in thicknesses, is essential for proper drill pipe fatigue

life." *Williamson Decl.* (PJA1755); *Smith Decl.* (PJA659). If the transition is

improper, the "improper fade out {from upsetting} can be cut from the end of the

tube, and the upset process can be attempted a second time." *Smith Decl.*

(PJA659).

"The upset pipe is then heat treated by any of several methods of thermal

processes to the desired API grade, with the drill pipe processor using a specific

green tube chemistries to produce the final API drill pipe grade, depending upon

their thermal treatment process." *Petition* at 10 (PJA78); *Smith Decl.* (PJA659-

PJA660); *API Standards II* (CJA1973) ("[

].")."The heat treatment process alters the

6

CONFIDENTIAL INFORMATION DELETED FROM THIS PAGE

microstructure of the steel such that it is the heat treatment process that is applied that will determine the ultimate yield strength of the OCTG or drill pipe." *DP-Master's Sept. 14, 2010 Submission*, Ex. 2 ("*Liu Decl.*") (PJA1696-PJA1703, PJA1709); *Smith Decl.* (PJA660).

There are several different heat treatment methods, including normalize, normalize and temper, and quench and temper, which vary in intensity with quench and temper the most intense, and normalize the least intense. *Liu Decl.* (PJA1712-PJA1714); *API Standards II* (CJA1979) ("[

].").  All drill pipe and most OCTG must be quench & temper heat treated. *Liu Decl.* (PJA1715); *API Standards II* (CJA1979).  Some OCTG may be subject to lesser heat treatment, such as J/K55 casing and tubing, which "are not heat treated ('Q&T') products," *Miller Decl.* (PJA1751), but rather are "normalize & temper" or simply "normalize" heat treatment product. *Liu Decl.* (PJA1715-PJA1716); *API Standards II* (PJA1979).  Petitioners described upsetting and heat treating as "capital and labor intensive operations." *Petrs' Feb. 12, 2010 Submission* at 4 (PJA535).  According an uncontroverted industry expert, the value of upsetting and heat-treating is 20% of the value of finished drill pipe with tool joints attached. *Smith Decl.* (PJA660).

### D.  Green Tube Chemistry

In addition to the heat-treatment process, the chemistry of the steel comprising the green tube is an important factor in determining the strength of finished drill pipe. *Liu Decl.* (PJA1709); *Miller Decl.* (PJA1751); *Williamson Decl.* (PJA1755). These "chemistry costs are affected by world prices of alloying elements"; thus, "the cost affect is the same around the world." *Liu Decl.* (PJA1709).

According to industry experts and API Standards, green tube used to produce drill pipe and green tube used to produce OCTG contain overlapping requirements for percentages of alloying elements. *API Standards II* (PJA1981); *Miller Decl.* (PJA1751-PJA1752); *Williamson Decl.* PJA1755-PJA1756; *Downhole Br.*, Att. 1 (CJA2374). Thus, "{d}epending on the type of . . . {OCTG}, the chemistry difference in the green tube used to produce them results in green tube prices that can be either lower or higher than drill-pipe green tube prices." *Liu Decl.* (PJA1710-PJA1711).

One industry expert explained that, although the API sets no standard for alloying chemistry in green tube used to make drill pipe, such green tube typically has 0.16% to 0.75% molybdenum and 0.75% to 1.50% chromium. *Miller Decl.* (PJA1752). This same alloying chemistry range is within the API range for green

8

CONFIDENTIAL INFORMATION DELETED FROM THIS PAGE

tube used to produce at least four types of OCTG: C90, T95, P110, and Q125. *API Standards II* (CJA2374); *Downhole Br.*, Att. 1 (CJA2374).

International pricing for molybdenum during the period of investigation ("POI") can be converted to a per metric ton price and multiplied by the chemistry percentages reported by petitioners. *See DP-Master's Sept. 14, 2010 Submission*, Ex.4 ("*Mineral Industry Surveys*") (PJA1723). For example, J/K55 OCTG may have 0% molybdenum, which is 0.16% to 0.75% less than the molybdenum content in drill-pipe green tube. *Miller Decl.* (PJA1752). By multiplying the molybdenum content percentage by the per metric ton ("MT") price of molybdenum, the difference in pricing calculates to approximately $86.32 per MT. *See id.; Mineral Industry Surveys* (PJA1723). Drill-pipe green tube as compared to J/K55 OCTG generally has an additional 0.5% to 1.0% chromium, or an average additional cost of $33.39 per MT. *Miller Decl.* (PJA1752); *Downhole's Pre-Draft Remand Cmts.* at 20 (PJA2185). The alloying element cost averages $119.71 per MT, and resulting in green tube prices that are approximately $[     ] higher. *Id.*; *Liu Decl.* (PJA1710).

### E. Tool Joints and Friction Welding

"If the heat treatment has been performed properly, the upset and heat-treated tube has . . . the necessary strength to perform as drill string, after tool joints have been properly attached." *Smith Decl.* (PJA660). Tool joints allow

individual drill pipe to connect together, thus, "the male tool joint section (or pin) is attached to one end of the length of drill pipe and the female tool joint section (or box) is attached to the other end." *Petition* at 10 (PJA78). Tool joints are friction welded to each end of the upset and heat-treated tube. *Petition* at 10-11 (PJA78-PJA79); *Smith Decl.* (PJA659-PJA660). Friction welding is accomplished by the heat created from rotational friction when the tool joint and pipe are pressed together. *Id.*

## II.    PROCEDURAL BACKGROUND

### A.    Pre-Initiation of the Investigation

Petitioners submitted their petitions for antidumping and countervailing duties on December 31, 2009. (PJA56)  In response to supplemental question by Commerce, Petitioners explained that petitioner TMK-IPSCO, and non-petitioning producers U.S. Steel and Timken produce unfinished drill pipe (green tube), while others produce drill pipe. *Petrs' January 8, 2010 Submission* at 8 (PJA2478).

Prior to initiation, and per 19 U.S.C. § 1673a(c)(4)(E), Downhole submitted comments related to the proposed scope of the investigation, arguing that green tube could not be included within the scope because it was already covered by the then on-going investigation into oil country tubular goods ("OCTG") from China. *DP-Master's Jan. 15, 2010 Submission* ("*Industry Support Submission I*") at 1-2 & n.1 (PJA412-PJA413) (*citing Certain Oil Country Tubular Goods From the*

*People's Republic of China*, 74 Fed. Reg. 64,045, 64,046 (Dep't of Commerce

Dec. 7, 2009) (CVD final); *DP-Master's Jan. 19, 2010 Submission* ("*Industry*

*Support Submission II*") at 1-2 (PJA445-PJA446). Downhole also argued that,

because the Drill Pipe investigation could not include green tube already covered

by the OCTG investigation, Commerce should disregard green tube production

volume for purposes of its calculation of domestic industry support. *Industry*

*Support Submission I* at 2 (PJA413); *Industry Support Submission II* at 2

(PJA446); 19 U.S.C. § 1673a(c)(4)(A)(i).

    **B.    Initiation of the Investigation**

    Commerce published its initiation of the AD investigation on January 28,

2010, pursuant to the petition filed by the VAM Drilling USA, Inc., Texas Steel

Conversion, Inc., Rotary Drilling Tools, TMK IPSCO, and the United Steel, Paper,

and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service

Workers International Union, AFL-CIO-CLC ("Union") (collectively

"Petitioners"). *Initiation*, 75 Fed. Reg. 4,531 (PJA527-PJA531). Commerce

determined that there was sufficient domestic industry support, taking into account

the green tube production volume of the three green tube producers. *Initiation*

*Checklist* Att.2 (PJA506-PJA514).

    In investigations involving products from countries designated as having

non-market economies, Commerce calculates dumping margins on the basis of a

normal value constructed from SVs for each product input. *Initiation Checklist* at

7-10 (PJA501-PJA504). Commerce initiated the drill pipe AD investigation with

estimated dumping margins of 429.53% to 496.93% based on, *inter alia*, a green

tube SV of $3,257 per MT.[1] *See Initiation*, 75 Fed. Reg. at 4,534 (PJA530);

*Initiation Checklist* (PJA523). Within the time allotted, both Petitioners and

Downhole submitted comments regarding the scope of the investigation, with

Downhole reiterating arguments made in its two pre-initiation submissions, while

submitting additional information. *DP-Master's Feb. 12, 2010 Submission*

(PJA541-PJA563); *Petrs' Feb. 12, 2010 Submission* (PJA532-PJA540).

### C. The Preliminary Determination

Commerce calculated DP-Master's preliminary dumping margin at 206%,

on the basis of a green tube SV of $1,313.33 per MT. *Drill Pipe from the People's*

*Republic of China*, 75 Fed. Reg. 51,004, 51,013 (Dep't of Commerce Aug. 18,

2010) (prelim) ("*Preliminary Determination*") (PJA1663-PJA1674); *Surrogate*

*Values of the Preliminary Results* ("*Prelim SV Memo*") at 7 (PJA1327). As the

---

[1] For purposes of initiation, Commerce used a SV of $35,633.83 per MT for the other major input, tool joints. *Initiation Checklist* (PJA523). Commerce used this same $35,633.83 per MT tool-joint SV in the *Preliminary Determination*. *Drill Pipe from the People's Republic of China*, 75 Fed. Reg. 51,004, 51,013 (Dep't of Commerce Aug. 18, 2010) (prelim) ("*Preliminary Determination*") (PJA1663-PJA1674); *Surrogate Values of the Preliminary Results* ("*Prelim SV Memo*") at 7 (PJA1327). Commerce changed the tool-joint SV for the final to approximately $5,000 per MT for tool joints DP-Master produced, and approximately $10,000 per MT for tool joints DP-Master purchased. *Final Determination*, 76 Fed. Reg. at 1,967 (PJA2026); *Dec. Mem.* at 24-29 (PJA1913-PJA1918).

green-tube SV, Commerce used prices published in the *Metal Bulletin Report, Seamless Pipe and Tube Monthly* ("MBR"), for an Oil Country Tubular Goods ("OCTG") product, J/K55, which has overlapping physical dimensions and yield strength to drill-pipe green tube. *Id.*

Commerce also conditionally included "green tubes suitable for drill pipe" within the scope of the investigation, and excluded "unfinished tubes for casing or tubing covered by any other antidumping or countervailing duty order." *Preliminary Determination*, 75 Fed. Reg. at 51,005 (PJA1665). Commerce noted, however, the parties' comments related to the scope of the investigation, and stated its intention to remove green tube from the scope of the investigation unless green tube used to produce OCTG could be distinguished from "green tube suitable for drill pipe":

> Unless specific characteristics are provided which distinguish between green tube for drill pipe and green tube for casing and tubing, all green tubes (other than green tube drill collars) will be removed from the scope of the antidumping and countervailing duty investigations on drill pipe from the PRC and will instead be considered as covered under the existing antidumping and countervailing duty orders on OCTGs from the PRC.

*Preliminary Determination*, 75 Fed. Reg. at 51,006 (PJA1666).

After the *Preliminary Determination*, Petitioners filed additional comments regarding the scope, conceding that if there were no discernable differences between green tube suitable for OCTG and for drill pipe, then green tube suitable

13

for drill pipe would be covered by the OCTG orders. *Petrs' Sept. 13, 2010 Submission* at 7 (PJA1681). But Petitioners argued that green tube suitable for drill pipe could be distinguished based upon three properties: first, an industry expert stated that typical drill pipe contained specific percentages of alloying elements molybdenum (0.16%-0.75%) and Chromium (0.75%-1.45%); second, Petitioners asserted that green tube suitable for drill pipe could be distinguished based upon its seamless nature; and third, Petitioners asserted that the outside diameter of green tube suitable for drill pipe was also a distinguishing property. *Id.* at 2-7 (PJA1676-PJA1681).

DP-Master submitted rebuttal comments, including API documentation demonstrating that none of these properties distinguished green tube suitable for drill pipe from green tube suitable for OCTG. *DP-Master Sept. 23, 2010 Submission* at 1-11 (PJA1729-PJA1739). In particular, Petitioners' industry expert and API documents established a complete overlap in percentages of alloying elements among OCTG products C90, T95, P110 and Q125; and a complete overlap in seamless nature with nearly all OCTG products. *Id.* at 3-5 (PJA1731-PJA1733).

Downhole submitted an administrative case brief that, among other things, reiterated that Commerce must remove green tube from the scope. *See Downhole Case Br.* at 27-30 (PJA2142-PJA2145. Petitioners argued that

14

Commerce should select as the green tube SV, the average of the AUVs of

IHTS 7304.23 (drill pipe) and 7304.29 (OCTG), reasoning, *inter alia*, that these

IHTS categories were more product-specific to drill-pipe green tube. *Petrs*

*Case Br.* at 18 (PJA1806). Petitioners attached customs rulings related to

classification of drill pipe under HTSUS 7304.20.80 (the predecessor to HTSUS

7304.23.90) and HTSUS 8431.43.8010 (drill pipe with tool joints attached), and

argued that "U.S. Customs Rulings specify that the tube component of drill pipe

is classified under USHTS 7304." *Id.* at 20 (PJA1808). In its rebuttal brief,

Downhole argued that record evidence established that no green tube entered

during the POI under IHTS 7304.23 and 7304.29, and pointed to alternative

record information that could be used as the green tube SV. *Downhole Rebuttal*

*Case Br.* at 10-12 (PJA1881-PJA1883).

## D. The Final Determination and Order

Commerce published its final determination on January 11, 2011,

calculating a dumping margin of 69.32%, having selected a new green tube SV of

$2,511.67,[2] which was the average of the AUVs of IHTS 7304.23 and 7304.29.

*Final Determination*, 76 Fed. Reg. at 1,970 (PJA2029); *Surrogate Values for the*

*Final Determination* ("*Final SV Memo*") at 3 (PJA1941). Commerce recognized

Petitioners' argument that HTS 7304.23 and 7304.29 "are the proper HTS

---

[2] This $2,511.67 is an approximate value derived from the value in Indian Rupees.

categories for green tube based on Customs rulings," *Dec. Mem.* at 29 (PJA1918),

but also acknowledged "that U.S. Customs rulings do not influence the

categorization of products in the IHTS." *Dec. Mem.* at 31 (PJA1920)   Still,

Commerce determined that these IHTS were "product-specific to the green tubes

used in the production of drill pipe" and were the best available information

despite the fact that they were "basket categories including more finished

merchandise." *Id.*

The final scope of the investigation was modified to include some green

tube, specifically:

> seamless tubes with an outer diameter of less than or
> equal to 6 5⁄8 inches (168.28 millimeters), containing
> between 0.16 and 0.75 percent  molybdenum, and
> containing between 0.75 and 1.45 percent chromium.

*Final Determination*, 76 Fed. Reg. at 1967 (PJA2016).  Commerce also clarified

that the scope did not "include unfinished tubes for casing or tubing covered by

any other antidumping or countervailing duty order." *Id.*

Following an affirmative final injury determination by the ITC, Commerce

published the AD order on March 3, 2011.  *Drill Pipe from the People's Republic*

*of China*, 76 Fed. Reg. 11,757 (Dep't Commerce) (March 3, 2011) (antidumping

duty order) (PJA2031-PJA2032).

### E.    Appeal to the Trade Court

Downhole appealed certain aspects of the *Final Determination*, including the inclusion of green tube within the scope and its consequent effect on the industry support calculation, and also the green tube SV.  The CIT determined that Downhole's scope argument "turns on whether modifying the scope during the course of an antidumping investigation requires Commerce to recalculate industry support."  *Downhole I*, 887 F. Supp. 2d at 1318 (PJA28).  The Court rejected Downhole's scope arguments, however, reasoning that Commerce had the discretion to determine the scope of the investigation, and could not reconsider industry support after the initiation.  *Id.* at 1319-20 (PJA29-PJA30).

The CIT remanded, however, the $2,511.67 green tube SV because it was not supported by substantial evidence on the record.  *Downhole I*, 887 F. Supp. 2d at 1323-25 (PJA33-PJA35).  Specifically, the Court concluded that the Department selected the IHTS data – and rejected MBR J/K55 data – based upon the Department's unsupported finding that green tube used to produce drill pipe actually entered India under IHTS categories 7304.23 and 7304.29 during the POR. *Downhole I*, 887 F. Supp. 2d at 1324 (PJA34).  The Court rejected this conclusion, stating that "{e}ven the most generous interpretation of the Infodrive data cannot support Commerce's explicit finding that the data 'definitively show entries of green tube.'"  *Id*.  The Court further noted that both the J/K55 and IHTS

17

categories were "comparable to drill-pipe green tube," but also noted that the IHTS

categories for drill pipe and OCTG appeared to be "highly distorted by expensive,

finished tubular goods." *Id* at 1325 (PJA35).

### 1. Remand Proceedings

Prior to Commerce issuing its draft remand, Downhole submitted comments

providing record citations to relevant information for the alternative green tube SV,

prior to Commerce's issuing draft remand redetermination. *Downhole's Pre-Draft*

*Remand Comments* (PJA2171-PJA2201). Downhole included information

regarding chromium pricing during the period of investigation ("POI") (which

Petitioners had submitted only on the record of the parallel countervailing duty

investigation), to complement the POI molybdenum pricing already on the record.

*Id.* at Att.2 (PJA2185).

Thirteen days later, Commerce placed new information upon the

administrative record – quantity and value information for POI entries under Indian

Harmonized Tariff Schedule ("HTS") classification 7304.59.10 and 7304.59.20.

*Commerce's Request for Comments on New Information* (PJA2202-PJA2204).

Downhole and Petitioners filed comments and rebuttal comments regarding the

new factual information. *See Downhole's Feb. 8, 2013 Submission* (PJA2205-

PJA2221); *Petrs' Feb. 8, 2013 Submission* (PJA2222-PJA2232); *Petrs' Feb. 13*

*2013 Submission* (PJA2233-PJA2242); *Downhole's Feb. 13, 2013 submission* (PJA2243-PJA2259).

Two days before issuing its draft remand redetermination ("*Draft Remand*"), Commerce placed a memo ("*NIS Memo*") on the record containing 2 sentences about a contact during the week of January 7, 2013, that Commerce had with a Customs and Border Protection ("CBP") National Import Specialist ("NIS"), during which the NIS "confirmed that drill-pipe green tubes would be categorized under HTS 7304.59." *NIS Memo* (PJA2259). No letter, email, or other memo was placed on the record to provide detail about the contact with CBP.

In the *Draft Results of Redetermination Pursuant to Remand* ("*Draft Remand*"), Commerce abandoned its position that the $2,511.67 green tube SV from the IHTS for drill pipe and OCTG provided a product-specific SV, and selected a new green tube SV of approximately $4,200 per metric ton, based upon average of the AUVs of IHTS 7304.59.10 and 7304.59.20. *Draft Remand* at 4-18 (PJA2261-PJA2278). Commerce determined that IHTS 7304.23 and 7304.29 contained semi-finished drill pipe and semi-finished OCTG and could be dismissed on their face as improper classifications for drill-pipe green tube, and thus were not specific to drill-pipe green tube. *Draft Remand* at 15 (PJA2275). Further, Commerce relied upon the *NIS Memo* to support its determination that IHTS 7304.59.20 was product specific to green tube. *Id.*

19

In Downhole's comments on remand, Downhole pointed to significant flaws in the *NIS Memo* and argued that Commerce's reliance upon that memo was unreasonable. *See Downhole's Draft Remand Cmts.*, at 5-7 (PJA2287-PJA2289). Downhole also submitted Infodrive data covering all entries under IHTS 7304.59.10, to demonstrate that there were no entries of drill-pipe green tube under that category during the POI. *Id.* at 7-9 (PJA2289-2291). Downhole also submitted Infodrive data for IHTS 7304.59.20, covering 60% of entries under that category, to demonstrate that none of the Infodrive-data entries were drill-pipe green tube. *Id.* Further, Downhole noted that Petitioners had argued that IHTS 7304.23 and 7304.29 (for drill pipe and OCTG) were more specific to green tube than IHTS 7304.59.20. *Id.* at 3 (PJA2285) (*citing Petition* at II-6 to II-9 & nn.9-10 (PJA207-PJA210)). Downhole also submitted import records demonstrating that petitioner VAM Drilling imported its green tube under HTS 7304.23. *Id.* at 3, Att.A (PJA2285, PJA2294-PJA2298). Finally, Downhole argued that the significantly higher value of the new green tube SV should cause Commerce to reevaluate its accuracy under Commerce's duty to calculate margins as accurately as possible. *Id.* at 2 (PJA2284).

Petitioners did not submit comments on draft remand or rebuttal comments on draft remand.

## 2.    Decision After Remand

Commerce filed its final remand redetermination ("*Remand*") on May 13, 2013.  (PJA2388-PJA2406).  In the *Remand*, Commerce explained that – after reviewing the HTS categories and contacting CBP – Commerce had determined that IHTS 7304.59 was the proper IHTS classification for drill-pipe green tube, and that IHTS 7304.23 and 7304.29 were not proper classifications for drill-pipe green tube.  *Remand* at 5, 7-8 (PJA2392, PJA2394-PJA2395).  Commerce agreed that no green tube entered under IHTS 7304.59.10, but concluded that there still was some possibility that green tube had entered under IHTS 7304.59.20 because the Infodrive data only covered 60% of the entries.  *Remand* at 16 (PJA2403).  Commerce further argued that HTS 7304.59 was appropriate because it is among the HTS listed in the scope description.  *Id.*  Commerce also explained that it believed that the alternatives suggested by Downhole failed to conform to Commerce's preferences for SV that are publicly available, contemporaneous with the POI, specific to the input, and exclusive of taxes on exports.  *Remand* at 6-11 (PJA2393-PJA2398).  Accordingly, Commerce continued its decision to abandon the $2,511.67 green tube SV (the AUV of IHTS categories for drill pipe and OCTG), selecting instead the $4,978.11 AUV of IHTS 7304.59.20 as the new green tube SV.  *Remand* at 17-18 (PJA2404-PJA2405).

It its comments before the CIT, Downhole reiterated its criticism of the *NIS Memo* and its arguments against Commerce's dismissal of IHTS 7304.23 and 7304.29 as the correct categories for green tube. *Plaintiffs' Comments On The Lack Of Substantial Evidence To Support, And The Unreasonableness Of, Commerce's Remand Redetermination* ("*Downhole Remand Cmts.*") at 8-15 (PJA2414-PJA2421). Downhole emphasized how the nearly $5,000 per ton green tube SV was even more aberrant than the initial remand selection, and nearly double the approximately $2,500 green tube SV selected in the *Final Determination* that had appeared to the CIT to be "highly distorted by expensive, finished tubular goods." *Downhole Remand Cmts.* at 18-21 (PJA2424-PJA2427). Downhole also argued that Commerce's adherence to its preferences mischaracterized record evidence and failed to acknowledge other SV selected by Commerce that did not satisfy the preferences. *Downhole Remand Cmts.* at 21-23 (PJA2427-PJA2429).

This appeal followed.

## SUMMARY OF THE ARGUMENT

The judgment below should be reversed. First, Commerce acted contrary to law when it included green tube within the scope of the investigation and consequently included green-tube production volume in the industry support calculation. Specifically, Commerce may not include a product within the scope of

an investigation if that product is already covered within the scope of an existing investigation or order. Downhole properly raised this issue prior to initiation. Despite Downhole's arguments to the contrary, Commerce initiated the investigation with green tube included in the scope and in the industry support calculation.

By the *Preliminary Determination*, however, Commerce had such reserves about including green tube that it stated it would remove green tube from the scope of the investigation unless green tube used to produce drill pipe could be distinguished from the green tube covered by the OCTG investigations (which by this time had become orders).

In the *Final Determination*, Commerce identified three criteria that it claimed distinguished green tube used to produce drill pipe from the green tube covered by the OCTG orders. But the record lacks substantial evidence to support Commerce's three criteria. Industry experts and published industry standards establish that each one of these criteria (that allegedly can only be satisfied by drill-pipe green tube) can equally be satisfied by OCTG green tube. Accordingly, green tube should be removed from the scope of the investigation, green-tube production volume should be removed from the industry support calculation, and Commerce should reassess whether the petition was brought on behalf of the domestic industry.

Second, the record lacks substantial evidence to support Commerce's remand surrogate value ("SV") determination that the $4,978.11 average unit value ("AUV") of category 7304.59.20 of the Indian Harmonize Tariff Schedule ("IHTS") (covering certain seamless alloy tube not classifiable elsewhere under IHTS 7304) is "best available information" on which to base the green-tube SV as a factor of production of DP-Master's drill pipe. This remand SV compares to the $1,313.33 green-tube SV used in the *Preliminary Determination* (based upon a certain OCTG product), and the $2,511.67 green-tube SV used in *Final Determination* (based upon the IHTS categories for drill pipe and OCTG).

To calculate the dumping margin in an investigation of products from countries designated as having non-market economies, Commerce reviews the production process of individually investigated producers, identifies each input in the production process. Commerce then selects a surrogate value ("SV") from a market-economy country for each input in place of the actual prices. These SVs are then used in connection with the relative volume of each input to produce a constructed normal value for the product, intended to reflect a market-economy price for the product. This constructed normal value is compared to the exporter price (the price at which the product is sold to the United States), to determine the dumping margin. While the process of selecting SVs is necessarily imprecise,

Commerce must strive for accuracy in value to comply with its obligation to calculate margins as accurately as possible.

Commerce failed in its duty here. Initially, the $4,978.11 AUV of the IHTS 7304.59.20 basket category for alloy seamless tubes is nearly double the $2,511.67 AUV of the IHTS category for finished drill pipe. Under the basic principle that an input should not be valued more than the finished product, Commerce failed to select an accurate SV. Exacerbating Commerce's error is uncontroverted industry expert testimony establishing the value of green tube at approximately 30% of the value of finished drill pipe. The green-tube SV selection is outside the bounds of commercial reality.

Further, the legal and factual analysis Commerce conducted to conclude that IHTS 7304.59.20 was the proper IHTS category for drill-pipe green tube (rather than the IHTS for drill pipe) ignored relevant legal principles. And, Commerce unreasonably relied upon an internal memo reporting a contact with the Bureau of Customs and Border Protection ("CBP") in which, without any legal analysis or explanation, CBP "confirmed" that IHTS 7304.59 was the correct IHTS category for drill-pipe green tube.

Moreover, Commerce improperly decided not to select alternative green-tube SV placed upon the record by Downhole. Commerce's rationale for ignoring alternative green-tube SV suggestions rests primarily upon Commerce's incorrect

determination that IHTS 7304.59 is specific to drill-pipe green tube, while the

alternatives are only comparable. Commerce also ignores relevant details about

the alternative green-tube SV selections that alleviate concerns Commerce

typically expresses regarding contemporaneity and single data points.

Accordingly, this Court should remand with instructions for Commerce to

reconsider the green-tube SV, and to select a green-tube SV with a commercially

reasonable value that is also supported by substantial record evidence.

## ARGUMENT

As we demonstrate below, Commerce's green tube SV selection is not

supported by substantial evidence upon the administrative record or in harmony

with law, and thus this case must be remanded for Commerce to redetermine the

green tube SV. Downhole respectfully submits that this Court should provide

guidelines to Commerce on remand regarding an appropriate range of values for

drill-pipe green tube, such that values outside this range will be rejected as

unreasonable, that is, not the best available information. Further, Commerce's

evaluation of industry support wrongfully included green tube production volume

because green tube was already covered by the OCTG investigation.

## I.    STANDARD OF REVIEW

This Court reviews the decisions of the CIT *de novo*, "apply{ing} anew the

same standard used by the court, and will uphold Commerce's determination

unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (citation and internal quotation marks omitted). Commerce must "articulate a 'rational connection between the facts and the choice made.'" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974).

"Substantial evidence" is defined as "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)). While the Court may not reweigh the evidence or substitute its own judgment for that of the agency, the substantial evidence standard requires more than "evidence which in and if itself justified {a determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica De Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (*citing Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Thus, the court reviews the record as a whole — including any evidence that "fairly detracts from the substantiality of the evidence" — in determining whether substantial evidence exists. *Micron Tech.*, 117 F.3d at 1393 (internal quotation omitted).

The agency "may not rely upon isolated tidbits of data which suggest a result

contrary to the clear weight of the evidence." *USX Corp. v. United States*, 655 F.

Supp. 487,489 (Ct. Int'l Trade 1987). To qualify as substantial evidence, the

administrative record "'must do more than create a suspicion of the existence of

the fact to be established.'" *Univ. Camera*, 340 U.S. at 477 (*quoting Labor Bd. v.*

*Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939)). In sum, the

Court must determine "whether, in light of the record evidence as a whole, 'it

would have been possible for a reasonable jury to reach {Commerce's}

conclusion.'" *Acciai Speciali Terni S.P.A. v. United States*, 118 F. Supp. 2d 1298,

1307 (Ct. Int'l Trade 2000) (*quoting Allentown Mack Sales & Serv., Inc. v. NLRB*,

522 U.S. 359, 366 (1998)).

This Court explained the standard of review regarding Commerce's SV

selections:

> In determining the valuation of the factors of production,
> "the critical question is whether the methodology used by
> Commerce is based on the best available information and
> establishes the antidumping margins as accurately as
> possible." *Shakeproof Assembly Components v. United*
> *States*, 268 F.3d 1376, 1382 (Fed.Cir.2001). This court's
> duty is "not to evaluate whether the information
> Commerce used was the best available, but rather
> whether a reasonable mind could conclude that
> Commerce chose the best available information."
> *Goldlink Indus. Co. v. United States*, 431 F.Supp.2d
> 1323, 1327 (Ct. Int'l Trade 2006).

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).

This Court has held that "{a}n agency's determination is not supported by substantial evidence where the agency fails to adequately explain the basis on which the agency made its decision." *Husteel Co. v. United States*, 491 F. Supp. 2d 1283, 1291 (Ct. Int'l Trade 2007).

## II. GREEN TUBE IS NOT PROPERLY INCLUDED IN THE SCOPE, THUS COMMERCE MUST RECALCULATE INDUSTRY SUPPORT

Commerce improperly included green tube in the scope of the investigation and green-tube production volume in the industry support calculation. Despite recognizing problems with including green tube within the scope of the investigation, *Commerce's Jan.6, 2010 Letter* at Att., para.4 (PJA2467), and despite Downhole's pre-initiation comments arguing that green tube could not be included within the scope, Commerce refused to adjust the scope or the industry support calculation. *Initiation Checklist*, Att.II at 8-9 (PJA513-PJA514). Although Commerce rejected Downhole's comments when initiating the investigation, in the *Preliminary Determination* expressed serious reservations about including green tube within the scope of the investigation. *Preliminary Determination*, 75 Fed. Reg. at 51,006 (PJA1666). In the *Final Determination*, Commerce determined that some drill-pipe green tube could be distinguished from OCTG green tube, based upon three criteria. *Final Determination*, 76 Fed. Reg. at

1,967 (PJA2026). Because these three criteria do not distinguish drill-pipe green tube from OCTG green tube, the same green tube is impermissibly covered by two antidumping duty orders. Thus, this Court should remand with instructions for Commerce to remove green tube from the scope of the later drill pipe investigation and to recalculate industry support.

### A. Legal Background

When initiation of an AD investigation is sought by petition, the petition must be filed on behalf of the domestic industry. 19 U.S.C. § 1673a(b)(1). Before initiating an antidumping duty investigation, Commerce must determine if a petition was presented on behalf of the U.S. domestic industry. 19 U.S.C. § 1673a(c)(1)(A)(ii) and (c)(2). The first threshold is whether "domestic producers or workers who support the petition {must} account for at least 25 percent of the total production of the domestic like product." 19 U.S.C. § 1673a(c)(4)(A)(i). If Commerce determines that the petition lacks industry support, Commerce "shall dismiss the petition {and} terminate the proceeding." 19 U.S.C. § 1673a(c)(3).

### B. The Record lacks substantial evidence to support Commerce's determination that drill-pipe green tube can be distinguished from OCTG green tube based upon three criteria

The record lacks substantial evidence to support Commerce's three criteria for including green tube within the scope of the drill pipe AD and CVD duty orders, despite already being covered by the OCTG AD and CVD orders.

30

Commerce claimed that "no specifications for OCTGs have been placed on the record that meet all of the criteria for drill-pipe green tube." These criteria limit coverage of the AD Order to green tube that is (1) seamless, (2) has outside diameter of 6 5/8" or less, and (3) has 0.16% - 0.75% molybdenum and 0.75% - 1.45% Chromium. Dec. Mem., PR258 at 11; PR204/CR98 at 5. The record establishes that each one of these criteria apply equally to green tube used to produce OCTG.

First, regarding the seamless nature of drill-pipe green tube, green-tube producing petitioner, TMK-Ipsco[3] explained that "{a}ll green tube for drill pipe, and much of the green tube for casing and tubing, but not all, must be made seamlessly." *DP-Master's Oct. 13, 2010 Submission* Att. at 7 (PJA1774); *API Standards II* (CJA1979). Second, API tables demonstrate significant amount of OCTG with outside diameter less than or equal to 6 5/8 inches. *Downhole's January 15, 2010 Submission* Ex.C (PJA441-PJA442); *Downhole's Feb. 12, 2010 Submission* at 11 (PJA551). Third, regarding chemistry, petitioners conceded that "the API does not set minimum alloy requirements for casing, tubing, and drill pipe." *Petrs Feb. 12, 2010 Submission* at 5 (PJA1679); *Miller Decl.* (PJA1752); *Williamson Decl.* (PJA1756-1757). Published industry standards confirm these

---

[3] Petitioner TMK-IPSCO was also a petitioner in the investigation into OCTG from China. *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 20,335 (Dep't of Commerce April 16, 2010) (final).

concessions, establishing that green tube used to produce several types of OCTG products would qualify under the revised scope criteria, namely, C90, %95, P110,a and Q125. *See DP-Master's Br.* Att.1 (PJA2079/CJA2588); *API Standards II* (PJA1981); *DP-Master's Sept. 23, 2010 Submission* at 10 (PJA1773), *Williamson Decl.* (PJA1756). Thus, the reasoning presented by Commerce is completely eviscerated by record information. Accordingly, green tube may not be included under the drill pipe orders. *See NTN Bearing Corp. v. United States*, 705 F. Supp. 594, 598 (Ct. Int'l Trade 1989).

### C. Without Green Tube Production Volume, the Petition Lacks Industry Support

As Downhole argued pre-initiation, based on a scope that excludes green tube, Commerce must re-determine whether there is sufficient industry support for the investigation. The record establishes that three companies who production volume was included in the industry support calculation produce green tube but not finished drill pipe. *Petrs' January 11, 2010 Submission* Att. Para.4 (PJA2478). A cursory review of the industry support calculation after removing green tube producers indicates that petitioners would not satisfy the required 25% industry-support threshold. *See Initiation Checklist* Att. 2 (CJA519). If on remand Commerce determines that industry support is lacking, it must revoke the orders. 19 U.S.C. § 1673a(c)(3).

### D.    The CIT Improperly Rejected Downhole's Arguments

The CIT improperly rejected Downhole's scope and industry support

arguments.  First, the CIT mischaracterized Downhole's argument to be that "some

green tube used to produce OCTG meet the technical specifications in the *Final*

*Determination* and are thus subject to two antidumping orders."  *Downhole I*, 887

F. Supp. 2d at 1319 (PJA29).  Downhole's argument was the opposite:  that

because the OCTG investigation covers all green tube, and Commerce cannot

distinguish out drill-pipe green tube, drill pipe green tube is already covered by the

OCTG investigation (and now orders).  Accordingly, drill-pipe green tube cannot

be included in the drill pipe investigation.

The CIT's mischaracterization also led it to mischaracterize Downhole's

argument regarding potential alternate scope wording.  The CIT believed that

Downhole agreed that language in the drill pipe scope that excludes green tube

covered under any other order could satisfactorily resolve the overlap in scope

coverage.  *Id.*  As stated above, however, it is the OCTG scope that is all-

encompassing, thus the drill pipe scope cannot carve itself out of the OCTG scope.

Further, the CIT wrongfully mischaracterized Downhole's argument as not

challenging the initiation scope.  *Id.*  That Downhole challenged the initiation

scope is unmistakable in it is arguments that industry support must be recalculated.

*Downhole's January 15, 2010 Submission* at 2 (PJA413); *Downhole's January 19,*

2010 Submission at 2 (PJA446); *Downhole's Br.* at 33 (PJA2072) ("Based on a scope that excludes green tube, Commerce must re-determine whether there is sufficient industry support for the investigation.").

Moreover, Downhole properly raised this scope/industry support issue prior to the *Initiation*, similar to the circumstances of *Save Domestic Oil, Inc. v. United States*, 116 F. Supp. 2d 1324, 1329-31 (Ct. Int'l Trade 2000). There, the CIT remanded for Commerce to reconsider whether "lease condensate" should be included within the scope, and whether including "lease condensate" had any effect on industry support. *Id.* The CIT affirmed Commerce's review and reopening of the record on remand. *Save Domestic Oil, Inc. v. United States*, 240 F. Supp. 2d 1342, 1348-53 (Ct. Int'l Trade 2002), *aff'd* 357 F.3d 1278 (Fed. Cir. 2004).

The instant case is distinguishable from the more recent CIT discussion of scope and industry support. In *PT Pindo Deli Pulp and Paper Mills v. United States*, 825 F. Supp. 2d 1310, 1326 (Ct. Int'l Trade 2012), while the CIT recognized that a challenge to industry support could be brought, the plaintiff had not raised its arguments prior to initiation, and the CIT did not excuse plaintiff's failure to exhaust administrative remedies. *See also Uruguay Round Agreements Act, Statement of Administrative Action*, H.R .Rep. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4194 ("Interested parties will continue to be able to

challenge the adequacy of Commerce's industry support determination . . . {if

Commerce} subsequently issues an antidumping or countervailing duty order.").

Thus, this Court should remand to Commerce to exclude green tube from the

scope of the orders, to recalculate industry support, and to revoke the AD and CVD

orders if industry support is lacking.

### III. COMMERCE HAS FAILED TO PROVIDE SUBSTANTIAL EVIDENCE TO SUPPORT ITS ABERRANTLY-HIGH-VALUED GREEN TUBE SV SELECTION

Commerce has failed to provide substantial record evidence or adequate

legal support for the aberrantly-high $4,978.11 green tube SV selection based upon

the AUV of IHTS 7304.59.20.  On remand, Commerce determined that it had

incorrectly determined that IHTS 7304.23 (drill pipe) was the property IHTS for

green tube, and instead determined that IHTS 7304.59 (other alloy pipe) was the

proper classification.  *Remand* at 5 (PJA2392).  Further, because Commerce

concluded that IHTS 37304.59 was a product match for green tube, it concluded

that alternative SV place upon the record by Downhole was less specific to drill-

pipe green tube.  *Remand* at 6-11 (PJA2393-PJA2398).  Commerce's

determination was based upon its own summary classification analysis, and the

unsubstantive *NIS Memo* it had placed upon the record during the remand

proceeding.  *Remand* at 4 (PJA2391).

Commerce's determination is unsupported by substantial record evidence for three reasons. First, the fact that the aberrantly high AUV of the IHTS category used to value unprocessed green tube input is double the value of the IHTS category for finished drill pipe should disqualify basket IHTS category 7304.59.20 as not based in commercial reality. Second, Commerce's own legal analysis ignores relevant legal principles, and the two-sentence *NIS Memo* provides such scant information that it cannot be relied upon for support. Finally, the factual record establishes the likelihood that IHTS 7304.59.20 contains no entries of green tube, and that IHTS 7304.59.20 cannot be product specific for approximately 70% of DP-Master's sales during the POI.

### A.    Legal Background

In an antidumping duty investigation, Commerce calculates the dumping margin of individual producers and exporters. 19 U.S.C. §1677f-1(e)(1). The dumping margin is "the amount by which the normal value exceeds the export price," where normal value is a measure of home-market value, and export price is a measure of U.S market value. 19 U.S.C. § 1677(35). In antidumping investigations of merchandise produced in nonmarket economy countries, such as China, Commerce uses factors of production to determine normal value. 19 U.S.C. § 1677b(c)(1):

> (1) In general
>> If—
>>> (A) the subject merchandise is exported from a nonmarket economy country, and
>>> (B) the administering authority finds that available information does not permit the normal value of the subject merchandise to be determined under subsection (a) of this section,
>> the administering authority shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise .... Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

Id. § 1677b(c)(1).  The value of factors of production are called "surrogate values."  Thus, under section 1677b(c)(1), Commerce must select surrogate values based upon the "best available information" of their values in a market economy country.

### A.    Commerce did not adequately address Downhole Pipe's argument that the $4,978.11 AUV of IHTS 7304.59.20 is aberrantly high

Commerce failed to adequately address Downhole's argument that the AUV of IHTS 7304.59.20 is aberrantly high.  The principle of Downhole's argument is clear: a basic input that indisputably comprises 30% of the finished product value should not be valued higher than the finished product.  *See Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("An overriding purpose of Commerce's administration of antidumping laws is to

37

calculate dumping margins as accurately as possible." (*Quoting Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed.Cir.1990)). Certainly, if Commerce must act within the bounds of commercial reality when penalizing non-cooperative respondents, Commerce must also do so when dealing with fully cooperative respondents. *Gallant Ocean (Thailand) Co., Ltd. v. United States,* 602 F.3d 1319, 1324 (Fed. Cir. 2010); *see also Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) ("an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action" (*quoting Bowman*, 419 U.S. at 284)).

Here, Commerce proposes the $4,978.11 AUV of IHTS 7304.59.20 as the green tube SV, *Remand* at 19 (PJA2406), and this value is almost double the value of the $2,511.67 AUV of the IHTS category for finished drill pipe that Commerce had selected in the *Final Determination*. *Dec. Mem.* at 31-32 (PJA1920-PJA1921). In light of uncontradicted expert testimony that drill-pipe green tube is 30% of the value of finished drill pipe, and 60% of the value of semi-finished drill pipe, *Smith Decl.* (PJA660), the $4,978.11 AUV simply does not make sense. Even without these percentages, it is unreasonable for Commerce to select an SV that is double the value of the finished product. No reasonable mind could accept this value as adequate to support the conclusion that it is the best available evidence. *Univ. Camera*, 340 U.S. at 477 (*quoting Consol. Edison*, 305 U.S. at 229).

The CIT has previously explained its view of the importance of scrutinizing the value of SVs:

> Scrutiny of surrogate values is important because they are proxies -- they are not actual costs but estimates based on the best available information. ***If the proxy values selected prove unrepresentative, reliance on them defeats their purpose, namely, to derive a dumping margin that is as accurate as possible***.

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1269-70 (Ct. Int'l Trade 2006) (emphasis added) (citations omitted).  Thus, the statutory mandate to select the "best available data" is a mandate to select "the best data {available} for calculating an accurate dumping margin." *Id.* at 1268.

The CIT recently reiterated this principle:

> "{w}hen confronted with a colorable claim that the data that Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive." In such a case, it is not enough for Commerce to "summarily discard the alternatives as flawed," Commerce must also "evaluate the reliability of its own choice."

*Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, Slip Op. 13-30 at *4 (Ct. Int'l Trade Mar. 11, 2013) (citations omitted).

Here, uncontradicted expert opinion places the value of green tube at 30% of the value of the finished product. *See DP-Master's June 22, 2010 Submission* at 5, Ex. SV44 (PJA649, PJA660).  Not only is the $4,978.11/MT proposed green tube

39

CONFIDENTIAL INFORMATION DELETED FROM THIS PAGE

SV nearly double the value of the green tube SV used in the *Final Determination*, but it is also double the value Petitioners submitted in the petition for the entire tube component (that is, green tube that has been upset and heat-treated). *See Petition*, at Ex. II-1-B-1-a (PJA230). Further, as comparison, the $4,978.11 green-tube SV is [                ] higher than the Petitioners AUV for its *finished drill pipe*. *Petition* at 17 (listing AUVs for 2006-2008 as [                      ] (CJA85). Adjusting these finished drill pipe prices by the uncontroverted 30% figure yields green tube values of [                              ]. These AUV are [

                                                          ].

    Alternatives suggested by Downhole [

              ]. These alternatives include seamless alloy steel pipes with identical length, wall thickness, diameter, and chemistry, along with other alternatives that are the product of summing costs from record information for a product identical to green tube.

| Price per MT | Description |
|---|---|
| 1. $1,100 | POI Indian prices for P110 OCTG |
| 2. $1,151.50 | Unadjusted, near-POI Indian prices for J/K55 OCTG |
| 3. $[        ] | POI green tube cost build up from Indian seamless blanks |
| 4. $1,079.67 | POI Indian seamless tube prices adjusted for chemistry |

*Downhole's Pre-Draft Comments* at 1-8 (PJA2170-PJA2177). These alternative

SV, [                                                                      ], all fall within the

range Downhole submitted is the reasonable price range for drill-pipe green tube,

that is, 30% to 60% of IHTS 7304.23.90 (alloy drill pipe), that is, from $753.50 to

$1,507.00. *Downhole's Pre-Draft Remand Comments* at 2 (PJA2171).

Thus, the $4,978.11 AUV of IHTS 7304.59.20, should have caused

Commerce to scrutinize, on a value basis, its decision to use a basket category of

seamless alloy steel tube products – many or all of which have no connection to

drill pipe – to value a drill-pipe green tube with its relatively minor amount of

alloying elements. *Acciai Speciali*, 118 F. Supp. 2d at 1307 (Court must determine

"whether, in light of the record evidence as a whole, 'it would have been possible

for a reasonable jury to reach {Commerce's} conclusion.'") (Q*uoting Allentown

Mack*, 522 U.S. at 366).

The CIT wrongly affirmed Commerce's dismissal of IHTS 7304.23 as a

reference point to determine whether the green tube SV was aberrantly high. The

CIT concluded that Commerce sufficiently reasoned that IHTS 7304.23 was

broader than just finished drill pipe, and thus was not a reliable indicator of the

value of finished drill pipe. *Downhole II*, 949 F. Supp. 2d at 1295 (PJA13-PJA14).

This rationale, however, should be rejected for two reasons. First, Commerce's

rationale here contradicts its rationale for selecting IHTS 7304.59.20. That is,

41

Commerce selected IHTS 7304.59.20 as a reliable indicator of the value of green

tube despite knowing that 60% of the entries under IHTS 7304.59.20 are not green

tube, and despite not knowing the identity of other entries. *Remand* at 16-17

(PJA2403-PJA2404). To the contrary, despite Downhole having demonstrated the

presence of significant entries of both finished and semi-finished drill pipe in IHTS

7304.23.90, Commerce rejects IHTS 7304.23.90 as unreliable to indicate the value

of finished drill pipe. *See DP-Master's July 20, 2010 Submission* at 9-18 (PJA802-

PJA810); *DP-Master's Rebuttal Case Br.* at 11 (PJA1882).

Second, while Commerce and the CIT criticize some of the entries under

7304.23.90 as possibly not finished drill pipe, these criticisms ignore the

underlying fact that IHTS 7304.23.90 is the correct category for drill pipe and

Downhole has positively identified a significant proportion of entries under IHTS

7304.23.90 as both semi-finished and finished drill pipe. *Id.* Downhole agreed

that the AUV of IHTS 7304.23.90 was not reflective of just finished drill pipe, but

of semi-finished drill pipe as well. *See Downhole's Remand Comments* at 20-21

(PJA2426-PJA2427) (*citing DP-Master's Rebuttal Br.* at 12 (PJA1883)). For that

reason – and in light of the uncontroverted industry expert testimony that drill-pipe

green tube is 30% of the value of finished green tube and 60% of the value of

semi-finished drill pipe – Downhole argues that the proper value of green tube lies

within a range from 30% to 60% of the AUV of IHTS 7304.29.90 – that is, from $753.50 to $1,507.00.

**B.  Commerce's Legal Analysis of IHTS Alternatives in India HTS 7304 Analysis Is Inadequate**

As we have demonstrated, the green-tube SV selected by Commerce is aberrantly high and should be remanded on that ground alone.  This Court, however, can also remand on the inadequacy of Commerce's rationale for selecting the remand green-tube SV.  Commerce's legal analysis to support selecting IHTS 7304.59.20 is a one-sentence assertion regarding classification under IHTS, which Commerce supported with a two-sentence memo reporting some sort of confirmation from CBP.

**1.  Commerce's legal analysis regarding the classification of green tube under IHTS is insufficient**

When disavowing IHTS 7304.23, Commerce stated that "Categorization of products under the HTS is a process of elimination,"  opining that "HTS categories under heading 7304 for . . . drill pipe, OCTG . . . can each be dismissed on their face as inaccurate for the categorization of drill-pipe green tube."  *Remand* at 5.  This brief legal analysis, however, is inadequate because it ignores basic legal principles – such as GRI 2(a) – which require some analysis before dismissal.  This analysis also ignores at least five significant contradictory aspects of the record.

First, in the petition and throughout the investigation, petitioners identified HTS 7304.23 and 7304.29 as the "more specific to drill pipe," specifically not using IHTS 7304.59.20. *Petition* II-6 to -9 & n.10 (PJA207-PJA210); *Petrs' June 18, 2010 Submission* at 3 (PJA629); *Petrs' July 19, 2010 Submission* at 9-10 (PJA776-PJA777); *Petrs' Case Br.* at 18-21 (PJA1806-1809). Commerce initially agreed, explaining in the Decisions Memorandum that green tube is properly included under HTS 7304.23, and finding (incorrectly) that Infodrive data had actual entries of green tube under HTS 7304.23. *Dec. Mem.* at 31-32 (PJA1920-1921). DP-Master agreed that drill-pipe green tube could properly enter under IHTS 7304.23, but DP-Master and Downhole Pipe demonstrated that there were no actual POI entries of green tube. *See DP-Master's July 20, 2010 Submission*, at 7-20 (PJA800-PJA813); *DP-Master's Rebuttal Case Brief* at 10-12 (PJA1881-PJA1883). Commerce did not provide any explanation for changing the IHTS category it believed was the correct classification for green tube.

Second, petitioner VAM Drilling imports green tube from its French, German, and Brazilian affiliates, *Petition* at 5 (PJA83), but does not classify them under HTSUS 7304.59. *Downhole's Draft Remand Comments* at 3, Att.A (PJA2285, PJA2294-PJA2218). Instead, VAM Drilling's seamless tube imports are classified under HTS 7304.19 "(Line pipe of a kind used for oil or gas pipelines, other"), 7304.23 ("other drill pipe"), 7304.29 ("casing, tubing and drill

44

pipe, of a kind used in drilling for oil and gas, other"), and 7304.39 ("non-alloy steel, other"). *Id.* Notably, Petitioners did not contradicted or otherwise clarify any aspect of this factual information in rebuttal comments. These facts should have caused Commerce to analyze the proper classification of drill-pipe green tube in more detail rather than dismissing them "on their face as inaccurate for the categorization of drill-pipe green tube." *Remand* at 5 (PJA2392).

Third, contrary to Commerce's argument, the HTS categories listed in scope description do not identify HTSUS 7304.59 as a category under which subject imports are *"currently classified*." *Remand* at 16 (emphasis added) (PJA2403). In its argument, Commerce omitted language in the scope description stating that "subject products are *currently classified*" under HTSUS 7304.22 (stainless steel drill pipe), 7304.23 (other drill pipe), and 8431.43.8040 (drill pipe fitted with tool joints). *Order*, 76 Fed. Reg. at 11,757 (emphasis added) (PJA2031). In contrast, other HTS categories listed in the scope description, including 7304.59, are not categories where green tube is "currently classified," but are categories under which subject imports "may enter." *Id.*

Fourth, there were no entries of drill-pipe green tube under IHTS 7304.59.10, and IHTS 7304.59.20 most likely also lacked entries of drill-pipe green tube. *See Downhole's Draft Remand Comments* at 7-10, Atts.D-E (PJA2289-PJA2291; PJA2305-PJA2326; PJA2328-2329). As Commerce

conceded, Infodrive India data for entries under IHTS 7304.59.10 and 7304.59.20,

along with information about the chemical composition of alloying elements in the

products identified in the Infodrive data, conclusively demonstrated that there were

no entries of drill-pipe green tube under IHTS 7304.59.10, and no entries of dill

pipe green tube in at least 60% of entries under IHTS 7304.59.20.  *Id.*; *Remand* at

14-17 (PJA2401-2404).  Both IHTS 7304.59.10 and 7304.59.20, however, contain

entries of high-alloy seamless steel tube that have much higher amounts of alloying

elements, which by themselves are hundreds and thousands of dollars higher in

cost than approximately $135 cost of alloying elements in drill-pipe green tube.

*See Downhole's Draft Remand Comments* at 8-9, Ex.E (PJA2290-PJA2291;

PJA2328-PJA2329); *Downhole's Pre-Draft Remand Comments* at 5-6 & n.20

(PJA2174-PJA2175).

Although Infodrive covers 60% of HTS 7304.59.20 entries, the description

of merchandise covered by IHTS 7304.59.20 is different from IHTS 7304.59.10

only in diameter:  7304.59.10 includes tubes and pipes up to 114.3 mm (4 ½

inches) in diameter, and 7304.59.20 includes tubes and pipes greater than 114.3

mm (4 ½ inches) but less than 219.1 mm (8 5/8 inches).  *Commerce's Request for

Comments* at Att.1 (PJA2204).  Without any other information, it would be

unreasonable to expect the product mix entering under these subheadings to be

dissimilar.  Indeed, as mentioned above, the total absence of drill-pipe green tubes

46

under IHTS 7304.59.10 is reflected in the total absence of drill-pipe green tubes in

the 60% of entries under IHTS 7304.59.20. *See Downhole's Draft Remand*

*Comments* at 7-10, Exs.D-E (PJA2289-PJA2291; PJA2305-PJA2326; PJA2328-

PJA2329). Thus, similar to the CIT's initial conclusion regarding IHTS 7304.23

and 7304.29, Infodrive data "appears to demonstrate that categories {7309.59.10

and 7304.59.20} do not actually 'capture' green tube and are highly distorted by

expensive, finished tubular goods." *Downhole I*, 887 F. Supp. 2d at 1325 (PJA35).

Fifth, IHTS 7304.59.20 could not be the correct classification for

approximately 70% of DP-Master's POI sales. Commerce conceded that IHTS

7304.59.10, covering tubes and pipes with a diameter of 4 ½ inches or less,

contains no entries of drill-pipe green tube. *Remand* at 16 (PJA2403). This

diameter measurement corresponds to approximately 70% of DP-Master's POI

sales. *DP-Master's Remand Cmts* at 17 (PJA2423). Thus, IHTS 7304.59.20 is not

a product match for 70% of DP-Master's POI sales. In view of the nearly $1,400

disparity between the $3,608.76 AUVs of IHTS 7304.59.20 and $4,978.11 AUV of

IHTS 3704.59.20, using the value from IHTS 3704.59.20 for all of DP-Master POI

sales would be extremely distortive for 70% of the sales.

Despite Commerce's claim that it "need not engage in a 'classification' to

determine which subheading contains entries of the input at issue," the issue is

whether Commerce's dismissal of IHTS 7304.23 (drill pipe) on its face "'as

inaccurate for the categorization of drill-pipe green tube" – without further explanation – is a reasonable determination. *Def. Reply Cmts*. at 9 (*quotation omitted*) (PJA2457); *Bowman*, 419 U.S. at 285 (agency must "articulate a 'rational connection between the facts found and the choice made'"). Commerce's own analysis and its reliance upon the *NIS Memo* undermine Commerce's claim that a classification analysis is irrelevant. *Def. Reply Cmts*. at 9-10 (PJA2458-PJA2459). And Commerce makes no attempt to explain how IHTS 7304.23 is facially improper. *Id.*

Moreover, despite Commerce's conclusion that IHTS 7304.23 covers "semi-finished drill pipe," *see Remand* at 7 (PJA2394), and quoting GRI 2(a), Commerce claims not to know how GRI 2(a) is relevant to an assessment of whether the HTS subheading that covers semi-finished drill pipe can be dismissed on its face. *Def. Reply Cmts.* at 8 & n.3 (PJA2457). As Downhole explained, GRI 2(a) requires that unfinished merchandise be classified with the merchandise named in the subheading. *Downhole Remand Comments* at 11 (PJA2417). The relevance is obvious. GRI 2(a) requires that drill-pipe green tube be classified under the IHTS category for drill pipe or semi-finished drill pipe because green tube is the major input for drill pipe, and the only physical input for *semi-finished* drill pipe. *Id.* GRI 2(a) is the most relevant rule for determining which HTS subheading covers green tube, but was ignored by Commerce.

48

Accordingly, all record evidence regarding both IHTS 7304.59.10 and

7304.59.20 taken together provides support only for the conclusion that there were

no entries of drill-pipe green tube under IHTS 7304.59.20, and that IHTS

7304.59.20 is not the proper classification for drill-pipe green tube.

### 2. The NIS Memo Does Not Provide A Scintilla Of Supporting Evidence

To support its summary IHTS classification analysis, Commerce

unreasonably relied upon a two-sentence memo, which provides only snippets of

general information regarding a communication  CBP.  *NIS Memo* (PJA2259).

The entire *NIS Memo* reads as follows:

> During the week of January 7, 2013, the Department of
> Commerce contacted Mary Ellen Laker, U.S. Customs
> and Border Protection National Import Specialist,
> regarding the Harmonized Tariff System ("HTS")
> classification of drill-pipe green tubes, as described in the
> scope of the Order.{} She confirmed that drill-pipe green
> tubes would be categorized under HTS 7304.59.

*Id.* (footnote omitted).  The Memo provides no other information.  The absence of

information in the NIS Memo exposes six significant flaws, that cannot be filled in

by Commerce's four *post hoc* attempts in the *Remand* to bolster the quality of the

*NIS Memo*.

The first significant flaw is the lack of information about the

communications.  *Downhole Draft Remand Cmts* at 5-6 (PJA2287-PJA2288).

There is no indication about whether the "contact" was via email, letter, fax,

telephone, over coffee, or through a friend. *Id.* If the contact was via email, letter, or fax, Commerce would have placed a copy on the administrative record because it would qualify as factual information "presented to, or obtained by the Secretary." 19 C.F.R. § 351.104(a)(1). Absent record evidence otherwise, the contact must have been a telephone call or some other informal communication, which would indicate that anything stated by the NIS could only be an off-the-cuff, off-the-record, unofficial, personal opinion.

The second significant flaw is the lack of any indication in the memo that Commerce actually provided the scope language to CBP for CBP to consider in its evaluation. *Downhole Draft Remand Cmts* at 6 (PJA2288). The memo merely states that the contact was "regarding the . . . classification of drill-pipe green tubes, as described in the scope of the Order." *See NIS Memo* (PJA2259). This phrase gives only the motivation for, but not the substance of the contact. The memo does not explain whether the scope language was given to CBP, read to CBP, or even whether the Commerce employee even mentioned "drill pipe." If CBP was not given the full written scope of the Order, it could not have meaningfully analyzed the scope language or provided an informed opinion.

The third significant flaw is similar: there is no indication of a discussion of any analysis by CBP of scope language, the alloying elements, seamless quality, or intended use affects the proper classification. *Downhole Draft Remand Cmts* at 7

(PJA2289). Simply, there is no record evidence establishing what, if anything, CBP considered prior to "confirm{ing}" Commerce's decision.

The fourth significant flaw is that there is no indication that the NIS has any training regarding how to classify imports under *IHTS* categories – or whether the NIS had any relevant training at all. *Downhole Draft Remand Cmts* at 6 (PJA2288). It could be accepted that the expertise of a "U.S. Customs and Border Protection National Import Specialist" would be the classification of specific types imports into the United States. *See Remand* at 14 n.64 (PJA2274). But no specific expertise is stated. Further, any expertise classifying imports into the United State does not translate into expertise classifying imports under other countries HTS categories. Commerce opined similarly: "It is true that U.S. Customs rulings do not influence the categorization of products in the IHTS." *Final Determination*, 76 Fed. Reg. 1,966, *Dec. Mem.* at cmt. 7 (PJA1920).

The fifth significant flaw of the *NIS Memo* is that there is no mention of whether CBP evaluated whether HTS categories, such as HTS 7304.23 (other drill pipe), might be more accurate when evaluating drill-pipe green tube, or whether CBP considered legal principles regarding how to classify drill-pipe green tube. *Downhole Cmts on Draft Remand* at 6 (PJA2288); *Downhole Remand Cmts* at 11, 13 (PJA2417, PJA2419). Among these legal principles is General Rule of Interpretation ("GRI") 2(a) which explains that "Any reference in a heading to an

51

article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article."[4] Because Commerce conceded that IHTS 7304.23 captures semi-finished drill pipe, and the sole physical input to semi-finished drill pipe is green tube, IHTS 7304.23 is the correct HTS classification for drill-pipe green tube. *Remand* at 7 (PJA2394); *Downhole II*, 949 F. Supp. 2d at 1293 (PJA9). Any analysis of the proper classification of drill-pipe green tube would have to address how GRI 2(a) applies in classifying drill-pipe green tube in relation to IHTS 7304.23. The CIT incorrectly dismissed GRI 2(a) as CBP regulations inapplicable to Commerce's analysis, but the GRI are international classification norms adopted by all parties to the World Customs Organization, including India. *See* http://www.wcoomd.org.

The sixth significant flaw is that there is no indication of how CBP "confirmed" Commerce's IHTS selection. *Downhole Draft Remand Cmts* at 7 (PJA2289). Nothing in the *NIS Memo* states whether the confirmation was a "yes" as a result of serious consideration of scope language and relevant legal principles,

---

[4] The GRIs are part of the HTSUS statute which "consists of '(A) the General Notes; (B) the General Rules of Interpretation; (C) the Additional U .S. Rules of Interpretation; (D) sections I to XXII, inclusive (encompassing chapters 1 to 99, and including all section and chapter notes, article provisions, and tariff and other treatment accorded thereto); and (E) the Chemical Appendix." *Baxter Healthcare Corp. of Puerto Rico v. United States*, 182 F.3d 1333, 1337 (Fed.Cir.1999) (citation omitted).

or a "yes" in response to a conditional set of facts (such as "If HTSUS 7304.23 and 7304.29 are not the right category, would HTS 7304.59 be correct?"), or in response to a leading question (such as, "Wouldn't it be correct to classify a seamless alloy tube under HTS 7304.59?"). Information regarding the substance of the confirmation is essential to evaluating the *NIS Memo*. Effectively, by relying upon the *NIS Memo*, Commerce demands that Commerce's conclusion from its contact with CBP be accepted without any context or explanation. Such a demand does not qualify as a reasoned explanation connecting the facts found to the conclusion reached. *Bowman*, 419 U.S. at 285.

Attempting to bolster the *NIS Memo*, Commerce included four, subtle *post hoc*, non-record factual assertions in its *Remand*. First, despite the absence of any indication of expertise in the *NIS Memo*, Commerce claimed that the CBP official was "CBP's NIS for steel tube and pipe products." *Remand* at 4 (PJA2391). Second, despite the *NIS Memo* stating only that Commerce "contacted" CBP, Commerce claimed that it had multiple contacts, using the plural "consultations," even though none of these "consultations" otherwise appear on the records. *Id.* at 15 (PJA2402). Third, despite the *NIS Memo* characterizing CBP's input solely as having "confirmed" something that Commerce must have proposed, Commerce elevates the simple confirmation to "{t}he NIS's professional opinion." *Id.* at 15-16 (PJA2402-PJA2403). Fourth, despite no indication in the *NIS Memo* that

Commerce provided the full scope language to CBP, Commerce implies that the NIS evaluated the scope language by its claim that the NIS confirmation was based upon "drill-pipe green tube, a*s described in the scope of the Order*." *Id.* at 16 (PJA2403). None of these factual assertions appear on the record.

Before the CIT, Commerce failed to address the deficiencies, and did not attempt to justify its *post hoc* factual assertions raised by Downhole Pipe. *Def. Response Cmts.* (PJA2449-PJA2464). Commerce merely parroted the *Remand*'s *post hoc* factual assertions. *Def. Response Cmts*. at 9-10 (PJA2458-PJA2459). The CIT gave Commerce a pass, characterizing Downhole's argument as "entirely conjectural." *Downhole Pipe II*, 889 F. Supp. at 1296. But this was the point of the argument: the *NIS Memo* is so bare that it supports nothing but conjecture. The CIT incorrectly reacted to Downhole Pipe's argument by claiming that the CIT could not reweigh the evidence. *Downhole Pipe II*, 889 F. Supp. at 1296. The Court can perform the legal function under the substantial-evidence standard of concluding whether that the *NIS Memo* lacked the substance required to amount to even a scintilla. *Micron*, 117 F.3d at 1393.

In sum, because it lacks context and substance, the *NIS Memo* does not provide any support for Commerce's new green tube SV selection. At best, the *NIS Memo* "'create{s} a suspicion of the existence of the fact to be established,'" which does not qualify as substantial evidence. *Univ. Camera*, 340 U.S. at 477

(*quoting Columbian Enameling*, 306 U.S. at 300). Because of the significant flaws (and rejecting Commerce's *post hoc* factual assertions), the *NIS Memo* fails to provide even the proverbial "scintilla." *Ad Hoc Shrimp Trade Action Committee v. United States*, 618 F.3d 1316, 1321 (Fed. Cir. 2010). Thus, Commerce's remand redetermination of the green tube SV lacks the support of substantial evidence upon the administrative record, and must be remanded.

## C. Commerce Does Not Cite To Adequate Justification For Ignoring The Alternatives Provided By Downhole

Because the selection of the AUV of IHTS 7304.59.20 as the green-tube SV is not supported by substantial record evidence, and consequently is not the best available evidence, Commerce wrongly dismissed Downhole's alternate green tube SVs. Downhole presented its arguments in support of the alternative SV in its Pre-Draft Remand Comments. *Downhole's Pre-Draft Remand Comments* (PJA2170-PJA2177/CJA2679-CJA2686). Commerce's primary reason for dismissing Downhole's alternative SV is Commerce's claim that IHTS 7304.59.20 is a product match. *Remand* at 5, 8 (PJA2392, PJA2395). Thus, if this Court concludes that IHTS 7304.59.20 is not supported by substantial record evidence, Commerce's rejection of these alternative SV must be reconsidered on remand.

Commerce primarily relies upon three reasons for not selecting the alternative SVs suggested by Downhole: (1) J/K55 and P110 cannot be used to produce drill pipe, (2) the MBR data provided reliable price data for a single month

(that for J/K55 is outside the POI) that is unreliable as subject to price fluctuations, and (3) MBR data in the POI are offers, not prices. *Remand* at 8-9 (PJA2395-PJA2396). These reasons are not valid.

First, Commerce's statement that record evidence demonstrates that P110 and J/K55 OCTG cannot be used to produce drill pipe is simply wrong. Commerce failed to identify any record evidence to support this conclusion. *Id.*; *Dec. Mem.* at 32 (PJA1921). To the contrary, uncontroverted expert testimony establishes that the upset (or otherwise inconsistent) ends of a seamless pipe may be cut off and the pipe may be subjected again to upsetting in preparation for heat treatment. *Smith Decl.* (PJA659-PJA660) (stating that commercial tolerances for tube length are set such that "an improper fade out {from upsetting} can be cut from the end of the tube, and the upset process can be attempted a second time"). Thus, either P110 or J/K55 (with proper chemistry) could be used to produce drill pipe. According to Petitioners' industry expert and API tables, P110 has identical length, outside diameter, wall thickness, chemistry, and is seamless. *Downhole's Jan. 15, 2010 Submission* Ex.C (PJA440-PJA442); *DP-Master's Sept. 14, 2010 Submission* at Ex.3 (CJA1971-CJA1988). Similarly J/K55 tubing has identical length, outside diameter, wall thickness, is seamless, and may have the same chemistry as drill pipe. *Id.* To the extent the alloying chemistry is different in practice, uncontroverted industry expert opinion that the cost/price effect of adding

56

the alloying elements is fully counter-balanced by the cost-price effect of not requiring intense heat-treatment. *Liu Decl.* (PJA714).

Further, Petitioners' industry expert explained that "{t}he most comparable product {to green tube} for which prices are published is seamless tubing and casing for oil country use." *Miller Dec.* (PJA1750). Moreover, the U.S. International Trade Commission previously reported that "Data collected by the Commission indicate that prices for unfinished drill pipe were generally in the same range as prices for other *unfinished* OCTG." *Petrs' Jan. 11, 2010 Submission* Ex.1 (PJA2497) (emphasis added). Thus, the record contradicts Commerce's assertion.

Second, Commerce's statement that some MBR data is not contemporaneous with the POI is misleading because it is contemporaneous with the time period for which Commerce sought information related to DP-Master's green tube upsetting and heat treatment. *See Final Analysis Memo* at 2 (PJA2015). Commerce used this pre-POI data to calculate DP-Master's dumping margin. *Id.* Further, Commerce has often reached outside the POI or period of review to select more accurate SV. *See, e.g., Changhong Elec. Co. v. United States*, 460 F. Supp. 2d 1338, 1364-65 (Ct. Intl. Trade 2006) ("That these purchases were slightly outside the POI cannot be said to materially diminish their reliability."); *Anshan Iron & Steel Co. v. United States*, 27 CIT 1234, 1247 (2003) ("Commerce should

not sacrifice representativeness for contemporaneity"). And Commerce reached outside the POI for accurate SV data in this investigation. *Preliminary SV Memo* at 6-7, 11 (PJA1326-PJA1327, PJA1331) (dried mud, natural gas, blast furnace gas, LP gas, coke oven gas, steam, pipe recovered heat, medium pressure gas, oxygen, nitrogen, diesel); *Final SV Memo* at 2-3 (PJA1940-PJA1941) (hydrogen and low pressure steam). Accordingly, that MBR data fell just outside the POI should not have been considered a disqualifying factor.

Third, Commerce dismissed P110 as an alternative SV in part because the MBR data is based upon "offers" rather than "prices." *Remand* at 9 (PJA2396). Commerce omitted, however, that the MBR data reported that "prices" were lower than the "offers." *DP-Master's July 26, 2010 Submission* at Ex.2 (PJA1286). Thus, the MBR data for P110 cannot be so easily dismissed.

Fourth, Commerce's statement expressing some concern that price fluctuations undermine the value of pricing data from one MBR report is misguided because the only fluctuation in seamless tube pricing was downward! *See DP-Master's Comments on Ministerial Error* at 19, Ex.MEA-3 (PJA1643, PJA1652); *DP-Master Case Br.* at 37-38 (PJA1862-PJA1863). The record establishes that prices for seamless tube products around the world were on a downward trend during the POI. *See DP-Master's Aug. 17, 2010 Submission*, at 33 (PJA1652). Accordingly, Commerce's dismissal of J/K55 and P110 data based

upon concerns for price fluctuations is not supported by substantial record evidence.

Regarding Downhole's other alterative SV suggestions, both of which require some adjustment for differences in chemistry, Commerce claims that it cannot make an adjustment for alloying elements, as suggested by Downhole, because it "does not have verified factor information for all factors of production that would be necessary to convert a non-alloy tube to an alloy tube." *Remand* at 11 (PJA2398). Commerce's response confuses the issue. The data relied upon include alloy seamless pipe for which the production process is complete, and which already include added alloying elements. Downhole suggests that all that would be required of mills producing seamless steel tubes would be to add more alloying element. Thus, the additional cost for alloy seamless steel tubes is practically limited to the cost of the alloying element itself. Adding the cost of alloying elements to the cost of the seamless tube gets closer than almost any other value on the record.

Finally, Commerce's concerns about adjustments for alloying costs are really about minimal cost differences. Based upon the scope percentages of alloying elements molybdenum and chromium, the average cost adjustment for alloying elements would be approximately $135. *Downhole's Pre-Draft Remand Comments* at 5-6 & n.20 (PJA2174-PJA2175). This cost for alloying elements in

scope drill-pipe green tube contrasts with the hundreds and thousands of dollars in cost for alloying elements of products imported under IHTS 7304.59. *Downhole's Comments on Draft Remand* at Ex.E (PJA2329). Thus, surrogate values calculated by adjusting seamless steel tubes for the cost of alloying elements are much more accurate – and therefor better available record information – than the basket category AUV for IHTS 7304.59.20.

## CONCLUSION

For the foregoing reasons, judgment below should be reversed with instructions to remand this matter to Commerce to eliminate green tube from the scope of the investigation, remove green tube production from the industry support calculation, and reconsider an reasonable green-tube surrogate value that is supported by substantial evidence in view of all detracting evidence.

Respectfully submitted,


  /s/ Mark B. Lehnardt
Mark Lehnardt

LEHNARDT & LEHNARDT LLC
20 Westwood Drive
Liberty, MO 64068
Tel: (816) 407-1400
Fax: 816-407-9049
e-mail: mark@lehnardt-law.com

*Counsel for Downhole Pipe &*
*Equipment, L.P., and DP-Master*
*Manufacturing Co., Ltd.*


Dated: March 11, 2014

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 13,401 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  March 11, 2014            /s/ Mark B. Lehnardt
                                    Mark B. Lehnardt

                                    *Counsel for Plaintiff-Appellant*
                                    *Downhole Pipe & Equipment, L.P.,*
                                    *and DP-Master Manufacturing Co.,*
                                    *Ltd.*

# CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 2014, two copies of this brief

were served by overnight delivery on:

**On behalf of the Defendant, United States**:

Mikki Cottet
U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch
- Civil Division
1100 L Street NW, Room 11066
Washington, DC 20005
Email: mikki.cottet@usdoj.gov

**On Behalf of VAM Drilling USA, Inc., Texas Steel Conversions, Inc., Rotary Drilling Tools, TMK IPSCO, and the United Steel Workers:**

Roger B. Schagrin, Esq.
Schagrin Associates
900 Seventh Street, NW
Suite 500
Washington, DC 20001
Email:
rschagrin@schagrinassociates.com

**On Behalf of United States Steel Corporation:**

Jeffrey D. Gerrish, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005-2111
Email:   jeffrey.gerrish@skadden.com

/s/ Mark B. Lehnardt
Mark B. Lehnardt

Mark B. Lehnardt, Esq.
LEHNARDT & LEHNARDT, LLC
20 Westwoods Drive
Liberty, MO 64068
Email: mark@lehnardt.com

PARTICIPANTS ONLY    Document: 20    Page: 72    03/11/2014

**ADDENDUM**

*Downhole Pipe & Equipment, L.P., et al. v. United States*
**Ct. No. 11-CV-00081, Slip Op. 13-134**
**(Ct. Int'l Trade Nov. 4, 2013)**

Slip Op. 13-134

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| DOWNHOLE PIPE & EQUIPMENT, LP, and DP-MASTER MANUFACTURING CO., LTD., | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Before: Nicholas Tsoucalas, |
| v. | : | Senior Judge |
| | : | |
| UNITED STATES, | : | Court No.: 11-00081 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| VAM DRILLING USA, TEXAS STEEL CONVERSION, INC., ROTARY DRILLING TOOLS, TMK IPSCO, and U.S. STEEL CORP., | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendant-Intervenors. | : | |

### OPINION

[The Department of Commerce's remand determination is sustained]

Dated:November 4, 2013

Mark B. Lehnardt, Lehnardt & Lehnardt, LLC, of Liberty, MO, and Irene H. Chen, Chen Law Group LLC, of Rockville, MD, for plaintiffs.

Mikki Cottet, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Todd M. Hughes, Deputy Director. Of counsel on the brief was Nathaniel J. Halvorson, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

Roger B. Schagrin and John W. Bohn, Schagrin Associates, of Washington, DC, for VAM Drilling USA, Texas Steel Conversion, Inc., Rotary Drilling Tools, and TMK IPSCO.

**TSOUCALAS, Senior Judge:** This matter is before the court

following remand to the Department of Commerce ("Commerce") in
Downhole Pipe & Equip. LP v. United States, 36 CIT __, 887 F. Supp.
2d 1311 (2012) ("Downhole I").    Commerce issued its remand
redetermination in May 2013.   See Final Results of Redetermination
Pursuant to Court Remand (May 13, 2013), ECF No. 94 ("Remand
Results").  Plaintiffs Downhole Pipe & Equipment, LP, and DP-Master
Manufacturing   Co.,   Ltd.   ("DP-Master"   and,   collectively,
"Plaintiffs"),  contest  the  Remand Results.   For  the  reasons
discussed below, the court sustains the Remand Results.

BACKGROUND

        The relevant facts and procedural history of this case
are set forth in Downhole I, 36 CIT at __, 887 F. Supp. 2d at
1315–18, and are summarized briefly herein.   Drill pipes are
"specialized high-strength iron alloy tube[s]" used in oil drilling
applications alongside other so-called oil country tubular goods
("OCTG").   Id. at __, 887 F. Supp. 2d at 1315.   In the original
proceeding, Commerce determined that "drill pipe from the [People's
Republic of China ("PRC")] is being, or is likely to be, sold in
the United States at [less than fair value ("LTFV")]".   Drill Pipe
From the PRC: Final Determination of Sales at LTFV and Critical
Circumstances, 76 Fed. Reg. 1966, 1966 (Jan. 11, 2011) ("Final
Determination").

        The Final Determination specifically targeted drill pipe
green tubes ("DPGT"), an input for drill pipe defined as "seamless

tubes with an outer diameter of less than or equal to 6 5/8 inches[,] . . . containing between 0.16 and 0.75 percent molybdenum, and containing between 0.75 and 1.45 percent chromium." Id. at 1967. Commerce determined the surrogate value for DPGT using import data for Indian Harmonized Tariff Schedule ("IHTS") categories 7304.23 and 7304.29. See Drill Pipe from the PRC: Issues and Decision Memorandum for the Final Determination at 31–32 (Jan. 3, 2011), A-570-965.

    In Downhole I, the Court remanded the Final Determination to Commerce with instructions to reconsider the surrogate values for DPGT and the labor wage rate.[1] Downhole I, 36 CIT at __, 887 F. Supp. 2d at 1330. The Court held that Commerce failed to address Infodrive data contradicting its finding that DPGT entered India under IHTS 7304.23 and 7304.29 during the period of investigation. Id. at __, 887 F. Supp. 2d at 1324–25. The Court acknowledged that the IHTS subheadings may in fact be the best available information, but it could not affirm the Final Determination on the basis of the explanation Commerce provided. Id. at __, 887 F. Supp. 2d at 1325.

    On remand, Commerce examined a number of potential

_____

[1] On remand, Commerce selected data from "Chapter 6A: Labor Cost in Manufacturing" in the ILO Yearbook for India as the surrogate value for the labor wage rate. Remand Results at 18. Plaintiffs do not allege error in their submission to the court. See Pls.' Comments on Remand Redetermination ("Pls.' Cmts.").

surrogate values for DPGT, including: import data for IHTS 7304.23,
7304.29, and 7304.59; price data on P1110 and J/K 55 tubes from
Metal Bulletin Research; and adjusted values for alloy steel
billets and seamless tubes. See Draft Results of Redetermination
Pursuant to Remand at 4 (Apr. 5, 2013), ECF No. 119-2 ("Draft
Results"). Commerce initially selected price data for imports
under IHTS 7304.59.10 and 7304.59.20, "circular, seamless, alloy"
classifications covering "products which are not properly
classified as drill pipe, OCTG, or a number of other clearly-
delineated types of tubes."[2] Id. at 15. Commerce found that the
IHTS 7304.59 data was most representative of DPGT, contemporaneous
with the period of investigation, duty and tax exclusive, publicly
available, and represented a broad market average. See id. at
15–16. Commerce "confirmed" its analysis with a National Import
Specialist at United States Customs and Border Protection ("CPB").
Memorandum from Toni Datch, re: Remand Redetermination in the
Investigation of Drill Pipe from the PRC at 1 (Mar. 26, 2013),
A-570-965 ("NIS Memo").

For the final results, Commerce selected import data from
IHTS 7304.59.20 alone to value DPGT. See Remand Results at 14–18.
Commerce concluded that Infodrive data Plaintiffs placed on the

---

[2] IHTS 7304.59.10 and 7304.59.20 differ only in terms of the
size of the tubes they cover: IHTS 7304.59.10 covers tubes with
diameters up to 114.3 mm, while IHTS 7304.59.20 covers tubes with
diameters between 114.3 mm and 219.1 mm. Remand Results at 5.

record conclusively demonstrated that DPGT did not enter India under IHTS 7304.59.10, but did not foreclose the possibility that DPGT entered under IHTS 7304.59.20. Id. at 14. Commerce continued to find that import data for IHTS 7304.59.20 best met its preferences for surrogate values. Id.

Plaintiffs filed comments alleging that the Remand Results were unsupported by substantial evidence and otherwise not in accordance with law. See Pls.' Cmts. at 7–23. Plaintiffs ask the court to remand again with guidance on an acceptable range of surrogate values for DPGT. See id. at 23–25.

## JURISDICTION and STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and section 516A(a)(2)(B)(i) of the Tariff Act of 1930,[3] as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2006).

The court will uphold Commerce's remand redetermination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "'Substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Goldlink Indus. Co. v. United States, 30 CIT 616, 618, 431 F. Supp. 2d 1323, 1326 (2006) (quoting Universal

---

[3] All further citations to the Tariff Act of 1930 are to the relevant provisions of Title 19 of the United States Code, 2006 edition, and all applicable supplements thereto.

Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)). Under this standard, "an agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Gerber Food (Yunnan) Co. v. United States, 31 CIT 921, 926, 491 F. Supp. 2d 1326, 1333 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)). Nevertheless, "the possibility of drawing two inconsistent conclusions from the evidence does not invalidate Commerce's conclusion as long as it remains supported by substantial evidence." Zhaoqing New Zhongya Aluminum Co. v. United States, 36 CIT __, __, 887 F. Supp. 2d 1301, 1305 (2012) (citing Universal Camera, 340 U.S. at 488).

## DISCUSSION

Commerce determines the normal value of subject merchandise produced in a non-market economy ("NME") "on the basis of the value of the factors of production utilized in producing the merchandise" in a comparable market economy. 19 U.S.C. § 1677b(c)(1). In selecting these surrogate values, Commerce must use the "best available information." Id. Commerce "normally will use publicly available information" from a single country, 19 C.F.R. § 351.408(c)(1), (2) (2013), and it "prefers data that reflects a broad market average, is . . . contemporaneous with the period of review, specific to the input in question, and exclusive of taxes on exports." Fuwei Films (Shandong) Co. v. United States,

36 CIT __, __, 837 F. Supp. 2d 1347, 1350-51 (2012).

"[T]he process of constructing foreign market value for a producer in a [NME] country is difficult and necessarily imprecise." Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (internal quotation marks omitted). Commerce has "broad discretion to determine the best available information," Goldlink, 30 CIT at 619, 431 F. Supp. 2d at 1327 (internal quotation marks omitted), and "[i]f Commerce's determination of what constitutes the best available information is reasonable, then the Court must defer to Commerce." Id., 431 F. Supp. 2d at 1327.

Plaintiffs argue that Commerce erroneously determined that IHTS 7304.59.20 was the best available information because IHTS 7304.59.20 is not representative of DPGT and Commerce did not provide adequate justification for rejecting non-IHTS alternative values on the record. See Pls.' Cmts. at 8-23.

## I. Commerce Reasonably Concluded that IHTS 7304.59.20 Best Represented DPGT

Plaintiffs argue that Commerce erred in finding that IHTS 7304.59.20 was representative of DPGT because: (1) Commerce's analysis of Indian tariff classifications was inadequate; (2) Commerce failed to address Infodrive data indicating that IHTS 7304.59.20 was not representative of DPGT or DP-Master's merchandise; (3) Commerce ignored evidence indicating that the average unit value ("AUV") of entries under IHTS 7304.59.20 was

"aberrantly high;" and (4) Commerce improperly relied on the NIS
Memo. See Pls.' Cmts. at 8–21.

### A. Analysis of Indian Tariff Classifications

Plaintiffs argue that "Commerce's legal analysis of
tariff classifications was inadequate" because Commerce dismissed
alternative IHTS subheadings without considering "legal principles"
such as General Rule of Interpretation 2(a).[4] Pls.' Cmts. at 13.
Plaintiffs insist further analysis was necessary given Commerce's
change in position from the Final Determination and record evidence
indicating that petitioners classified DPGT under subheadings other
than 7304.59. Id. at 13–15.

Plaintiffs fail to demonstrate that Commerce's IHTS
analysis was inadequate. First, Plaintiffs do not cite any legal
authority demonstrating that Commerce must conduct a full
classification analysis when considering import data from a
particular foreign tariff heading as a surrogate value.[5] Second,
Plaintiffs provide virtually no legal analysis contravening

---

[4] GRI 2(a) reads: "Any reference in a heading to an article
shall be taken to include a reference to that article incomplete or
unfinished, provided that, as entered, the incomplete or unfinished
article has the essential character of the complete or finished
article."

[5] Plaintiffs also fail to provide guidance on why CBP
regulations should apply to the classification of DPGT under IHTS
categories over Indian laws and regulations. The court need not
address this matter because Commerce's selection of IHTS 7304.59.20
was reasonable on the basis of the record as a whole.

Commerce's selection.  This court has ruled that Commerce should not rely on a basket tariff category if a more representative surrogate value is available.  See Arch Chems., Inc. v. United States, 33 CIT 954, 972 (2009) (not reported in the Federal Supplement) (citing Polyethylene Retail Carrier Bag Comm. v. United States, 29 CIT 1418, 1444 (2005) (not reported in the Federal Supplement)).  Here, Commerce reasonably concluded that IHTS 7304.59.20 was more representative of DPGT than the alternative IHTS categories on the record.  See Draft Results at 5–6, 15–16; Remand Results at 14–18.  Commerce concluded that IHTS 7304.23 was not representative of DPGT because it captured processed semi-finished drill pipe.  See Draft Results at 5 (unchanged in Remand Results).  Similarly, Commerce concluded that IHTS 7304.29 was not representative of DPGT because it captured "semi-finished [OCTG] casing and tubing," which is not an input for drill pipe.  Id. (unchanged in Remand Results).  In contrast, Commerce found that IHTS 7304.59.20 better represented DPGT because it was a "circular, seamless, alloy category cover[ing] products which are not properly classified as drill pipe, OCTG, or a number of other clearly-delineated types of tubes."  Id. at 15 (unchanged in Remand Results).  Commerce "confirmed" its analysis with the professional opinion of a CPB official.  See NIS Memo at 1.  Accordingly, Commerce's classification analysis was reasonable.  See Gerber Food, 31 CIT at 926, 491 F. Supp. 2d at 1333 (quoting Motor Vehicle

Mfrs. Ass'n, 463 U.S. at 43).

### B. Infodrive Data

Plaintiffs also argue that Infodrive data demonstrates that 7304.59.20 is not representative of DPGT generally, or DP-Master's DPGT. See Pls.' Cmts. at 16–18. Plaintiffs cite Infodrive data indicating that there were no entries of DPGT in at least 60% of the entries under IHTS 7304.59.20 during the period of investigation. See id. at 16. In light of this evidence and Infodrive data indicating that DPGT did not enter under IHTS 7304.59.10 at all, Plaintiffs conclude that Commerce erroneously selected IHTS 7304.59.20 data to value DPGT. See id. at 17–18.

Plaintiffs essentially compare Commerce's selection of IHTS 7304.59.20 to the surrogate value for DPGT that the Court remanded in Downhole I. See id. at 17. In that opinion, the Court recognized Infodrive's "utility . . . as a supplement to aggregated IHTS data," but also noted that "Commerce need not rely on Infodrive data that is incomplete or demonstrably inaccurate." Downhole I, 36 CIT at ___, 887 F. Supp. 2d at 1323. The Court also acknowledged that "Commerce is obliged to address Infodrive data offered in rebuttal if it specifies a 'definite and substantial percentage' of imports under a particular IHTS category." Id., 887 F. Supp. 2d at 1323 (quoting Calgon Carbon Corp. v. United States, 35 CIT ___, ___, Slip Op. 11-21 at 17 (Feb. 17, 2011) (not reported in Federal Supplement)). The Court remanded Commerce's IHTS

classification because Commerce failed to explain contradictory
Infodrive data. Id. at __, 887 F. Supp. 2d at 1325. It also noted
that IHTS 7304.23 and 7304.29 might be the best available
information, but Commerce had to substantially support its
selection in light of the Infodrive data. Id., 887 F. Supp. 2d at
1325. See also Calgon, 35 CIT at __, Slip Op. 11-21 at 17-18
(remanding where Commerce failed to substantially support its
tariff classification while taking into account incomplete but
contradictory Infodrive data).

        In contrast to the facts in Downhole I, here Commerce
explained why its decision retained substantial record support in
light of the Infodrive data. See Remand Results at 16-17. As
noted above, Commerce selected IHTS 7304.59.20 based on its own
analysis of the IHTS and the professional opinion of a CBP
official. See Draft Results at 5-6, 15-16; Remand Results at
14-16. With specific regard to the Infodrive data, Commerce noted
that IHTS 7304.59.20 was not limited to DPGT as it is "a basket
category covering multiple types of seamless alloy tubes that could
not be classified elsewhere." Id. at 16-17. Additionally, given
that the other IHTS subheadings did not capture DPGT, and "without
information corroborating what the remainder of the overall imports
consist[ed] of," Commerce concluded that IHTS 7304.59.20 was still
most representative of DPGT. See id. at 17. Because it addressed
the Infodrive data in compliance with the requirements articulated

in Downhole I and Calgon, Commerce's analysis was reasonable. See
Downhole I, 36 CIT at __, 887 F. Supp. 2d at 1325; Calgon, 35 CIT
at __, Slip Op. 11-21 at 17-18.

          Plaintiffs also argue that the Infodrive data established
that IHTS 7304.59.20 was not representative of DP-Master's DPGT.
Pls.' Br. at 17.  According to Plaintiffs, 70% of DP-Master's DPGT
was of the diameter covered by IHTS 7304.59.10.  Id.  As Infodrive
data indicated that DPGT did not enter India under IHTS 7304.59.10,
and IHTS 7304.59.20 does not correspond to 70% of DP-Master's
merchandise, Plaintiffs insist that the surrogate value should not
apply to that merchandise.  See Pls.' Br. at 17-18.

          This   argument   is   unconvincing.    As   noted   above,
determining  a  surrogate  value  is  "difficult  and  necessarily
imprecise."  Nation Ford Chem. Co., 166 F.3d at 1377.  Although
IHTS  7304.59.20  does  not  perfectly  cover  DP-Master's  DPGT,
Commerce's  decision  was  reasonable  nonetheless  given  the  record
support  for  IHTS  7304.59.20  and  the  relative  weakness  of  the
alternative values.  See QVD Food Co. v. United States, 34 CIT __,
__, 721 F. Supp. 2d 1311, 1318 (2010) (when considering "imperfect
alternatives"  for  a  surrogate  value,  Commerce's  selection  is
reasonable if supported with substantial evidence in the record),
aff'd 658 F.3d 1318 (Fed. Cir. 2011).

### C. AUV of Entries Under IHTS 7304.59.20

          Third, Plaintiffs argue that Commerce failed to address

its claim that the $4,978.08/MT AUV of IHTS 7304.59.20 entries was "aberrantly high." <u>See</u> Pls.' Cmts. at 18. According to Plaintiffs, record evidence demonstrated that DPGT comprises approximately 30% of the value of finished drill pipe. <u>Id.</u> at 20. Because the AUV for IHTS 7304.59.20 entries is nearly double the $2,511.67/MT AUV for entries of finished and semi-finished drill pipe under IHTS 7304.23, Plaintiffs insist that "no reasonable mind could accept this value." <u>Id.</u> at 18.

"'[W]hen confronted with a colorable claim that the data that Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive.'" <u>See Xinjiamei Furniture (Zhangzhou) Co. v. United States</u>, 37 CIT __, __, Slip Op. 13-30 at 10 (Mar. 11, 2013) (quoting <u>Mittal Steel Galati S.A. v. United States</u>, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308 (2007)). "In such a case, it is not enough for Commerce to 'summarily discard the alternatives as flawed,' Commerce must also 'evaluate the reliability of its own choice.'" <u>Id.</u>, Slip Op 13-30 at 10 (quoting <u>Shanghai Foreign Trade Enters. Co. v. United States</u>, 28 CIT 480, 495, 318 F. Supp. 2d 1339, 1352 (2004)).

Commerce clearly addressed this argument in the <u>Remand Results</u>, finding that Plaintiffs' "previous arguments indicate that [IHTS 7304.23] is much broader than finished drill pipe, and is not a reliable indicator of the value of finished drill pipe." <u>Remand</u>

Results at 14. Specifically, Commerce noted that Plaintiffs "previously explained that some line items under [IHTS] category 7304.23.90 may be of drill pipe tools, other drill pipe products, or inputs of either." Id. at 14–15 (internal quotation marks omitted). Additionally, the Court acknowledged in Downhole I that IHTS 7304.23.90 contains entries of "seamless pipe" and other products. See Downhole I, 33 CIT at __, 887 F. Supp. 2d at 1324 & n.11. Simply put, there was no verifiable "benchmark" for drill pipe from which Commerce could value DPGT. And, as noted above, Commerce provided a reasonable explanation for its selection of IHTS 7304.59.20. Accordingly, Commerce reasonably rejected Plaintiffs' argument. See Gerber Food, 31 CIT at 926, 491 F. Supp. 2d at 1333 (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43).

### D. The NIS Memo

Plaintiffs argue that Commerce's determination was unreasonable because the NIS Memo was the "sole factual justification." Pls.' Cmts. at 8. The NIS Memo reads: "During the week of January 7, 2013, [Commerce] contacted Mary Ellen Laker, [CBP] National Import Specialist, regarding the HTS classification of [DPGT], as described in the scope of the Order. She confirmed that [DPGT] would be categorized under HTS 7304.59."[6] NIS Memo at

---

[6] The "Order" Commerce referred to is Drill Pipe From the PRC: Antidumping Duty Order, 76 Fed. Reg. 11,757 (Mar. 3, 2011), which is based, in part, on the Final Determination.

1 (internal footnote omitted). Plaintiffs allege that the NIS Memo
is unreliable as evidence because it does not explain whether the
contact with the CPB official was casual or formal, whether
Commerce provided the scope language to the CBP official, whether
the CBP official knew the Indian tariff categories as well as the
U.S. categories, whether the CBP official considered alternative
IHTS categories, or whether the CBP official considered the scope
language. See Pls.' Cmts. at 9–12. Accordingly, Plaintiffs argue
that the NIS Memo "fails to provide even the proverbial scintilla"
of evidence. Id. at 13 (internal quotation marks omitted).

     Plaintiffs' argument is unconvincing. First, contrary to
Plaintiffs' insistence, Commerce did not rely solely on the NIS
Memo in its analysis. As noted above, Commerce fell back on IHTS
7304.59.20 after reasonably concluding that it was more
representative of DPGT than the other IHTS classifications on the
record. See Draft Results at 5–6, 15–16; Remand Results at 14–18.
With specific regard to the NIS Memo, Commerce explained that it
"confirmed" this analysis with the CPB official. See NIS Memo at
1; Remand Results at 15–16.

     Second, Plaintiffs' argument is entirely conjectural.
Plaintiffs insist that the NIS Memo contains several possible
flaws, but fail to identify any evidence in the record supporting
their assertions. See Pls.' Cmts. at 9–12. Accordingly, their
argument simply invites the court to reweigh evidence. However,

"[t]he court's role is not to reweigh evidence," <u>Fedmet Res. Corp.</u> <u>v. United States</u>, 37 CIT __, __, 911 F. Supp. 2d 1348, 1355 (2013) (Tsoucalas, J.) (citing <u>Laminated Woven Sacks Comm. v. United States</u>, 34 CIT __, __, 716 F. Supp. 2d 1316, 1328 (2010) (Tsoucalas, J)), and it declines to do so here.

## II. Commerce Reasonably Rejected the Alternative Surrogate Values on the Record

Finally, Plaintiffs argue that Commerce "wrongly dismissed" the other alternative surrogate values on the record. Pls.' Cmts. at 21. Incorporating by reference their pre-draft remand comments, Plaintiffs insist that the price data for P1110 and J/K 55, as well as the adjusted values for alloyed steel billets and seamless tubes, are all superior to the data Commerce selected. <u>Id.</u> at 21–23. Plaintiffs add that, contrary to Commerce's findings, the data from these sources would require little if any adjustment to calculate a surrogate value for DPGT. See <u>id.</u> at 23.

As noted above, when selecting a surrogate value, Commerce "normally will use publicly available information" from a single country, see 19 C.F.R. § 351.408(c)(1), (2), and it "prefers data that reflects a broad market average, is . . . contemporaneous with the period of review, specific to the input in question, and exclusive of taxes on exports." <u>Fuwei Films</u>, 36 CIT at __, 837 F. Supp. 2d at 1350–51. Here, Commerce reasonably determined that

IHTS 7304.59.20 import data satisfied more of its selection criteria than the flawed alternatives on the record.

Commerce rejected <u>Metal Bulletin Research</u> price data for J/K 55 because J/K 55 is not an input for drill pipe and was "at best comparable" to DPGT. <u>Draft Results</u> at 8 (unchanged in <u>Remand Results</u>). Moreover, the J/K 55 data did not reflect actual sales prices, was not contemporaneous with the period of investigation, and covered only one month of prices. <u>Id.</u> (unchanged in <u>Remand Results</u>). Therefore, Commerce reasonably concluded that J/K 55 data did not satisfy its selection criteria. <u>See</u> <u>Fuwei Films</u>, 36 CIT at __, 837 F. Supp. 2d at 1350–51.

Commerce rejected the P1110 price data for similar reasons, finding that P1110 is not representative of DPGT because it is a "finished OCTG product" that cannot be used as an input for drill pipe. <u>Draft Results</u> at 9 (unchanged in <u>Remand Results</u>). Additionally, the P1110 data was based on offers and only covered one month of price information. <u>Id.</u> at 9 (unchanged in <u>Remand Results</u>). Accordingly, Commerce reasonably determined that the P1110 data was not the best available information. <u>See</u> <u>Fuwei Films</u>, 36 CIT at __, 837 F. Supp. 2d at 1350–51.

Commerce also rejected adjusted values for alloy steel billets and seamless tubes, finding that the record lacked sufficient information to adjust the values for the required alloying costs and that calculating such adjustments required

proprietary information.  See Draft Results at 9–12 (unchanged in
Remand Results).  Plaintiffs contest this finding, arguing that the
cost of alloying elements for steel billets and seamless tubes is
minimal and therefore the values for these products are the most
accurate on the record.  See Pls.' Cmts. at 22–23.  Plaintiffs fail
to address Commerce's finding that these adjustments, however
small, require proprietary information.  See Remand Results at 17.
Because its regulations direct it to use "publicly available
information," 19 C.F.R. § 351.408(c)(1), Commerce reasonably
rejected these adjusted values.

In contrast, Commerce found that the IHTS 7304.59.20 data is
"contemporaneous with the [period of investigation], represent[s]
a broad market average, [is] tax and duty exclusive, and [is]
publicly available, thus comporting with [its] selection criteria."
Draft Results at 16; see also Remand Results at 14.  And, as noted
above, Commerce determined that IHTS 7304.59.20 was the surrogate
value most representative of DPGT.  See Draft Results at 5–6,
15–16; Remand Results at 14–18.  Accordingly, Commerce reasonably
concluded that IHTS 7304.59.20 was the best available information
on the record.  See 19 C.F.R. § 351.408(c)(1), (2); Fuwei Films, 36
CIT at __, 837 F. Supp. 2d at 1350–51.

Court No. 11-00081                                                    Page 19

## CONCLUSION

For the foregoing reasons, Commerce's remand redetermination is sustained in its entirety. Judgment will be entered accordingly.


                                              _/s/ Nicholas Tsoucalas_
                                              **Nicholas Tsoucalas**
                                              **Senior Judge**

Dated: November 4, 2013
       New York, NY

### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DOWNHOLE PIPE & EQUIPMENT, LP, and DP-MASTER MANUFACTURING CO., LTD., | : <br> : <br> : <br> : |
|        Plaintiffs, | : <br> : Before: Nicholas Tsoucalas, |
|    v. | :         Senior Judge <br> : |
| UNITED STATES, | : Court No.: 11-00081 <br> : |
|        Defendant, | : <br> : |
|      and | : <br> : |
| VAM DRILLING USA, TEXAS STEEL CONVERSION, INC., ROTARY DRILLING TOOLS, TMK IPSCO, and U.S. STEEL CORP., | : <br> : <br> : <br> : <br> : |
|        Defendant-Intervenors. | : <br> : |

### JUDGMENT

Upon consideration of the remand redetermination filed by the Department of Commerce pursuant to the Court's order in <u>Downhole Pipe & Equip. LP v. United States</u>, 37 CIT __, 887 F. Supp. 2d 1311 (2012), the comments and replies thereto, and all other papers and proceedings herein, it is hereby

**ORDERED** that the remand redetermination (ECF No. 94) is sustained; and it is further

**ORDERED** that judgment is entered for the United States.

                   /s/ Nicholas Tsoucalas
                  **Nicholas Tsoucalas**
                    **Senior Judge**

**Dated:** **November 4, 2013**
      **New York, New York**