2014-1225

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DOWNHOLE PIPE & EQUIPMENT, L.P., and
DP-MASTER MANUFACTURING CO., LTD.,

Plaintiff-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

VAM DRILLING USA; TEXAS STEEL CONVERSION, INC.;
ROTARY DRILLING TOOLS; TMK IPSCO; and
U.S. STEEL CORP.,

Defendant-Appellees,

Appeal from the United States Court of International Trade in
case No. 11-CV-00081, Judge Nicholas Tsoucalas

BRIEF OF DEFENDANT-APPELLEES
VAM DRILLING USA; TEXAS STEEL CONVERSION, INC.;
ROTARY DRILLING TOOLS; and TMK IPSCO

Roger B. Schagrin
John W. Bohn
SCHAGRIN ASSOCIATES
900 7TH St. NW, Suite 500
Washington, DC 20001
(202) 223-1700

June 16, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## DOWNHOLE PIPE & EQUIPMENT, L.P. v. UNITED STATES

### No. 2014-1225

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee VAM Drilling USA certifies the following:

1. The full name of every party or amicus represented by me is: VAM Drilling USA.

2. The real name of the parties in interest (if the party named in the caption is not the real party in interest) is: not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties or amicus curiae represented by me are:

   VAM Drilling is a subsidiary of Vallourec & Mannesmann Tubes, a subsidiary of Vallourec Group, which is traded on the Paris stock exchange.

4. The name of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are: Schagrin Associates, Roger B. Schagrin and John W. Bohn.

___/s/ Roger B. Schagrin___
Roger B. Schagrin
John W. Bohn
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

Dated: June 16, 2014

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

DOWNHOLE PIPE & EQUIPMENT, L.P. v. UNITED STATES

No. 2014-1225

**CERTIFICATE OF INTEREST**

Counsel for Defendant-Appellee Texas Steel Conversion, Inc. certifies the following:

1. The full name of every party or amicus represented by me is: Texas Steel Conversion, Inc.

2. The real name of the parties in interest (if the party named in the caption is not the real party in interest) is: not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties or amicus curiae represented by me are:

   None.

4. The name of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are: Schagrin Associates, Roger B. Schagrin and John W. Bohn.

__/s/ Roger B. Schagrin____
Roger B. Schagrin
John W. Bohn
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

Dated: June 16, 2014

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

DOWNHOLE PIPE & EQUIPMENT, L.P. v. UNITED STATES

No. 2014-1225

**CERTIFICATE OF INTEREST**

Counsel for Defendant-Appellee TMK IPSCO certifies the following:

1. The full name of every party or amicus represented by me is: TMK IPSCO.

2. The real name of the parties in interest (if the party named in the caption is not the real party in interest) is: not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties or amicus curiae represented by me are:

   TMK IPSCO is traded on the Moscow stock exchange.

4. The name of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are: Schagrin Associates, Roger B. Schagrin and John W. Bohn.

___/s/ Roger B. Schagrin___
Roger B. Schagrin
John W. Bohn
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

Dated: June 16, 2014

# TABLE OF CONTENTS

I.  STATEMENT OF RELATED CASES ..............................................................1

II.  STATEMENT OF THE FACTS.................................................................1

III.  SUMMARY OF ARGUMENT.....................................................................6

  A.  Downhole's scope argument .........................................................6

  B.  Downhole's surrogate value argument.........................................8

IV.  ARGUMENT.............................................................................................11

  A.  Commerce properly included green tube in the scope................11

    1.  Downhole is wrong that the OCTG investigation included all "green tube" ..........................................................................................11

    2.  Downhole is incorrect that excluding green tube for drill pipe from the drill pipe scope would warrant re-evaluating industry support, much less finding that industry support was lacking.........................................17

  B.  SUBSTANTIAL EVIDENCE SUPPORTS COMMERCE'S GREEN TUBE SURROGATE VALUE SELECTION ....................................................20

    1.  Commerce's surrogate values were not "aberrantly high" ......................21

    2. Commerce reasonably concluded that IHTS 7304.23 is the correct category for green tube for drill pipe ..............................................................25

3.      Commerce reasonably rejected Downhole's other proposed alternative

SVs  .................................................................................................36

V.  CONCLUSION ..............................................................................45

# TABLE OF AUTHORITIES

## Cases

*Am. Silicon Techs. v. United States*, 261 F.3d 1371 (Fed. Cir. 2001) .....................27

*Downhole Pipe & Equip. LP v. United States*, 887 F. Supp. 2d 1311  (Ct. Int'l

Trade 2012)....................................................................................... 15, 29

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ....................47

*NMB Singapore Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009)..................34

*PSC VSMPO – Avisma Corp. v. United States*, 688 F.3d 751 (Fed. Cir. 2012)......33

*SEC v. Schreiber*, 381 U.S. 279 (1965) ..................................................................33

## Statutes

19 U.S.C. § 1673a(c)(4)(E).....................................................................................20

## Other Authorities

*Certain Oil Country Tubular Goods from India, Korea, The Philippines, Saudi Arabia, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, USITC Pub. 4422 (prelim.) (Aug. 2013)............................................................39

*Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 28,551 (Dep't Commerce May 21, 2010) (amended final AD determ.). ....13

*Drill Pipe and Drill Collars from China*, Inv. Nos. 701-TA-474 & 731-TA-1176 (final), USITC Pub. 4213 (Feb. 2011)..................................................... 1, 3, 4, 46

*Drill Pipe from China*, Inv. Nos. 701-TA-474 & 731-TA-1176 (prelim.), USITC Pub. 4127 (Mar. 2010)...........................................................13

*Drill Pipe from the People's Republic of China*, 76 Fed. Reg. 1966 (Dep't Commerce Jan. 11, 2011) (final AD determ.).......................................................8

*Drill Pipe from the People's Republic of China*, 76 Fed. Reg. 1966 (Dep't Commerce Jan. 11, 2011) (final AD determ.).......................................................14

*Investigation with Respect to the Operation of the Harmonized System Subtitle of the Omnibus Trade and Competitiveness Act of 1988*, USITC Pub. 2296, 1990 ITC LEXIS 244 (June, 1990) ...........................................................35

*Oil Country Tubular Goods from Argentina, Austria, Italy, Japan, Korea, Mexico, and Spain*, USITC Pub. 2911, 1995 USITC LEXIS 626 (Aug. 1995) (final determination)...........................................................37

## I. STATEMENT OF RELATED CASES

As required by Rule 47.5 of this Court, counsel for Defendants-Appellees VAM Drilling USA, Texas Steel Conversions, Inc., Rotary Drilling Tools, and TMK IPSCO state:

1.    No other appeal in or from the same civil action or proceeding in the lower court was previously before this Court or any other appellate court.

2.    *Downhole Pipe & Equipment, L.P. v. United States*, No. 11-00080, is presently before the U.S. Court of International Trade. That case is an appeal of the U.S. International Trade Commission's original affirmative determination in *Drill Pipe and Drill Collars from China*, Inv. Nos. 701-TA-474 & 731-TA-1176. If that appeal results in a final negative ITC decision, this case will be moot.

## II. STATEMENT OF THE FACTS

A very brief summary of some of the facts is necessary to describe certain technical terms and correct certain misimpressions that Downhole's statement may leave.

Oil rig operators drill oil and gas wells by rotating a "drill string," which consists of lengths of drill pipe and other steel tube, with a drill bit on the bottom. *See generally Drill Pipe and Drill Collars from China*, Inv. Nos. 701-TA-474 & 731-TA-1176 (final), USITC Pub. 4213, at 5 & I-7 to I-11 (Feb. 2011) ("*Drill Pipe*

*Final*"). As the drill string gets deeper the operator attaches new lengths to the top. Sometimes the string can extend for miles downward, and typically it twists to drill sideways to reach the oil or gas formations. *Id.* When the operator finishes a hole, it raises the drill string and disassembles for use at a different location. However, drill pipe gets worn down by the abrasion, vibration, and metal fatigue caused by rotating at 50 to 200 rpm through rock under high heat and pressure. Williamson Declaration (JPA 1756-1757). The drill pipe has to transmit the rotational energy from the drill rig down to the drill bit without getting twisted, and also must support the weight of the entire string of massive metal components below it, particularly when it is raised out of a hole. *Id.* When its walls get too thin or otherwise damaged to do this reliably, it becomes worn out. *Id.* For these reasons, drill pipe needs to be both strong in all dimensions (to resist pressure and support weight), tough (to absorb rotational energy without cracking), and susceptible to welding (as described below), requirements that normally conflict from a metallurgical perspective. *Id.;* Miller Declaration ¶ 10 (JPA 1751); Williamson Declaration (JPA 1756). The required chemical, dimensional, and other characteristics of drill pipe are set out in American Petroleum Institute ("API") standard 5L, or in special proprietary standards sometimes used for particularly exacting applications.

The drill pipe manufacturing process starts with a solid steel "billet" that has the necessary alloying elements. *Drill Pipe Final*, USITC Pub. 4213 at I-12 to I-14. The steel used for drill pipe must be particularly "clean," because even tiny inclusions will cause the final product to wear or crack in use. Miller Declaration ¶ 10 (JPA 1751). A steel tube mill forms a hollow steel tube from billet that has the necessary wall thickness and other dimensions for the drill pipe. USITC Pub. 4213 at I-13; Williamson Declaration (JPA 1755). The industry often refers to the resulting unfinished tube at this stage as a "green tube" (in the sense of raw or fresh), though this term does not appear in industry specifications (or tariff classifications). Williamson Declaration at note 1 (JPA 1755). At this point the green tube has the chemistry and general dimensions of the finished drill pipe, but cannot be used in a drill string until it undergoes an extensive finishing process. *Id.* (JPA 1755-56).

The drill pipe finishing process first requires heating the green tube to forging temperature to "upset" or thicken their ends pounding them inward. *Drill Pipe Final*, USITC Pub. 4213 at I-13 & n.29; Smith Declaration (PJA 659). Thickening the ends is necessary because a special connector called a "tool joint." A tool joint is a feature unique to drill pipes. It gets welded to both ends of the tube to connect them to other drill pipe lengths, and the ends of the drill pipe must be made thick and strong enough to accommodate it. *Drill Pipe Final*, USITC Pub.

4213 at I-13. For drill pipe the upsetting process also requires carefully controlling the transition or "fadeout" on the inside and outside of the pipe between the normal wall thickness and the thickened end. Smith Declaration (PJA 659). API standards cover the exact dimensions of the upset and fadeout for each size and grade of drill pipe. USITC Pub. 4213 at I-13 n.29.

The next step involves heat treating the pipe, *i.e.,* heating and cooling it in controlled ways to impart the necessary microstructure to the steel. Smith Declaration (JPA 659). After that, the tool joint gets welded on and the pipe sustains additional heat treatment and processing before it is finally finished. *Drill Pipe Final*, USITC Pub. 4213 at I-13.

Oil country tubular goods ("OCTG") form a different category of steel pipe. OCTG consists primarily of "casing" and "tubing." When the drill string is removed from the well it is replaced by casing, which creates a wall inside the hole, and within it tubing, through which the oil or other petroleum products are extracted. The unfinished tube used to make OCTG is also called green tube, but it has qualities suited to make OCTG, rather than drill pipe.

The different qualities derive from the different functions of the two sorts of products. Whereas drill pipe gets rotated rapidly in the drill hole for thousands of hours, and gets moved regularly, casing and tubing stay fixed in place once put into the hole. The primary function of OCTG is therefore to withstand or contain

pressure. Williamson Declaration (JPA 1756). Thus, it does not sustain the

torsional loading of drill pipe, alternating bending loads, and the tension of being

moved in and out of a hole. *Id.* This means that green tube for OCTG does not

need the same combination of alloys, and does not require steel that is as clean.

Williamson Declaration (PJA 1756); Miller Declaration ¶¶ 10, 14 (PJA 1751).

Similarly, since OCTG walls do not get continually abraded by rotation, they need

not have the same wall thickness or tolerance, or degree of roundness. Williamson

Declaration (PJA 1757); Miller Declaration ¶ 12 (PJA 1752).[1] Indeed, because

OCTG need not have the same strength, about half is made from welded tubes, not

seamless tubes like drill pipe, and the lower grades of OCTG such as J and K

normally are not heat treated. Miller Declaration ¶ 7 (PJA 1751); Williamson

Declaration (PJA 1756). Further, the ends of OCTG are simply threaded, not

welded, so green tube for OCTG need not be designed for weldability, and finished

OCTG will have different upset and fadeout shape, if indeed it is upset at all.

Miller Declaration (PJA 1756).

---

[1] Since manufacturing processes are not exact, dimensions and other characteristics will deviate from the nominal requirement to some degree. Drill pipe and OCTG specifications therefore set out how much deviation will be tolerated, either for an individual tube or for a shipment.

## III.    SUMMARY OF ARGUMENT

Downhole raises two arguments.

### A.    Downhole's scope argument

First, it contends that the scope of the drill pipe investigation was improper, because, it claims, all green tubes for drill pipe are already covered by the scope of a separate antidumping (AD) order on OCTG from China. Downhole argues that since the scope of the drill pipe investigation was improper, Commerce must remove green tube for drill pipe from the scope, and reconsider whether it has sufficient domestic industry support with a revised scope.

Downhole misinterprets the coverage of the OCTG order. It encompasses "OCTG . . . whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products)". *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 28,551, 28,553 (Dep't Commerce May 21, 2010) (amended final AD determ.). It thus defines "green tube" for purposes of the OCTG order as a type of unfinished OCTG. Accordingly, tube that practically cannot or will not be made into OCTG does not fall within the scope of the OCTG order.

Drill pipe green tube cannot as a physical or commercially practical matter be made into OCTG. Aside from the physical differences described above, drill pipe green tube differs from OCTG green tube in its channels of distribution,

customer expectations, and end use. The scope of the drill pipe investigation when it was initiated encompassed "green tubes suitable for drill pipe" while excluding "unfinished tubes for casing or tubing covered by any other antidumping or countervailing duty order." *Drill Pipe from the People's Republic of China*, 75 Fed. Reg. 4531, 4535 (Dep't Commerce Jan. 28, 2010) (initiation AD investigation) (PJA527-531) ("*Initiation*"). Accordingly, this scope encompassed only green tube that could not physically be made into OCTG, or that commercially would not be used as such. Green tube having the physical characteristics described above for drill pipe, and that differs from OCTG green tube in channels of distribution, customer expectations, and end use, would fall within the scope of the drill pipe investigation, but not the OCTG scope. There is no overlap.

After initiation, Commerce expressed concern that it would be difficult to administer the original scope, because Customs and Border Protection (CBP) cannot readily assess non-physical qualities of imported merchandise such as channels of distribution, customer expectations, and end use. Commerce therefore required a modification of the scope to define drill pipe green tubes as "seamless tubes with an outer diameter of less than or equal to 6 5/8 inches (168.28 millimeters), containing between 0.16 and 0.75 percent molybdenum and 0.75 and 1.45 percent chromium". *Drill Pipe from the People's Republic of China*, 76 Fed.

7

Reg. 1966, 1967 (Dep't Commerce Jan. 11, 2011) (final AD determ.) (PJA 2025-2030) ("*Final*"). However, the final scope still excluded "unfinished tubes for casing or tubing covered by any other antidumping or countervailing duty order." *Id.* Downhole maintains that drill pipe green tube meeting the physical limitations set out in the final scope could still theoretically make some unusual, high-grade OCTG products. However, Downhole has cited no actual examples of this. In any event, products meeting all of the drill pipe physical requirements described above would still be distinguishable from OCTG based on channels of distribution, customer expectations, and end use. Accordingly, they either could not or would not be made into OCTG, and would fall outside of the OCTG scope.

In any event, it would be unlawful for Commerce to revisit industry support based on changes to the scope after initiation, as Downhole demands, and Downhole's arguments about industry support disregard production of other types of unfinished drill pipe, and green tube for heavyweight drill pipe and drill collars.

## B. Downhole's surrogate value argument

Second, Downhole complains that Commerce used an unreasonable surrogate value ("SV") for drill pipe green tube. Commerce selected as its SV for drill pipe green tube an average of values of imports into India under Indian Harmonized Tariff Schedule ("IHTS") 7304.59.20. It concluded based on HTS tariff headings that IHTS 7304.59.20 would be the appropriate classification in

India for drill pipe green tube, and confirmed this opinion by discussing the matter

with the National Import Specialist ("NIS") from Customs and Border Protection

("CBP"), Mary Ellen Laker.

Downhole complains that this average value was "aberrantly high," because

it exceeded the average value of Indian imports under IHTS 7304.23.90, the IHTS

category that includes finished and semi-finished (heat treated) drill pipe, as well

as other potential SV measures of the value of green tube advocated by Downhole.

Downhole points out that the value of a finished drill pipe should not exceed

the value of its individual components, including green tube. However, that is not

the point. The average import values in both IHTS 7304.59.20 and IHTS

7304.23.90 reflected values for a variety of different products, not just green tube

on the one hand and semi-finished or finished drill pipe on the other. Commerce

reasonably determined that IHTS 7304.23.90 included various low-value products

as well, which would have depressed the overall value in this category and made it

not comparable to green tube prices.

Downhole also complains that Commerce had no reasonable basis to

conclude that IHTS 7304.59.20 in fact included green tube for drill pipe.

Downhole notes that published excerpts from shipping documents in this category

do not reference "green tube." However, as Commerce pointed out, these

documents did not describe all of the entries in this category. Furthermore, "green

tube" is not a standardized industry term and is not mentioned in the IHTS headings, so it is not possible to say that other types of seamless tubes mentioned in these documents were not, in fact, drill pipe green tube.

Downhole also objects to Commerce's conclusion that imports of drill pipe green tube would properly be categorized in IHTS 7304.59.20. It asserts that the Petitioners themselves may import drill pipe green tube in different categories. It particularly objects to Commerce's reliance on Ms. Laker's opinion. It alleges that since Commerce's contact with her "must have been a phone call," it therefore "could only be an off-the-cuff, off-the-record, unofficial, personal opinion." Downhole Br. 50. Downhole suggests that Ms. Laker issued her opinion without considering the scope of the drill pipe order, the characteristics of the drill pipe, or general rules of tariff interpretation, and that Ms. Laker is unqualified to discuss Indian HTS categories.

Downhole's objections make no sense. It is incongruous for Downhole to allege that Petitioners' putative opinions about the proper classification of green tube imports are sufficiently compelling evidence of the proper classifications to warrant reversing Commerce's decision, while dismissing the opinion of the CBP National Import Specialist herself. Its accusations that Ms. Laker issued a frivolous opinion without considering either the facts or law is wholly speculative, and lacks any support in the record. Finally, the World Customs Organization, to which both

India and the United States below, has harmonized HTS categories specifically to allow international comparisons and permit businesses in one country to understand tariff classifications in others.

Finally, Downhole proposes a series of alternative SVs, which it insists the record required Commerce to adopt in lieu of the one that Commerce selected. Downhole's arguments in this regard are classic attempts to persuade the Court to re-weigh the agency's evaluation of evidence. While there may have been other reasonable alternative SV choices available to Commerce, none compel the conclusion that Commerce's choice was unreasonable. Accordingly, the Court must sustain it.

## IV.  ARGUMENT

### A.  Commerce properly included green tube in the scope

#### 1.  Downhole is wrong that the OCTG investigation included all "green tube"

First, Downhole is incorrect that Commerce's investigation of OCTG from China, or the order that resulted from it, includes all "green tube."

As Downhole currently describes its argument, it contends that "because the OCTG investigation covers all green tube, and Commerce cannot distinguish out drill-pipe green tube, drill pipe green tube is already covered by the OCTG

11

investigation (and now orders)." Downhole Br. 33. That is, Downhole views the OCTG order's scope as "all-encompassing," so that the drill pipe scope cannot "carve itself out of the OCTG scope." *Id.* Downhole contends that since no class of merchandise can simultaneously be covered by two different antidumping orders, Commerce must exclude all green tube from the scope of the drill pipe antidumping order.

### a. *Downhole fails to define "green tube"*

To analyze this claim requires, as an initial matter, being clear about what "green tube" means. Downhole's brief nowhere defines what Downhole means by "green tube." The closest that it comes is in its statement of facts, which states, "the primary input into drill pipe is a seamless tube – called 'green tube' – which is produced from raw steel." Downhole Br. at 4.

This implies that Downhole views green tube as any seamless steel tube. Yet that is certainly not the definition of green tube in the OCTG order. Much OCTG is welded, not seamless. Also, other orders cover other types of both welded and seamless tube from China.

In fact, the OCTG order makes clear that "green tube" is a type or subset of "unfinished" OCTG. The OCTG scope states that it encompasses "OCTG . . . whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products)". *Certain Oil Country*

*Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 28,551, 28,553

(Dep't Commerce May 21, 2010) (amended final AD determ.). In particular, green

tube is unfinished drill pipe at a relatively early stage of the production process,

and that has thus not been heat treated.[2]

   This understanding is entirely consistent with the scope in the *Drill Pipe*

order, which encompasses "unfinished drill pipe (including drill pipe green tubes,

which are tubes meeting the following description: seamless tubes with an outer

diameter of less than or equal to 6 5/8 inches (168.28 millimeters), containing

between 0.16 and 0.75 percent molybdenum and 0.75 and 1.45 percent chromium".

*Drill Pipe from the People's Republic of China*, 76 Fed. Reg. 1966, 1967 (Dep't

Commerce Jan. 11, 2011) (final AD determ.) (PJA 2025-2030) ("*Final*").

Similarly, the *Drill Pipe* scope excludes "unfinished tubes for casing or tubing

covered by any other antidumping or countervailing duty order." *Id.*

---

[2]   *E.g., Drill Pipe from China*, Inv. Nos. 701-TA-474 & 731-TA-1176
(prelim.), USITC Pub. 4127, at 9 & I-17 & I-20 (Mar. 2010). After it is heat
treated and upset, but before its tool joint is affixed, it is unfinished but no
longer green tube. For example, Downhole distinguishes between green tube
and what it calls "semi-finished" drill pipe at a later stage in the production
process. Downhole Br. at 38.

### b.    *Green tube for drill pipe is distinguishable from green tube for OCTG based on end-use as well as physical characteristics*

Because green tube is an "unfinished" product, its definition depends on its end use. Green tube that practically or commercially cannot be used for OCTG is not "unfinished OCTG" and hence does not fall in the scope of the order on OCTG form China. Indeed, before the Court below, Downhole seemed to acknowledge that green tube for drill pipe could be distinguished from green tube for OCTG based on end use. When Commerce initiated the investigation, it included in the scope "green tubes suitable for drill pipe" but excluded "unfinished tubes for casing or tubing covered by any other antidumping or countervailing duty order." *Initiation*, 75 Fed. Reg. at 4535 (PJA527-531). Downhole told the court below that "distinguishing green tube by end-use, might have remedied the overlap if it had been published before the OCTG investigation was initiated." *Downhole Pipe & Equip. LP v. United States*, 887 F. Supp. 2d 1311, 1319  (Ct. Int'l Trade 2012) (PJA 29) ("*Downhole I*").

Be that as it may, however, the language of the scope of both orders makes clear that what types of tubes are green tubes for OCTG and what types are green tubes for drill pipe depends not just on their physical characteristics, but their end use. Based on this, it is easy to see the substantive defects in Downhole's argument.

> ### c. Other physical and non-physical distinctions between green tube for drill pipe and green tube for OCTG ensure that the OCTG scope does not cover drill pipe green tube

As noted above, Downhole argues that *all* green tube meeting the three physical requirements mentioned in the drill pipe scope could also make C90, T95, P110, and Q125 OCTG products, based on the American Petroleum Institute ("API") specifications for these OCTG products.

As an initial matter, Downhole's assertion that "petitioners conceded that 'the API does not set minimum alloy requirements for casing, tubing, and drill pipe'" is misleading. *See* Downhole Br. 31 (quoting Petitioner's Feb. 12, 2010 Submission at 5 (PJA 1679). In fact, what Petitioners stated was "Although the API does not set minimum alloy requirements for casing, tubing, and drill pipe, in order to meet the API physical strength standards the following percentages of the alloying elements molybdenum and chromium must be present." Petitioner's Feb. 12, 2010 Submission at 5 (PJA 1679). In other words the API chemical specifications by themselves do not determine what tubes can and cannot be made into OCTG. Rather, engineering practicality requires certain levels of alloying elements if the pipe is to meet the API strength standards. Thus, Downhole's argument is based merely on the hypothetical possibility that any given drill pipe

15

green tube could be made into OCTG. It does not show that this would be practical as an engineering matter, let alone a commercial one.

In fact, it is not technically and commercially practical for drill pipe green tube to be made into OCTG. Thus, "green tube" as used in the OCTG order as a type of unfinished OCTG does not cover green tube for drill pipe, as the drill pipe order expressly excludes "unfinished tubes for casing or tubing covered by any other antidumping or countervailing duty order." As the Court below recognized, even if a green tube were to meet the three physical specifications noted in the drill pipe scope (*i.e.*, being seamless, having an outside diameter 6 5/8 inches or less, and having certain ranges of molybdenum and chromium), in assessing whether tubes also meet these other end-use related requirements, other physical characteristics of drill pipe plus other non-physical characteristics, such as channels of distribution and customer expectations, also come into play.[3]

*Downhole I*, 887 F. Supp. 2d at 1320 (PJA 30). In the rare circumstances where

---

[3]    Other physical differences include wall thickness, and dimensional tolerances. Drill pipe must be rotated steadily as it drills through rock, and gets re-used to drill multiple wells. Miller Declaration; Williamson Declaration at 3 (PJA 1757). This wears down the drill pipe, the walls of the green tube from which it is made have to be made extra thick, and with tightly controlled tolerances for thickness and roundness. Casing and tubing simply sit in the well after it is drilled, so the walls are normally thinner, and can have more variance. Drill pipe green tube steel must also have fewer inclusions, which can cause cracking. Miller Declaration ¶¶ 9-10 (PJA 1751).

seamless OCTG green tube for the rather unusual specifications cited by Downhole might meet the dimensional and alloy requirements set forth in the drill pipe scope, the importer can point to the lack of these other characteristics to show that the product nevertheless is not subject to duties on drill pipe.[4]

Accordingly, the record contradicts Downhole's claim that all drill pipe green tube is also OCTG green tube that falls within the scope of the OCTG order. Thus, Downhole's argument that Commerce must exclude all drill pipe green tube from the scope of the drill pipe order cannot prevail.

**2.      Downhole is incorrect that excluding green tube for drill pipe from the drill pipe scope would warrant re-evaluating industry support, much less finding that industry support was lacking**

The relief that Downhole requests is also improper. Downhole argues that Commerce included three companies that make green tube but not finished drill pipe in its calculation of U.S. industry support. Downhole argues that since green tube is not properly included in the scope, Commerce must recalculate industry support without these companies. It maintains that without these three companies,

---

[4]      Domestic Producers understand that this has been the consistent interpretation of both Commerce and CBP, since before the drill pipe preliminary duties took effect, CBP did not apply OCTG duties to drill pipe green tube and U.S. producers never requested it.

the Petitions would not have had support of 25 percent of the U.S. industry. Downhole Br. 32.

However, the scope of the investigation at the time of initiation did not even refer to any particular physical characteristics of green tube for drill pipe, but simply encompassed green tube "suitable for drill pipe" while excluding "unfinished tubes for casing and tubing covered by the scope of any other antidumping or countervailing duty order." *Initiation*, 75 Fed. Reg. at 4535 (PJA 531). This clearly allowed Commerce to distinguish between drill pipe green tube and OCTG green tube based on its likely end-use. Even Downhole does not claim that any law prohibited Commerce from using such "end-use" scope language. As discussed above, it is fairly straightforward to distinguish drill pipe for green tube from drill pipe for OCTG based on end-use, given the differences in physical characteristics, channels of distribution, and customer expectations.

In any event, at the time of initiation of the drill pipe investigation, there was no AD order yet in effect involving OCTG, so there was as of that time no possible double AD coverage. Even if overlap existed, which it did not, Downhole cites no case prohibiting investigation of one product in separate antidumping proceedings. Indeed, Commerce would need discretion to do so because, until it has investigated, it may not be certain of the proper scope of any order.

18

Thus, even if Downhole were correct that under the *final* scope language that Commerce adopted all green tubes for drill pipe were already unlawfully encompassed in the scope of the OCTG order, which is not the case, Commerce could not revisit industry support. Once Commerce initiated the investigation, 19 U.S.C. § 1673a(c)(4)(E) expressly prohibited it from re-assessing industry support, even if it later saw fit to change the scope of the investigation due to the supposed administrative convenience of using physical characteristics language in the scope. The statute prohibits such revisions for good reason. Commerce cannot revisit industry support every time it clarifies or modifies the scope at any time after initiation, to ensure that no production of products later determined to fall outside the scope was counted in the industry support calculation. This would require revisiting orders on a constant basis.

It is also notable that Downhole's demand that Commerce recalculate industry support excluding green tube conflates the definition of green tube and unfinished drill pipe. Downhole claims that "three companies who {sic} production volume was included in the industry support calculation produce green tube but not finished drill pipe." Downhole Br. 32 (citing Petitioners' Jan. 11, 2010 Submission Attachment ¶ 4 (PJA 2478). That is misleading. The cited reference states that these three companies produce "unfinished" drill pipe, but that is not the

same thing as green tube.[5] "Unfinished drill pipe" is a broader category that includes not only green tube but also heat-treated and upset pipe before it has been finished by welding the tool joint. Downhole's arguments involving the alleged overlap in physical qualities between drill pipe green tube and OCTG green tube do not even attempt to establish that heat treated and upset drill pipe tube ready for welding on tool joints can be made into OCTG, let alone ever would be made into OCTG.

Accordingly, the Court should reject Downhole's argument that the scope of the OCTG order encompasses all green tube for drill pipe, and that Commerce must therefore exclude three petitioners from its industry support calculations.

**B.    SUBSTANTIAL EVIDENCE SUPPORTS COMMERCE'S GREEN TUBE SURROGATE VALUE SELECTION**

In its remand redetermination, Commerce used an average of values reported in Indian HTS 7304.59.20 as a surrogate value ("SV") for drill pipe green tube.

---

[5]    For example, Timken stated, "Our seamless drill pipe can be ordered as green tube or as upset and heat-treated." *Drill Pipe from China*, USITC Pub. 4127, at I-20 to I-21 (Mar. 2010) (prelim.). Additionally, Downhole does not argue that the scope of the OCTG investigation includes green tube for heavyweight drill pipe or drill collar, so those products would have to be considered separately.

### 1. Commerce's surrogate values were not "aberrantly high"

Downhole principally objects to Commerce's choice of SV on the grounds that the average of values obtained from Indian HTS 7304.59.20 was "aberrantly high" as a surrogate for the value of green tube in India, because it exceeded the average value under Indian HTS 7304.23.90, a category that includes finished and unfinished drill pipe imported into India.

Downhole attempts to take a superficially plausible assertion – that the value of a finished product must be greater than the value of its components – and misapply it out of context.[6] Neither IHTS 7304.59.20 nor IHTS 7304.23.90 represent the values of individual products, much less the values of an individual component and its finished output. Rather, they represent averages for prices of

---

[6] Downhole even insists that it knows exactly how much less valuable Indian green tube imports must be than Indian drill pipe imports. At least five times in its brief, Downhole refers to the "uncontroverted" or "undisputed" testimony of its expert witness that green tube represents "approximately 60%" of the cost of a drill pipe, excluding the tool joint. Smith Declaration (PJA 659). Petitioners do not allege that Mr. Smith was lying. However, they note that his declaration makes very clear that the process of finishing green tube (particularly upsetting) is much more labor intensive than rolling the green tube itself. *Id.* at 1. Therefore, in countries with low labor costs, such as India and its neighbors, the cost of an imported green tube is likely a much larger proportion of the cost of the finished drill pipe. Accordingly, Mr. Smith's declaration has little relevance to the particular point Downhole here raises, which is whether the average value of the IHTS category for green tube imports is aberrantly large in light of other IHTS import values.

groups of products, they are not exactly matched, and both include other products with different values.

Commerce reasonably concluded that IHTS 7304.23.90, which Downhole maintains must have a higher value than the value of drill pipe green tube imported into India, actually includes lower value products that would render such a comparison unreliable. As Commerce noted, Downhole itself has stated that HTS 7304.23.90 includes more products than just drill pipe, including inputs to drill pipe and unspecified "seamless pipe." Remand Redetermination at 15 (PJA 2402). These would dilute or depress the value of products in this category relative to the value of drill pipe itself. Indeed, Downhole suggested a 40% to 70% discount factor to "account" for this effect. Downhole Remand Comments at 20 (June 11, 2013) (PJA 2426). Yet Downhole does not actually know what these products are, and cannot effectively measure the difference between their value and the value of either finished drill pipe or drill pipe green tube. Thus, Commerce was not compelled to adopt its methodology.

Moreover, even assuming that Indian imports in HTS 7304.23.90 measured only the values of imports of finished drill pipe, which is not the case, the values of imported finished goods probably do not correspond to the values of imported inputs, particularly in developing countries such as India. For example, where developing countries export high-value products such as drill pipe to developed

22

countries, they may need to import high-value inputs that they cannot easily make themselves to enable them to produce for export. In fact, India, like China, exports considerable volumes of high-value finished oilfield tube products to the United States, Middle East, and other markets. "India's Steel Industry" at 31-32 (attachment 1 to Downhole's Feb. 8, 2013 SV comments, PJA 2217-18).

Downhole notes that the SV that Commerce selected provides higher values than four other potential SV benchmarks that Downhole advocates. Downhole Br. at 40. It is not surprising, however, that the SV's advocated by Downhole would be lower than the SV chosen by Commerce. That is why Downhole selected them. The record contains extensive discussion of the weaknesses of Downhole's proposed alternatives, which are also discussed further below in section IV.B.3 below.[7] The point here is that given the large number of different steel pipe and tube products that exist, all of them similar in at least some ways to each other, and the even larger number of price and cost datasets that exist, the number of alternative benchmarks that may be proposed is limited only by counsel's imagination. Indeed, Commerce originally selected yet another alternative SV, considerably higher than any of the SVs that Downhole advocates.[8] The existence

---

[7]    *E.g.,* Petitioners' June 11, 2013 Remand Comments at 11-13 (PJA 2417-19).

[8]    This involved IHTS 7304.23 and 7304.29 data. Although the Court below rejected Commerce's original rationale for employing these benchmarks – that they definitely contained green tube imports – Commerce could have sought to justify them on essentially the same grounds now advocated by

of multiple alternatives to Commerce's SV benchmark shows only that the issue is a complex one and that Respondents' counsel has been busy, not that Commerce's SV is itself unreasonable.

Downhole suggests that if Commerce selected IHTS 7304.59.20 because that category may contain green tube imports, then Commerce must compare it to IHTS 7304.23.90, because the latter category definitely contains some finished and unfinished drill pipe imports. Downhole Br. 41-43. However, that misses the point. Regardless of whether 7304.23.90 does or does not contain drill pipe, it is clearly distorted in a downward direction by the presence of other imports, as discussed above. One might just as well accuse Downhole of inconsistency. Downhole complains that Commerce should not use IHTS 7304.59.20 because it is distorted upwards, but insists that Commerce compare it to a benchmark that Downhole recognizes is distorted downwards. Again, Downhole's arguments simply illustrate that the proper SV for green tube is a complex question with many possible options, none perfect. It is for Commerce, not Downhole, to choose which option to take.

---

Downhole, that these IHTS categories encompassed OCTG categories similar to drill pipe green tube. *See Downhole I*, 887 F. Supp. 2d at 1324-25 (PJA 34-25). Commerce instead preferred on remand to use the IHTS categories covering unfinished green tube, rather than attempt to use values for related products. However, the point again is that if one ventures into looking at related products, then not all of the possible alternative values conform to the valuations for the benchmarks selected by Downhole.

Accordingly, even though the value of one piece of finished drill pipe is greater than the value of the particular green tube from which it was made, the fact that values in HTS 7304.59.20 exceed values in HTS 7304.23.90 does not signify that the former are "aberrantly" high surrogate values for drill pipe green tube.

### 2. Commerce reasonably concluded that IHTS 7304.23 is the correct category for green tube for drill pipe

Downhole also suggests that Commerce was unreasonable to decide that IHTS 7304.23 is the correct category for entries of green tube into India. As is usual for tariff analysis, Commerce arrived at this conclusion primarily by analyzing the tariff headings themselves, and by excluding alternatives. Draft Remand Results at 5 (PJA 2265). It then confirmed this view by speaking with the National Import Specialist ("NIS") at U.S. Customs and Border Protection, Mary Ellen Laker.

### a. Downhole's citations to conflicting evidence do not undermine the reasonableness of Commerce's decision

Downhole argues that five pieces of evidence in the record contradict Commerce's conclusion that IHTS 7304.23 encompasses green tube for drill pipe. Downhole Br. 44-47. Domestic Producers submit that Downhole's arguments amount to nothing more than a request that the Court re-weigh the evidence that Commerce considered. Yet, the possibility that some evidence may point in the

other direction does not undermine Commerce's determination. *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001). Petitioners will make only the following brief comments.

Downhole first asserts that the Petitions imply a different HTS category is more commonly used for green tube and that petitioner VAM Drilling imports green tube using a different HTSUS category. Downhole Br. at 44. While Domestic Producers should perhaps be flattered that Downhole considers them more accurate sources of information on customs classification than the National Import Specialist at Customs and Border Protection itself, the notion that Commerce *must* adopt Domestic Producers' alleged interpretation of the HTS over CBP's view is strange at best.[9]

Downhole also argues that data from the commercial service *Infodrive* indisputably showed that no imports of green tube entered under IHTS 7304.59. That is not true.

---

[9] In fact, Downhole is just speculating about VAM Drilling's import classifications, which are not on the record of this proceeding and not publicly available, as well as irrelevant. Possibly Downhole got the idea about their classification from public bill of lading information. On some occasions an HTS number will be placed on a bill of lading or shipping container which may get picked up by public reporting services, but the packing description does not necessarily reveal the HTS categories reported to CBP.

Once Commerce determined that HTS 7304.59 encompassed drill pipe green tube, Commerce considered two eight-digit subcategories, 7304.59.10 for smaller diameters (up to 4 ½ inches), and 7304.59.20 for larger diameters (4 ½ to 8 5/8 inches). Remand Redetermination at 16 (PJA 2403). Commerce declined to use the data for the smaller diameter 7304.59.10 category because data from *Infodrive* covered substantially all imports in this category and "does not show entries of drill pipe green tube under this category." Remand Redetermination at 16 (PJA 2403). However, evidence indicated that *Infodrive* data covered only 60 percent of imports under HTS 7304.59.20. Commerce thus decided that data from HTS 7304.59.20 was usable. "While it *may* be true that 60 percent of the entries under this HTS category are not drill pipe green tube, without information corroborating what the remainder of the overall imports consist of, the Department continues to find that this category constitutes the best available information with which to value drill pipe green tube." Remand Redetermination at 17 (PJA 2404) (emphasis added).

Based on the *Infodrive* data, Downhole claims that there were no entries of drill pipe green tube under IHTS 7304.59.10 and that IHTS 7304.59.20 "most likely" also lacked any entry of drill pipe green tube. Downhole Br. 45. However, *Infodrive* is a problematic source of information at best. It relies on multilingual importers' non-standardized descriptions of their merchandise on shipping

documents. Thus, even when *Infodrive* describes imports, it is often impossible to establish their identity with sufficient detail to determine exactly what they are, especially where, as with "green tube," the term is not standardized or defined in API specifications, nor named in HTS headings. Williamson Declaration at 1 (PJA 1755). There is no reason to think that importers would necessarily have described green tube as "green tube," as opposed to simply seamless pipe. In fact, some imports listed by *Infodrive* are described simply as "seamless pipe," and within HTS 7304.59.10, *Infodrive* describes some imports only as "seamless tubes/alloy steel." *E.g.*, PJA 2321 (Aug. 19, 2009); *Downhole I*, 887 F. Supp. 2d at 1324. Accordingly, *Infodrive* may serve to corroborate that goods *do* enter in a particular HTS category, where they obviously appear. But it does a much worse job of proving negatives, especially in this case. It therefore cannot establish that green tube does *not* enter in HTS 7304.59.10 and 7304.59.20, either due to the ambiguity of the records or their lack.

Downhole also argues that using values from HTS 7304.59.20, the larger-diameter category, would be "extremely distortive" for measuring Downhole's smaller diameter drill pipe green tube, given that the smaller-diameter category, 7304.59.10, has lower values. Downhole Br. 47. It claims that the values should be the same. *Id.* Downhole's argument is internally inconsistent. Commerce found that the smaller-diameter HTS 7304.59.10 may not have contained drill pipe green

tube imports, and Downhole appears to agree. Accordingly, the values in this smaller-diameter HTS category cannot be used to establish that the values in the larger-diameter HTS 7304.59.20 category fail to reflect drill pipe green tube values.[10]

Thus, *Infodrive* data does not undermine the reasonableness of using HTS 7304.59.20 data as a surrogate value for drill pipe green tube. *Infodrive* cannot reveal what actually entered in HTS 7304.59.20, so Commerce may use that category for surrogate values based on its finding that it would be the appropriate HTS for entries of drill pipe green tube.

Finally, Petitioners note some irony in Downhole's argument that GRI 2(a) requires the classification of green tube in the same category as semi-finished or finished drill pipe. Downhole Br. 48. General Rule of Interpretation ("GRI") 2(a) explains that "Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article." Downhole Remand Comments (June 11, 2013), at 11 (quoting GRI 2(a)) (PJA 2417).

---

[10] As an additional point, while Downhole often asserts that *Infodrive* contains data for high-value products, it neglects to point out that values for products such as generic "seamless tube" are likely to be lower than for drill pipe green tube. Thus, one cannot say that value data for HTS 7304.59.10 would exceed values for drill pipe green tube, as discussed above.

29

Downhole insists in the first part of its brief that green tube for drill pipe differs so greatly from finished drill pipe that it automatically falls into the scope of a different order. It is incongruous for Downhole to argue in the latter part of its brief that green tube must enter in the same HTS category as finished drill pipe. As Downhole's expert witness points out, green tube lacks the finishing and tool joint that form one of drill pipe's distinctive characteristics. Smith Declaration (PJA 659). Downhole repeatedly claims that only 30 percent of the value of finished drill pipe is in the green tube, and that drill pipe green tube can also be made into OCTG. Downhole Remand Comments (June 11, 2013), at 20 (PJA 2426). Thus, Commerce could reasonably determine that green tube for drill pipe enters in a different HTS category than finished drill pipe.

### b. *Commerce reasonably relied on the opinion of a senior Customs official to confirm its classification interpretation*

Commerce also called the relevant National Import Specialist ("NIS") at CBP, Ms. Mary Ellen Laker, for her opinion of the likely classification of drill pipe green tubes in the Harmonized Tariff System. Commerce placed a memo in the record memorializing this discussion (PJA 2259) and indicating her opinion that drill pipe green tube would be categorized under HTS 7304.59. After Downhole complained that the memo lacked detail, Commerce supplied further information about its discussions with Ms. Laker in its remand determination (PJA 2391).

30

Downhole claims that this memo "does not provide a scintilla of supporting evidence" for Commerce's classification decision. Downhole Br. at 49.

Again, there is much irony in Downhole's position. On the one hand, Downhole suggests that evidence regarding VAM Drilling's alleged choice of HTS codes when it imports green tube into the United States, and the Petitioners' characterization of what USHTS tariff codes may be used for drill pipe, are such compelling evidence of the proper classification of drill pipe green tube that they compel the Court to reject Commerce's determination. Downhole Br. 44-45. Then, Downhole later argues that the opinion of a National Import Specialist on this subject provides "not a scintilla of evidence." This is self-contradictory. In fact, opinion evidence may inform Commerce's decision, and it is up to Commerce what weight to accord it.

The bulk of Downhole's argument consists of totally unsupported speculation that when contacted by Commerce, Ms. Laker, a senior CBP official, incompetently rendered an informal opinion without reviewing any of the necessary documents or understanding any of the legal principles involved. A presumption of correctness surrounds agency proceedings. *SEC v. Schreiber*, 381 U.S. 279, 296 (1965); *PSC VSMPO – Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012). Downhole asks the Court to presume without evidence that Ms. Laker was inept at best. The Court should not reverse Commerce's

determination based on Downhole's unsubstantiated and implausible claims, which, furthermore, additional evidence described in Commerce's remand determination flatly contradicts.

None of Downhole's arguments has any merit.

First, Downhole objects that "Absent record evidence otherwise, the contact must have been a phone call or some other informal communication, which would indicate that anything stated by the NIS could only be an off-the-cuff, off-the-record, unofficial, personal opinion." Downhole Br. 50. Downhole thus argues that all telephone calls between U.S. government officials regarding matters within their job description that are under investigation could only be off-the-cuff, off-the-record, unofficial, and personal. Needless to say, no evidence supports this position.

Second, Downhole asserts that the NIS Memo does not show that Ms. Laker actually saw the scope of the drill pipe order. However, the scope of the Order is readily available both online at the Commerce website, in the Federal Register, and in ITC publications. Downhole offers no basis to believe that Ms. Laker overlooked the scope.

Third, Downhole argues that "there is no indication of a discussion of any analysis by CBP of scope language, the alloying elements, seamless quality, or intended use affects {sic} the proper classification." Downhole Br. 50. Downhole

seems to argue that Ms. Laker issued an opinion about HTS classifications without considering any of the relevant factors. Again, Downhole has no evidence to support this allegation. Further, Downhole demands in essence that when an agency consults outside experts it must provide all parties to the investigation with answers to every question that a diligent counsel could think to ask in cross examination. This would essentially require all evidence-gathering to be conducted using formal discovery. Downhole cites no precedent that AD investigations require this. To the contrary, the agency decides what evidence it considers probative, and the rules of evidence found in the rules of civil procedure do not bind it. Commerce does not need to exhaustively document its rationales but only allow the Court and parties to discern them. *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

Fourth, Downhole points out that Ms. Laker specializes in United States rather than Indian tariff classifications. Of course, however, both countries use the *Harmonized* Tariff classification system. The World Customs Organization, which includes virtually every country on earth, has designed this system specifically so that exporters, importers and customs officials can apply a uniform system of tariff classifications around the world. *Investigation with Respect to the Operation of the Harmonized System Subtitle of the Omnibus Trade and Competitiveness Act of 1988*, USITC Pub. 2296, 1990 ITC LEXIS 244, at *6-7 (June, 1990) ("The

purpose of the Convention is to facilitate international trade by the use of a single nomenclature for the description, classification, and coding of goods as they move in international trade, and to facilitate the collection, comparison, and analysis of international trade statistics."). Thus, knowledge of HTS classifications is relevant to Indian HTS classifications. To be sure, each country does have distinct categories and classification rules. However, the six-digit Indian and U.S. HTS 7304.59 categories at issue here are essentially the same. Commerce considered the differences between Indian and U.S. HTS categories and correctly found that none were relevant. Remand Redetermination at 16 (PJA 2406). Downhole points to no differences between Indian and U.S. HTS categories or interpretive rules that call this result into question.

Fifth, Downhole states that Ms. Laker may have failed to consider other categories, or have failed to consider legal principles of classification, such as General Rule of Interpretation ("GRI") 2(a), which explains that "Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article." Downhole Remand Comments (June 11, 2013), at 11 (quoting GRI 2(a)) (PJA 2419).

Again, it is incongruous for Downhole to suggest that green tube "has the essential character" of finished drill pipe. Downhole has spent years of litigation

arguing that finished drill pipe and green tube are very distinct. In fact, there are differences that could reasonably lead Commerce to conclude that green tube and finished drill pipe enter in separate HTS categories. For one, green tube lacks the tool joint that allows connection of lengths of drill pipe and is one of drill pipe's distinctive characteristics. *Oil Country Tubular Goods from Argentina, Austria, Italy, Japan, Korea, Mexico, and Spain*, USITC Pub. 2911, 1995 USITC LEXIS 626, at *17 (Aug. 1995) (final determination). This allegation by Downhole also illustrates its odd idea of how Commerce and CBP officials behave. Downhole suggests not only that a CBP NIS would act frivolously but that one would have failed to consider basic rules of HTS interpretation such as GRI 2(a). Suffice to say that one does not become a CBP NIS by failing to consider basic rules of interpretation. *See* Remand Redetermination at 15 n.64 (noting qualifications of NIS), PRR 22.

Sixth, Downhole complains that Ms. Laker's opinion might have been "a 'yes' in response to a conditional set of facts . . . or in response to a leading question." Downhole Br. 53. Again, an agency need not employ formal depositions, and Downhole is not entitled to a transcript of Commerce investigators' discussions.

Finally, Downhole complains that Commerce included further information about its discussions with Ms. Laker in its Remand Redetermination, rather than

including them in the memo first reporting Commerce's discussion with her. For example, Commerce recorded in its remand determination, not in the earlier memo, that Ms. Laker specialized in steel tube and pipe products, that Commerce had plural contacts with the NIS, that the NIS addressed six-digit classifications, that the NIS gave an "opinion," and that CBP provided the scope to the NIS. Downhole argues that it was error for Commerce to include this information in its final Remand Determination, rather than earlier, because the evidence is "*post hoc.*" Downhole Br. 53.

In fact, there is no legal reason that Commerce could not place this information in its remand determination. The remand determination formed part of the record for the Court of International Trade to review (constituting document 22 in the public remand record). The information belies Downhole's baseless accusations against Ms. Laker and the court below properly rejected Downhole's claims.

### 3. Commerce reasonably rejected Downhole's other proposed alternative SVs

Last, Downhole complains that Commerce unreasonably rejected its other proposed SVs. Of course, even if these other proposed SVs might have been acceptable choices for Commerce, the question now before the Court is simply whether Commerce's selection was reasonable, not whether it might have made

other selections. Nevertheless, in each case Commerce reasonably articulated a sound basis for rejecting Downhole's proposed alternatives.

### a. Commerce reasonably rejected alternative SVs based on finished OCTG offer price reports

Two of Downhole's proposed alternative SVs consisted of prices from an extremely limited set of news reports in a publication called MBR, relating to prices (or more accurately price offers) for finished J/K55 OCTG products, or another small set of data for P110 OCTG. J/K55 OCTG is low grade, and not heat treated even when finished, while P110 is a higher grade that is heat treated to give it extra strength. When finished, both types of products would be threaded for attachment to other casing or tubing, and may occasionally be upset for "sour service" applications.[11]

Commerce rejected use of Downhole's proposed J/K55 SV on the grounds that it was based on only a single month of price data from outside the period of investigation, and that "J/K 55 cannot be used to produce drill pipe, and is at best comparable, differing in alloying element content and production methods." Remand Determination at 8 (PJA 2395). Also, the MBR price data represented

---

[11] *Certain Oil Country Tubular Goods from India, Korea, The Philippines, Saudi Arabia, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, USITC Pub. 4422 (prelim.), at I-22 (Aug. 2013).

offer prices, not necessarily actual transaction prices. *Id.* As to P110, Commerce

determined that it "cannot be used as an input to drill pipe because it is a finished

OCTG product, distinct from the drill pipe green tube input." Remand

Determination at 9 (PJA 2396). Commerce also noted that the reported prices were

based on offers for sale, not actual transaction prices, and covered only one month,

which would make it more susceptible to market fluctuations. *Id.*

Downhole raises three objections. None are valid.

First, it argues that J/K55 and P110 OCTG can in fact be made into drill

pipe. It posits that a processor could purchase these types of finished OCTG and

slice off the threaded ends. Downhole Br. 56. Downhole notes that the process of

upsetting drill pipe green tube is complicated and often fails the first time. Thus

drill pipe green tube producers allow enough length in green tubes so that it is

possible if the first attempt at upsetting fails to cut out the improperly upset portion

and try again. Downhole Br. 56 (citing Smith Declaration, PJA659-660).

Downhole thus posits that after slicing off the threaded ends of the OCTG, it would

similarly be possible to make an attempt at upsetting them to drill pipe standards. If

this failed there would be no second try, but if it worked, then Downhole believes

that the pipe could be heat treated, and a tool joint welded to it. Downhole Br. 56.

Thus, assuming that the OCTG has proper chemistry, it could be made into drill

pipe. *Id.* Downhole adds, "To the extent the alloying chemistry is different in

practice, uncontroverted industry expert opinion that the cost/price effect of adding the alloying elements is fully counter-balanced by the cost-price effect of not requiring intense heat-treatment." *Id.* (citing Liu Declaration (PJA 714)).

Downhole's counsel pulls together bits of evidence from various sources and suggests that such a procedure could thus be theoretically possible, but does not identify any expert who says it can be or is actually done.

As defined in the scope of the Order here, green tube for making drill pipe must contain between 0.75 and 1.45 percent chromium. *Final*, 76 Fed. Reg. at 1967. But J/K 55 tubing and all grades of casing must typically contain between 0.25 and 0.45 percent chromium. Miller Declaration ¶ 11 (PJA 1752). There is no way to add extra chromium to a steel tube short of melting it down and starting all over again – basically, scrapping it. Thus, any SV based on finished J/K 55 tubing will include products that cannot make in-scope drill pipe.[12] Any SV based on P110 OCTG may include products with the wrong chemistry as well, because casing has similar chromium limits to the J/K 55 tubing.

In addition, drill pipe green tube and OCTG differ in terms of other manufacturing processes, as Commerce noted, such as vacuum degassing, electromagnetic testing, and additional inspections and steel selection to insure the

---

[12]     Also, half of J/K55 sold worldwide is welded, rather than stainless, so a J/K55 SV would likely pick up much lower-value welded material as well. Miller Declaration ¶ 7 (PJA 1751).

final product lacks inclusions. Miller Declaration ¶¶ 9-10 (PJA 1751). Similarly, even where chemical, wall thicknesses and other dimensional specifications of the drill pipe and OCTG standards overlap, drill pipe manufacture requires tighter control of tolerances and cleaner steel. *Id.* ¶¶ 9-10 & 12 (PJA 1752). This is partly because drill pipe, unlike OCTG, gets worn down as it rotates in the hole through years of use, and thus cannot afford to be even slightly too thin as noted above. Williamson Declaration at 3 (PJA 1757). Thus, casing and tubing that complies with J/K 55 or P110 wall thickness and chemistry requirements could fail to meet drill pipe standards, even where the listed maximum and minimum percentages are the same.

Furthermore, finished P110 is a heat-treated product. However, as Downhole's own experts made clear, upsetting drill pipe occurs *before* heat treatment. Smith Declaration (PJA 659) ("*After* a proper upset is performed, the tube must be heat treated to the desired API grade") (emphasis added); Liu Declaration ¶ 9 ("API standards require upsetting *before* heat treatment") (emphasis added).[13] Downhole does not show that it is practical or even possible to

---

[13]    Thus, Downhole's assertion that the cost savings from reduced heat treatment needed to make drill pipe from OCTG would offset any cost detriment from different chemistry make no sense. Any heat treatment to which OCTG was subjected prior to being upset would not meet API standards for drill pipe. All that Downhole's expert was saying on the subject was claiming that "generally speaking" the cost of heat treating drill pipe about equals the cost of the additional alloying elements needed to

further heat treat to drill pipe specifications finished OCTG that has already been heat treated to an OCTG specification.

All this is not to deny the similarities between some types of OCTG and drill pipe green tube. However, Commerce was certainly entitled to note the differences in its selection of SVs, including the fact that a SV based on OCTG price data would be based on products that could not and would not be made into drill pipe.

Second, Downhole argues that Commerce could not object to using pre-POI data as a SV, because it sought information related to DP-Master's green tube upsetting and heat treatment for a period before the POI, and because Commerce has sometimes used pre-POI SV data in this and other cases. Downhole Br. 57. Again, however, the issue is not whether Commerce could have chosen to use pre-POI SV data for green tubes in this case, but rather whether it could prefer to use POI data over other alternatives. The fact that it used pre-POI data in other instances does nothing to undermine this long-standing preference.

Third, Downhole argues that Commerce could not object that the MBR data reflected offers, rather than prices, because "the MBR data reported that 'prices' were lower than the 'offers.'" Downhole Br. 58 (citing DP-Master's July 26, 2010

---

make green tube for drill pipe vis-à-vis OCTG. Liu Declaration ¶ 12 (PJA 1714). That generalization is so broad as to be almost meaningless, given the many variables involved, and certainly does not support Downhole's argument.

Submission Ex. 2 (PJA 1286)). Downhole is relying on the following sentence in

the MBR publication for May, 2009, which states, "Offers for P110 are being

made for $900 - $1,200/tonne fob with more competitive prices being given to

larger order volumes." *Id.* Downhole interprets this as saying that "prices" are

lower than "offers." In fact, all it is saying is that prices for larger order volumes

are lower than prices for smaller order volumes. In other words, it is saying that

quantity discounts exist, which is not surprising, not that buyers are actually paying

less than they offer on average.

Fourth, Downhole says that Commerce should not fear that data from a

single month would be unrepresentative, because seamless tube prices were falling

over the POI. Asserts Downhole, "the only fluctuation in seamless tube pricing

was downward! . . . The record establishes that prices for seamless tube products

around the world were on a downward trend during the POI." Downhole Br. 58.

But Downhole conflates two different statistical concepts:  fluctuation (variation),

and the trend of the average (mean). Even where the mean of a set of data points is

trending in one direction, individual observations may fluctuate by a much larger

amount. Looking at a single observation may thus give entirely inaccurate results.

Commerce correctly wished to ensure that it had a large enough set of data so that

its results would not depend on random fluctuations. The dataset that it chose

based on Indian imports would capture any trends occurring during the POI, while

including enough observations to ensure that it would not be susceptible to random chance.

Accordingly, Commerce reasonably chose not to use Downhole's proposed OCTG-based SVs.

### b.    Commerce properly refused to use SVs built up based on cost estimates

Finally, Downhole complains that Commerce should have used SVs constructed by adjusting costs for billet (the basic steel product from which green tube is made) to add the costs of making green tube. Downhole states that all Commerce needed to do to calculate the value of green tube for drill pipe would be to add the costs of adding various alloying elements to the cost of seamless pipe. Thus, Commerce was wrong to state that it would not use such a SV partly because it "does not have verified factor information for all factors of production that would be necessary to convert a non-alloy tube to an alloy tube." Downhole Br. 59 (quoting Remand Determination at 11 (PJA 2398)).

In fact, Commerce was entirely correct. First of all, manufacturing a green tube for drill pipe is not a matter of adding alloying elements to a seamless steel tube, as Downhole implies. There is no way to add chromium, molybdenum, or other elements to a steel tube – they cannot be rubbed in, injected, or compressed into solid steel. Rather, the manufacturing process starts with steel that already has

43

the alloying elements. Further, in addition to differences in alloys, drill pipe green tube manufacture requires careful control of the production process, and results in a unique type of tube. *Drill Pipe Final,* USITC Pub. 4213 at 9. The production process includes ensuring that impurities do not enter the tube, carefully controlling dimensions, and assuring against structural defects, particularly in tube that is not going to receive high subsequent heat treatment. Although there is overlap between oil casing and tubing and drill pipe green tube, there is no evidence on the record indicating that the costs and processes of drill pipe green tube manufacturers are the same as the costs and processes of manufacturers of other sorts of seamless tube. Furthermore, other forms of seamless tube are used for an extremely wide range of structural, mechanical, and other purposes in a broad range of industries such as automobiles, machinery, heating and cooling systems, and many others. As the price of seamless tube is determined by supply of seamless tube and demand for seamless tube, not merely the price of seamless tube inputs, there is no conclusive evidence that market conditions for these products are sufficiently similar to require such price comparisons. At best, that would be an alternative methodology or inference that could be drawn, but does not warrant rejecting the methodology chosen by Commerce. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1347-48 (Fed. Cir. 2006).

## V.     CONCLUSION

Commerce's action in this case was consistent with the language of the statute, and furthered the purpose of the statute. Downhole has presented no legal or logical basis for overturning it.

For the foregoing reasons, Defendants-Appellees VAM Drilling USA; Texas Steel Conversion, Inc.; Rotary Drilling Tools; and TMK IPSCO ask the Court to affirm the judgment of the court below.

Respectfully submitted,

  /s/Roger B. Schagrin
Roger B. Schagrin
John W. Bohn
Schagrin Associates
900 7th St. NW #500
Washington, DC 20001
(202) 223-1700
*Counsel for Defendants-
Appellees VAM Drilling USA;
Texas Steel Conversion, Inc.;
Rotary Drilling Tools; and
TMK IPSCO*

June 16, 2014

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

Jun 16, 2014

- ☐ US mail
- ☐ Fax
- ☐ Hand
- ☒ Electronic Means
    (by email or CM/ECF)

| Roger B. Schagrin | /s/ Roger B. Schagrin |
|---|---|
| Name of Counsel | Signature of Counsel |

Law Firm        Schagrin Associates

Address        900 Seventh Street, N.W., Suite 500

City, State, ZIP        Washington, D.C. 20001

Telephone Number        (202) 223-1700

FAX Number        (202) 429-2522

E-mail Address        rschagrin@schagrinassociates.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e). The brief contains 10,498 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Times New Roman type with Microsoft Word.

/s/Roger B. Schagrin
Roger B. Schagrin
John W. Bohn
Schagrin Associates
900 7th St. NW #500
Washington, DC 20001
(202) 223-1700
*Counsel for Defendants-Appellees VAM Drilling USA; Texas Steel Conversion, Inc.; Rotary Drilling Tools; and TMK IPSCO*

June 16, 2014