# United States Court of Appeals
# for the Federal Circuit

_____

**DOWNHOLE PIPE & EQUIPMENT, L.P., AND
DP-MASTER MANUFACTURING CO., LTD.,**
*Plaintiffs-Appellants,*

**v.**

**UNITED STATES, VAM DRILLING USA,
TEXAS STEEL CONVERSIONS, INC.,
ROTARY DRILLING TOOLS, AND TMK IPSCO,**
*Defendants-Appellees,*

**AND**

**UNITED STATES STEEL CORPORATION,**
*Defendant.*

_____

2014-1225

_____

Appeal from the United States Court of International
Trade in No. 11-00081, Senior Judge Nicholas Tsoucalas.

_____

Decided:  January 29, 2015

_____

MARK B. LEHNARDT, Lehnardt & Lehnardt LLC, of
Liberty, Missouri, argued for plaintiffs-appellants.

MIKKI COTTET, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States.   With her on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and CLAUDIA BURKE, Assistant Director.  Of counsel was MICHAEL THOMAS GAGAIN, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

ROGER B. SCHAGRIN, Schagrin Associates, of Washington, DC, argued for defendants-appellees VAM Drilling USA, Texas Steel Conversion, Inc., Rotary Drilling Tools, and TMK IPSCO.  With him on the brief was JOHN W. BOHN.

———————————

Before REYNA, LINN, and WALLACH, *Circuit Judges*.

WALLACH, *Circuit Judge*.

Appellants Downhole Pipe & Equipment, LP, and DP-Master Manufacturing Co., Ltd. (collectively, "Downhole Pipe") appeal the decisions of the United States Court of International Trade ("CIT") (1) affirming the United States Department of Commerce's ("Commerce") scope and industry support determinations and (2) sustaining Commerce's Final Results of Redetermination Pursuant to Court Remand.   *See Downhole Pipe & Equip., LP v. United States* (*Downhole Pipe II*), 949 F. Supp. 2d 1288 (Ct. Int'l Trade 2013); *Downhole Pipe & Equip. LP v. United States* (*Downhole Pipe I*), 887 F. Supp. 2d 1311 (Ct. Int'l Trade 2012); *see also Drill Pipe From the People's Republic of China*, A-570-965 (Dep't of Commerce May 13, 2013) (final results of redetermination pursuant to court remand) (Public Joint Appendix ("P.J.A.") 2388–406) ("*Remand Results*"); *Drill Pipe From the People's Republic of China*, 75 Fed. Reg. 4,531 (Dep't of Commerce Jan. 28, 2010) (initiation of antidumping duty investigations)

("*Initiation*").  Because Commerce's determinations were supported by substantial evidence and were not otherwise contrary to law, this court affirms.

BACKGROUND

I. Facts

Downhole Pipe is a United States importer of "drill pipe" produced by DP-Master Manufacturing Co., Ltd. ("DP-Master"), a Chinese producer.  Drill pipe is a specialized high-strength iron alloy tube, used in oil-drilling applications, and is manufactured in three stages: first, seamless tubes called "green tube" are produced from raw steel; second, the manufacturer uses complex processes to "upset" and heat-treat green tube to thicken the ends and increase the yield strength to the desired American Petroleum Institute ("API") grade; third, the manufacturer friction-welds a specialized "tool joint" to the ends of the heat-treated and upset tube to complete the drill pipe. While green tube is the primary input in the production of drill pipe, it can also be processed into other "oil country tubular goods."  Oil country tubular goods, which consist primarily of casing and tubing, are used in connection with the transport of oil and gas, while drill pipe is primarily used in drilling.

II. Proceedings

In 2009, Commerce received a petition from several domestic drill pipe producers, including Appellees VAM Drilling USA, Texas Steel Conversion, Inc., Rotary Drilling Tools, and TMK IPSCO (collectively, "Petitioners"), seeking imposition of antidumping and countervailing duties on drill pipe from the People's Republic of China ("China").  *Drill Pipe From the People's Republic of China*, No. A-570-965 (Dep't of Commerce Dec. 31, 2009) (petition for the imposition of antidumping and countervailing duties) (P.J.A. 56–230) ("*Petition*").  Some of the petitioners produce green tube for drill pipe, while others produce

finished drill pipe. Prior to Commerce's initiation of the antidumping investigation, Downhole Pipe objected to the proposed scope of the investigation, arguing green tube should not be included within the scope, because it was already covered by an ongoing investigation into oil country tubular goods, and Commerce should disregard green tube production for purposes of calculating domestic industry support.

After considering these objections, Commerce revised the scope of the investigation in the *Initiation*, specifying "'[t]he scope does not include . . . unfinished tubes for casing or tubing covered by any other antidumping or countervailing duty order.'" *Downhole Pipe I*, 887 F. Supp. 2d at 1316 (citation omitted); *Initiation*, 75 Fed. Reg. at 4,535. Commerce also found sufficient domestic industry support for the Petition, as calculated using the revised scope. Therefore, in 2010, Commerce initiated the antidumping investigation of drill pipe from China.

In its *Preliminary Determination*, Commerce determined drill pipe from China was, or was likely to be, sold in the United States at less-than-fair value. *Drill Pipe From the People's Republic of China*, 75 Fed. Reg. 51,004 (Dep't of Commerce Aug. 18, 2010) (preliminary determination of sales at less than fair value and affirmative determination of critical circumstances, and postponement of final determination) ("*Preliminary Determination*"). While Commerce maintained the scope as defined in the *Initiation* over Downhole Pipe's objections, in the *Preliminary Determination* it stated, given "concerns regarding the imprecision of the definition of 'green tubes suitable for drill pipe' currently contained in the scope," it would "request additional information regarding characteristics distinguishing green tube for drill pipe from green tube for casing and tubing covered under the orders on [oil country tubular goods from China]." *Id.* at 51,006. Further,

> [u]nless specific characteristics are provided
> which distinguish between green tube for drill
> pipe and green tube for casing and tubing, all
> green tubes . . . will be removed from the scope
> of the . . . investigations on drill pipe from [China]
> and will instead be considered as covered under
> the existing [orders on oil country tubular goods
> from China].

*Id.*

Commerce issued its *Final Determination* on January 11, 2011, continuing to find drill pipe from China was being, or was likely to be, sold in the United States at less-than-fair value. *Drill Pipe From the People's Republic of China*, 76 Fed. Reg. 1,966 (Dep't of Commerce Jan. 11, 2011) (final determination of sales at less-than-fair value and critical circumstances) ("*Final Determination*"), and accompanying Issues & Decision Memorandum ("*Issues & Dec. Mem.*") (P.J.A. 1890–938).

For the *Final Determination*, Commerce "developed characteristics for drill pipe green tubes based on numerous submissions of factual data from parties regarding the physical and chemical characteristics of drill pipe and drill pipe green tubes." *Issues & Dec. Mem.* at 11. Thus, "Commerce narrowed the scope by adding three physical criteria to the description of subject green tube." *Downhole Pipe I*, 887 F. Supp. 2d at 1317. Specifically, Commerce narrowed the scope to green tube: (1) that is seamless; (2) that has a certain outer diameter; and (3) that contains specific percentages of molybdenum and chromium. *Issues & Dec. Mem.* at 11. Thus, the scope specified in the *Final Determination* reads:

> The products covered by the investigation are
> steel drill pipe, and steel drill collars, whether or
> not conforming to [API] or non-API specifications.
> Included are finished drill pipe and drill collars
> without regard to the specific chemistry of the

steel (*i.e.,* carbon, stainless steel, or other alloy steel), and without regard to length or outer diameter. Also included are unfinished drill collars (including all drill collar green tubes) and *unfinished drill pipe (including drill pipe green tubes, which are tubes meeting the following description: seamless tubes with an outer diameter of less than or equal to 6 5⁄8 inches (168.28 millimeters), containing between 0.16 and 0.75 percent molybdenum, and containing between 0.75 and 1.45 percent chromium). The scope does not include . . . unfinished tubes for casing or tubing covered by any other antidumping or countervailing duty order.*

*Final Determination*, 76 Fed. Reg. at 1,967 (emphasis added).

As part of its *Final Determination*, Commerce also calculated a surrogate value for the green tube input as one of the factors of production. Two sources were on the record to serve as surrogate data: (1) price quotes printed in a trade publication called *Metal Bulletin Research* for grades J and K casing and tubing ("J/K 55") and (2) the average transaction prices paid for products imported into India under the Harmonized Tariff Schedule of India ("IHTS") subheadings 7304.23 and 7304.29. Commerce ultimately determined the best available information was the average Indian import prices for sales of merchandise under these IHTS subheadings. Using this data, Commerce calculated a surrogate value of $2,511.67 for the green tube input.

Downhole Pipe appealed several of Commerce's determinations to the CIT, including its inclusion of green tube within the scope of the investigation and in the industry support calculation, as well as its choice of the surrogate data used to value the green tube input. In *Downhole Pipe I*, the CIT rejected Downhole Pipe's scope

arguments, reasoning Commerce had discretion to determine scope and could not reconsider industry support after initiation of the investigation. The CIT also remanded the *Final Determination* to Commerce with instructions to reconsider the surrogate values used for green tube. In particular, the CIT found Commerce had failed to address the *InfoDrive India* ("*InfoDrive*") import data Appellants had placed on the administrative record that called into question Commerce's finding that green tube entered India under IHTS subheadings 7304.23 and 7304.29. The CIT acknowledged data from the IHTS subheadings might be the best available information, but it could not affirm the *Final Determination* on the basis of the explanation provided by Commerce.

On remand, Commerce examined all other potential surrogate values for green tube on the record, including: (1) import statistics for goods imported into India under IHTS categories 7304.23, 7304.29, and 7304.59; (2) *Metal Bulletin Research* price data for J/K 55 and for "P110"; (3) adjusted value data for alloy steel billets processed into green tube provided by Appellants; and (4) adjusted value data for seamless tubes provided by Appellants. Commerce found the price data for products entered under IHTS 7304.59 (as opposed to IHTS 7304.23 and 7304.29) was the best available information on the record because it was most representative of the green tube used for drill pipes, contemporaneous with the period of investigation, duty and tax exclusive, publicly available, and represented a broad market average. Commerce also confirmed its analysis with a National Import Specialist at United States Customs and Border Protection ("Customs"). Although in its draft remand results Commerce used data from both IHTS 7304.59.10 and IHTS 7304.59.20, in its final *Remand Results* Commerce based the surrogate value for green tube on the average unit value of entries made under IHTS 7304.59.20 alone.

On return to the CIT, Appellants argued the *Remand Results* were unsupported by substantial evidence and were otherwise not in accordance with law. Therefore, Downhole Pipe asked the CIT to once again remand the issue of the surrogate values used to value the green tube. In *Downhole Pipe II*, the CIT sustained the *Remand Results*.

Downhole Pipe appeals. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (2012).

DISCUSSION

I. Standard of Review

This court reviews the decisions of the CIT de novo, "apply[ing] anew the same standard used by the [CIT]." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (internal quotation marks and citation omitted). Under that standard, this court must uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2006). "Although such review amounts to repeating the work of the [CIT], we have noted that 'this court will not ignore the informed opinion of the [CIT].'" *Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1356 (Fed. Cir. 2010) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994)); *see also Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) ("When performing a substantial evidence review, . . . we give great weight to the informed opinion of the [CIT]. Indeed, it is nearly always the starting point of our analysis.") (internal quotation marks and citation omitted).

Substantial evidence is defined as "more than a mere scintilla," as well as evidence that a "reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).

This court's review is limited to the record before Commerce in the particular review proceeding at issue and includes all "evidence that supports and detracts" from Commerce's conclusion. *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1362 (Fed. Cir. 2009). An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

## II. Legal Framework

The United States imposes duties on foreign-produced goods sold in the United States at less-than-fair value ("antidumping duties"), 19 U.S.C. § 1673(1), or that benefit from subsidies provided by foreign governments ("countervailing duties"), *id.* § 1671(a)(1). Commerce is responsible for investigating whether there have been, or are likely to be, sales at less-than-fair value or whether a subsidy has been provided, *id.* §§ 1673(1), 1671(a)(1), while the International Trade Commission determines whether imported merchandise materially injures or threatens to materially injure the pertinent domestic industry, *id.* §§ 1673d(b)(1), 1671d(b)(1). "If both inquiries are answered in the affirmative, Commerce issues the relevant antidumping and countervailing duty orders." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002). The orders contain a description of the merchandise that is covered by the order, called the scope. 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2).

Antidumping investigations are typically initiated by a petition filed with Commerce by a domestic industry. *Duferco Steel*, 296 F.3d at 1089. The petition defines the initial scope of the investigation. *Id.* After a petition is received, several statutory criteria must be met before Commerce may initiate an investigation, including determining whether the petition was filed on behalf of the domestic industry, 19 U.S.C. § 1673a(c)(1)(A)(ii), (c)(2), and whether there is domestic industry support for the

petition, *id.* § 1673a(c)(4). To determine whether there is industry support, Commerce must determine whether domestic producers or workers who support the petition "account for at least 25 percent of the total production of the domestic like product." *Id.* § 1673a(c)(4)(A)(i). If Commerce determines the petition lacks industry support, it "shall dismiss the petition [and] terminate the proceeding." *Id.* § 1673a(c)(3). If, however, Commerce "makes a determination with respect to initiating an investigation, *the determination regarding industry support shall not be reconsidered.*" *Id.* § 1673a(c)(4)(E) (emphasis added).

Once an antidumping investigation has been initiated, to determine whether foreign goods are being sold or are likely to be sold in the United States at less-than-fair value, *id.* § 1673, Commerce compares the export price (or constructed export price) of a foreign producer's sales with "normal value" (the price in the foreign market), *id.* § 1677b(a). If the price of an item in the foreign market (normal value) is higher than the price for the same item in the United States (export price), dumping has occurred. *Id.* § 1677(35)(A) (The antidumping duty margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise.").

Further, if Commerce considers the exporting country a "nonmarket economy country,"[1] it determines normal

---

[1]    A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Because it deems China to be a nonmarket economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under

value by valuing the "factors of production" used in producing the merchandise in a comparable market economy[2] to come up with "surrogate values." *See id.* § 1677b(c)(1)(B). In doing so, Commerce "attempt[s] to construct a hypothetical market value of that product" in the nonmarket economy. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999). Thus, Commerce must value the factors of production "to the extent possible . . . in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4)(A)–(B).

The statute also directs Commerce to value the factors of production "based on the *best available information* regarding the values of such factors in a market economy country." *Id.* § 1677b(c)(1)(B) (emphasis added). Commerce has discretion to determine what constitutes the best available information, as this term is not defined by statute. *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011). However, "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

---

19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 318 F. Supp. 2d 1339, 1341 (Ct. Int'l Trade 2004).

[2] Here, "Commerce selected India as the primary surrogate country, and used Indian data to calculate surrogate values for two key drill pipe inputs relevant to this case." *Downhole Pipe I*, 887 F. Supp. 2d at 1316.

III. Commerce Properly Included Green Tube in the Scope
of the Investigation and in the Calculation of Industry
Support

Appellants challenge the lawfulness of including
green tube within the scope of the investigation, and
consequently of including green tube in the industry
support calculation. In *Downhole Pipe I*, the CIT rejected
Downhole Pipe's scope arguments, reasoning (1) Com-
merce has discretion to define the scope of the investiga-
tion, and (2) Commerce is barred by statute from
reconsidering industry support after the initiation of an
investigation. *Downhole Pipe I*, 887 F. Supp. 2d at 1319
(Downhole Pipe's "sole argument—that some green tube
used to produce [oil country tubular goods] meet the
technical specifications of the Final Determination and
are thus subject to two antidumping orders—has little
bearing on Commerce's decision to initiate the investiga-
tion."). In support of its conclusions, the CIT pointed to
three prior International Trade Commission determina-
tions, which describe "why technical specifications and
customer expectations led it to treat green tube for drill
pipe as a 'distinct like product' from green tube for [oil
country tubular goods]." *Id.* at 1320 (citation omitted).
Therefore, the CIT concluded, "[g]iven the end-use excep-
tion and the extensive evidence showing a distinction in
channels of distribution, customer expectations, and
technical specifications, it would not be appropriate for
this court to usurp Commerce's exercise of discretion in
defining the scope of the *Initiation*." *Id.*

Nonetheless, on appeal, Downhole Pipe continues to
argue that Commerce may not include products within
the scope of an investigation that are already covered by
the scope of another investigation or order. As to the
three criteria identified by Commerce as distinguishing
green tube for drill pipe from green tube for oil country
tubular goods—i.e., that green tube for drill pipe (1) is
seamless, (2) has an outside diameter of 6 5/8 inches or

less, and (3) has 0.16%–0.75% molybdenum and 0.75%–1.45% Chromium—Downhole Pipe argues the record lacks substantial evidence to support these three criteria. Further, Appellants argue, "[b]ecause these three criteria do not distinguish drill-pipe green tube from [oil country tubular goods] green tube, the same green tube is impermissibly covered by two antidumping duty orders." Appellants' Br. 30.

In support, Appellants rely on record evidence that purportedly establishes that each of these three criteria may apply to green tube used to produce oil country tubular goods. Specifically, as to the first criterion, Appellants argue that while all green tube used for drill pipe must be seamless, some green tube used to produce oil country tubular goods is also seamless. As to the second criterion, Appellants note some oil country tubular goods use green tube with an outside diameter of less than or equal to 6 5/8 inches. Finally, regarding chemistry, Appellants contend there are no API specifications for "minimum alloy requirements for casing, tubing, and drill pipe." *Id.* at 31.

In addition, Appellants argue that without the inclusion of green tube production volume in its industry support calculation, the Petition lacks the requisite industry support. Appellants' Br. 32 ("A cursory review of the industry support calculation after removing green tube producers indicates that petitioners would not satisfy the required 25% industry-support threshold."). Therefore, Appellants insist the industry support calculation must be remanded. As to the statutory bar against revising this calculation post-initiation, Appellants contend it "properly raised this scope/industry support issue prior to the *Initiation*." *Id.* at 34.

These arguments are unavailing because Commerce reasonably included green tube within the scope of the investigation. First, substantial evidence supports Com-

merce's identification of three physical characteristics that distinguish green tube for drill pipe from that intended for oil country tubular goods. As Commerce explained, the first criterion (that green tube for drill pipe must be seamless) was "based on Petitioners' comments and submission of technical specifications." *Issues & Dec. Mem.* at 11. As to the second criterion, that the drill pipe green tube must have a certain outer diameter, Commerce explained this was "based on DP-Master Group's submission of [API] specifications for drill pipe." *Id.* As to the final criterion regarding the green tube's chemical composition, this was "based on Petitioners' submission of declarations from experienced drill pipe engineers who direct the purchase of green tubes for drill pipe based on specific physical and chemical requirements." *Id.* While Appellants invite this court to reweigh this evidence, this court may not do so. *See Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992) ("It is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew.").

It is important to note that Appellants have failed to identify any green tube intended for oil country tubular goods that satisfies all three of these criteria. As the Government points out, "[i]n order to be covered by the Order here, the green tube must satisfy all three of the requirements established by Commerce." United States' Br. 19. Appellants have not called into question Commerce's conclusion that, "[w]hile the DP-Master Group has provided specifications for certain [oil country tubular goods] that overlap in some characteristics with drill pipe, no specifications for [oil country tubular goods] have been placed on the record that meet *all* of the criteria for drill pipe green tube." *Issues & Dec. Mem.* at 11. Even if Downhole Pipe had been able to do so, moreover, Commerce added an explicit exception to exclude any such overlapping goods: "The scope does not include . . . unfin-

ished tubes for casing or tubing covered by any other antidumping or countervailing duty order." *Final Determination*, 76 Fed. Reg. at 1,967. As the CIT pointed out, Downhole Pipe did "not analyze the purported overlap in light of this potentially remedial exception," *Downhole Pipe I*, 887 F. Supp. 2d at 1319, and makes no attempt to do so before this court.

As to Downhole Pipe's insistence that industry support must be recalculated using a revised scope, Appellants have not overcome the statutory obstacle to doing so. That is, while 19 U.S.C. § 1673a(c)(4)(E) provides that any potential interested party may submit comments or information on the issue of industry support prior to the initiation of an investigation, it explicitly states "[a]fter [Commerce] makes a determination with respect to initiating an investigation, the determination regarding industry support shall not be reconsidered." 19 U.S.C. § 1673a(c)(4)(E). Given this court's finding that Downhole Pipe has failed to demonstrate Commerce erred in including green tube within the scope, this statutory bar means the contention that Commerce must redetermine whether there is sufficient industry support necessarily fails. This is not to say a party may not challenge whether its goods properly fall within the scope,[3] but only that the industry support calculation is not reviewable under these circumstances.

Accordingly, Commerce's inclusion of green tube in the scope of the investigation and in the calculation of

---

[3] Indeed, pursuant to 19 C.F.R. § 351.225 (2012), a party can request a scope determination to determine whether its merchandise falls within the scope of an order. Here, as the CIT observed, "DP-Master does not export green tube to the U.S., and neither it nor any party below have requested a scope determination." *Downhole Pipe I*, 887 F. Supp. 2d at 1318.

industry support was supported by substantial evidence and was not contrary to law.

## IV. Substantial Evidence Supports Commerce's Selection of the Surrogate Value for Green Tube

Appellants also challenge the lawfulness of Commerce's selection of a surrogate value for valuing green tube, as redetermined following the remand by the CIT. In *Downhole Pipe I*, the CIT ordered a remand because "Commerce's rebuttal of each of [Downhole Pipe's] four alternative surrogates . . . d[id] not cure its inadequate explanation of its reliance upon the IHTS data," and "its failure here to explain evidence apparently contrary to a finding central to its determination leaves the court without the means necessary to affirm it as supported by the record." *Downhole Pipe I*, 887 F. Supp. 2d at 1325 (internal citations omitted). The CIT noted on remand, "Commerce [was] not barred from selecting the IHTS data," but it was required to "explain why such data is more representative of the price for drill pipe green tube than other potential surrogate values in light of *InfoDrive* data that appears to demonstrate that [IHTS] 7309.23 and 7309.29 do not actually 'capture' green tube and are highly distorted by expensive, finished tubular goods." *Id.*

As noted, on remand Commerce examined four potential data sources for valuing green tube: (1) import statistics for goods imported into India under IHTS categories 7304.23, 7304.29, and 7304.59; (2) *Metal Bulletin Research* price data for J/K 55 and P110; (3) adjusted value data for alloy steel billets processed into green tube; and (4) adjusted value data for seamless tubes. Commerce then determined it had incorrectly found that IHTS 7304.23 and 7304.29 were the proper IHTS subheadings for green tube, and instead determined that IHTS 7304.59.20 was the proper subheading.

In *Downhole Pipe II*, the CIT affirmed the *Remand Results*, holding "[a]lthough IHTS 7304.59.20 does not

perfectly cover [Downhole Pipe's] [drill pipe green tubes], Commerce's decision was reasonable nonetheless given the record support for IHTS 7304.59.20 and the relative weakness of the alternative values." *Downhole Pipe II*, 949 F. Supp. 2d at 1295. Specifically, the CIT held, "Commerce reasonably determined that IHTS 7304.59.20 import data satisfied more of its selection criteria than the flawed alternatives on the record," *id.* at 1297, and, in contrast to the alternate surrogate values on the record, "Commerce found that the IHTS 7304.59.20 data is 'contemporaneous with the [period of investigation], represent[s] a broad market average, [is] tax and duty exclusive, and [is] publicly available, thus comporting with [Commerce's] selection criteria.'" *Id.* (citations omitted). For these reasons, the CIT held Commerce reasonably determined that data from IHTS 7304.59.20 was the best available information on the record and Commerce "reasonably rejected" the alternative surrogate values. *Id.* at 1296–97 (citations omitted).

On appeal, Downhole Pipe challenges Commerce's selection of the surrogate value for green tube on three grounds. First, Appellants contend Commerce improperly rejected the alternative surrogate values on the record, and that its legal analysis in support of selecting IHTS 7304.59.20 was insufficient. Specifically, Appellants characterize "Commerce's legal analysis to support selecting IHTS 7304.59.20" as "a one-sentence assertion regarding classification under IHTS, which Commerce supported with a two-sentence memo reporting some sort of confirmation from [Customs]." Appellants' Br. 43. They therefore claim that when analyzing the competing IHTS subheadings on the record, Commerce improperly "ignore[d] basic legal principles—such as [General Rule of Interpretation] 2(a)—which require some analysis before dismissal." *Id.* In so arguing, Appellants concede "the process of selecting [surrogate values] is necessarily imprecise," but nonetheless argue that "Commerce must

strive for accuracy in value to comply with its obligation to calculate margins as accurately as possible." *Id.* at 24–25.

This court declines Appellants' invitation to reweigh the evidence in order to reject Commerce's conclusions, which were well-supported and fully explained. *See id.* at 44–49 (challenging each of Commerce's conclusions regarding the alternative surrogate values on the record and offering Appellants' own interpretations). Regarding Downhole Pipe's argument that Commerce's "legal analysis" of the competing tariff headings was insufficient because Commerce failed to employ the General Rules of Interpretation of the Harmonized Tariff Schedule as part of its evidentiary determination, this is *not* a customs classification case. Commerce was not required to engage in a classification analysis to determine which IHTS subheading contained entries of drill pipe green tube; rather, it was required to determine which of the competing subheadings constituted the best available information for valuing the green tube input. In addition, as the CIT pointed out, Appellants "do not cite any legal authority demonstrating that Commerce must conduct a full classification analysis when considering import data from a particular foreign tariff heading as a surrogate value," and Appellants "provide virtually no legal analysis contravening Commerce's selection." *Downhole Pipe II*, 949 F. Supp. 2d at 1293.

As to its selection process, in the *Remand Results* Commerce explained it used "a process of elimination" to select IHTS subheadings 7304.59.10 and 7304.59.20 because "[c]ategorization of products under the HTS is a process of elimination." *Remand Results* at 5. Using this process, Commerce explained it rejected IHTS 7304.23 and 7304.29 because the former captures processed semi-finished drill pipe and the latter captures semi-finished casing and tubing, which are not inputs for drill pipe. Therefore, these headings were "no longer the best avail-

able information on the record." *Id.* at 7. Commerce further explained, "after examining all possible subcategories under IHTS heading 7304, the process of eliminating the other items entering under these headings demonstrates that categories 7304.59.10 and 7304.59.20 cover drill pipe green tube as defined in the scope of the *Order*." *Id.* at 5. Of these two subheadings, Commerce found the latter better represented green tube because further classification under these subheadings was based on tube diameters, and 7304.59.20 better reflected the diameter of the green tube covered by the Order. *Id.*

To the extent Downhole Pipe requests this court to reweigh Commerce's findings with regard to each heading, this court may not do so. "This court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (Ct. Int'l Trade 2006)). In light of Commerce's well-reasoned explanation of its selection process, this court finds Commerce's selection of data from IHTS 7304.59.20 was supported by substantial evidence.

As to Appellants' argument that Commerce unreasonably rejected the alternative surrogate values on the record, Commerce appropriately evaluated each of the alternatives on the record and provided an ample explanation as to why it should be rejected. With regard to the price data for J/K 55 from the *Metal Bulletin Research*, Commerce explained this data was not the best available information on the record because: (1) "it is not contemporaneous;" (2) "it represents only a single month of price data;" (3) "J/K 55 cannot be used to produce drill pipe;" and (4) J/K 55 "is at best comparable [to green tube], differing in alloying element content and production methods." *Remand Results* at 8. Moreover, the J/K 55

data did not reflect actual sales prices, but rather offer prices. *Id.* at 5–6. Commerce reasonably concluded the J/K 55 data did not satisfy its selection criteria. *See Qingdao Sea-Line*, 766 F.3d at 1386 ("Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review.").

Commerce rejected the P110 price data from the *Metal Bulletin Research* for similar reasons, finding P110 is not representative of green tube because it is a finished oil country tubular good product that cannot be used as an input for drill pipe. *Remand Results* at 9. Additionally, the P110 data was based on offer prices and only contained one month of pricing information. *Id.* As compared to the data from IHTS 7304.59.20, Commerce reasonably found these alternatives were not the best available information for valuing the green tube input.

Similarly, Commerce reasonably explained why the adjusted value data offered by Downhole Pipe for alloy steel billets processed into green tube and for seamless tubes were not the best available information as compared to the data from IHTS 7304.59.20. Specifically, Commerce found the record lacked sufficient information to adjust the values for the required alloying costs and that calculating such adjustments required proprietary information. *Id.* at 9–11. Because Commerce's regulations direct it to use "publicly available information," 19 C.F.R. § 351.408(c)(1), Commerce rejected these adjusted values. Thus, Commerce supported with substantial evidence its determinations that it had selected the best available information and reasonably rejected the alternatives proposed by Downhole Pipe.

Appellants also argue Commerce's choice of a surrogate value for green tube is "aberrantly high" and therefore outside the bounds of commercial reality. Appellants'

Br. 41. Specifically, Downhole Pipe claims Commerce's choice of the average price for goods entered under IHTS 7304.59.20 resulted in a surrogate value of $4,978.11 for green tube, which is "aberrantly high" because it is almost double the value of the $2,511.67 figure Commerce used in the *Final Determination* based on goods entered under IHTS 7304.23.90. Appellants point out IHTS 7304.59.20 is a basket category for alloy seamless tubes, while the previously-selected IHTS 7304.23.90 includes both finished and unfinished drill pipe. Therefore, Appellants argue, "[u]nder the basic principle that an input should not be valued more than the finished product, Commerce failed to select an accurate [surrogate value]," and "[e]xacerbating Commerce's error is uncontroverted industry expert testimony establishing the value of green tube at approximately 30% of the value of finished drill pipe." *Id.* at 25. In support, Downhole Pipe points to the *InfoDrive* data for entries made under IHTS 7304.59.10 and 7304.59.20 that Appellants argue "conclusively demonstrated that there were no entries of drill-pipe green tube under IHTS 7304.59.10, and no entries of d[r]ill pipe green tube in at least 60% of entries under IHTS 7304.59.20." *Id.* at 46.

As the Government notes, "[a]lthough Downhole succeeds in creating a stark comparison, Downhole fails to do so using substantiated reference points." United States' Br. 41. In particular, while Downhole Pipe argues the value of a finished drill pipe should not exceed the value of an individual input, like green tube, its comparison relies on the incorrect assumption that IHTS 7304.59.20 covers green tube exclusively and IHTS 7304.23.90 covers semi-finished or finished drill pipe exclusively. Appellants fail to provide any evidence in support of this proposition. For example, Appellants state "IHTS 7304.59.20 *most likely* also lacked entries of drill-pipe green tube," citing for support its own comments submitted in response to the draft remand results and the *InfoDrive*

data. Appellants' Br. 45 (citing P.J.A. 2289–91, 2305–26) (emphasis added). As noted above, Commerce provided substantial evidence to support its finding that the data from IHTS 7304.59.20 was the best available information on the record.

Finally, Downhole Pipe argues Commerce erred in relying on a memo from the National Import Specialist to confirm its selection of IHTS 7304.59 as the appropriate heading for drill pipe green tube. Specifically, Appellants claim they "expose[] six significant flaws, that cannot be filled in by Commerce's four *post hoc* attempts in the *Remand* to bolster the quality of the [National Import Specialist's] Memo." *Id.* at 49. These alleged flaws include (1) that Appellants cannot determine whether Commerce contacted the National Import Specialist by "email, letter, fax, telephone, over coffee, or through a friend"; (2) there is no indication that Commerce supplied the scope language to the National Import Specialist for her consideration; (3) there is no indication that a discussion of the scope language occurred, and therefore there is no record evidence establishing what the National Import Specialist considered prior to confirming Commerce's selection; (4) "there is no indication that the [National Import Specialist] has any training regarding how to classify imports under *IHTS* categories—or whether the [National Import Specialist] had any relevant training at all"; (5) the memo does not indicate whether Customs evaluated other IHTS categories or considered legal principles regarding how to classify drill pipe green tube; and (6) there is no indication of how Customs "confirmed" Commerce's IHTS classification decision. *Id.* at 49–52.

Given Commerce's well-reasoned explanation why data from IHTS 7304.59.20 constituted the best available information for valuing green tube, this court need not entertain this argument. As the CIT correctly noted: first, "Commerce did not rely solely on the [National Import Specialist] Memo in its analysis . . . [and] explained that

it 'confirmed' [its] analysis with the [Customs] official," and second, this "argument is entirely conjectural. [Appellants] insist that the [National Import Specialist] Memo contains several possible flaws, but fail to identify any evidence in the record supporting their assertions." *Downhole Pipe II*, 949 F. Supp. 2d at 1296; *see also* Petitioners' Br. 31 ("The bulk of Downhole's argument consists of totally unsupported speculation that when contacted by Commerce, . . . a senior [Customs] official, incompetently rendered an informal opinion without reviewing any of the necessary documents or understanding any of the legal principles involved. A presumption of correctness surrounds agency proceedings."). Substantial evidence supports Commerce's selection of the surrogate value for green tube.

CONCLUSION

For the foregoing reasons, the decision of the United States Court of International Trade is

**AFFIRMED**